JOINER, Judge.[1]
Anthony Lee (“Tony”) Stanley was convicted of capital murder for the intentional murder of Henry Smith by stabbing him during the course of a first-degree robbery, see § 13A-5-40(a)(2), Ala.Code 1975. During the penalty phase of Stanley’s trial, the jury, by a vote of 8 to 4, recommended that Stanley be sentenced to life imprisonment without the possibility of parole. After receiving a presentence-investigation report and conducting a sentencing hearing, the trial court overrode the jury’s recommendation, finding that the aggravating circumstances outweighed the mitigating circumstances, and sentenced Stanley to death. Stanley filed a motion for a new trial, which the court denied. Stanley appeals his capital-murder conviction and sentence of death.
The evidence introduced at trial showed the following. On Saturday, June 18, 2005, Henry Smith was stabbed to death in an apartment in Tuscumbia that Stanley shared with his wife, Shelly. The crime was discovered the following Monday, June 20, 2005, when the landlord’s son, Ronald Berryhill, cut the padlock on the apartment door. He accessed the apartment because his mother, Swanie Berry-hill, the landlord, had been told by Dorothy (“Dot”) Stanley, who actually leased the apartment from Swanie, that her son, Stanley, and his wife, Shelly, had left town and that several dogs remained inside the apartment. The medical examiner and forensic pathologist, Dr. Emily Ward, testi *246 fied that Smith died as a result of multiple stab wounds and severe head injuries.
Shelly Stanley testified that she and Stanley had been using illegal narcotics, including crack cocaine and OxyContin, for several days, including Friday evening into the early morning hours of Saturday, June 18, 2005. When they exhausted their supply of money and drugs, Stanley directed her to telephone Smith, an individual they knew to carry cash and pills. She called Smith under the guise that she was going to pay him for the pills she and Stanley had obtained from him that Friday night.[2] Stanley told her that he planned to rob and kill Smith. When Smith arrived at the Stanleys’ apartment, Shelly, while standing away from the door, called for Smith to come inside. As Smith entered the apartment, Stanley attacked him with an aluminum baseball bat, striking him in the face, the leg, and other parts of his body numerous times.[3] Stanley knocked Smith to the floor, took a steak knife from the top of a china cabinet, straddled Smith with his knees on the floor, and repeatedly stabbed him in the back, while Smith begged for his life.[4] When the steak knife bent, Stanley got another steak knife and continued to stab Smith.
Shelly testified that, while Stanley was stabbing Smith, she moved Smith’s truck, which Smith had left running outside the Stanleys’ apartment, behind the laundromat so that it was not visible from the road. When she returned to the apartment, she and Stanley searched Smith’s pockets and wallet. Because they found no cash or drugs, Stanley changed clothes, padlocked the apartment door, and left to search Smith’s apartment for money and pills. They ransacked Smith’s apartment, taking cash, change jars, and OxyContin pills, and returned to their apartment to get a 1987 maroon Toyota pick-up truck, which had been loaned to them by another acquaintance, Jonathan Patterson, who testified at trial that he was addicted to drugs and that he often purchased pills from the Stanleys.
Around 9:00 a.m. on Saturday morning, Stanley took Smith’s pick-up truck into the Colbert Heights area of Tuscumbia and abandoned it.[5] Shelly followed him in their borrowed pick-up truck. After abandoning Smith’s truck, they drove to Muscle Shoals and checked into a room at the Best Western hotel. They also purchased supplies from a nearby K-Mart discount store with the proceeds from the sale of the stolen OxyContin pills. Sometime that day, Shelly returned to their apartment in Tuscumbia and put a comforter over Smith’s body to prevent the several dogs that were in the apartment from disturbing it. Around noon that day, Shelly visited her daughter, Jenna Mitchell, and told her that she was going to be gone for awhile and needed to tell her and her granddaughter goodbye before she left.[6]
*247 According to Mitchell, Stanley was not with her mother that afternoon, and her mother was visibly upset and crying.[7]
The next morning, Sunday, June 19, 2005, Stanley and Shelly checked out of the hotel and returned to their apartment to pack their belongings. While there, they moved Smith’s body to the floor on the other side of their bed and covered the bloodstained floor with another carpet. Jonathan Patterson knocked on the door to retrieve the pick-up truck he had loaned to the Stanleys. When they did not answer the door, Patterson, using his extra set of keys, took his truck. They now were without transportation, and Stanley, who, according to Shelly, panicked, telephoned his mother, Dot, to come pick them up. Dot picked them up and drove them to Stanley’s sister’s house. They stayed there until Monday morning, June 20, 2005. According to Shelly, they used drugs throughout Sunday evening.
On Monday morning, Dot drove Stanley and Shelly to the Colbert Heights area near where they had left Smith’s truck on Saturday. Stanley and Shelly drove Smith’s truck to a friend’s house in Rus-sellville, where they left their duffel bags they had packed on Sunday. While driving back to Muscle Shoals that afternoon, Stanley telephoned his mother, and she informed him that the Berryhills planned to enter their apartment that afternoon because they believed the Stanleys had left town and they were concerned about the dogs that had been left in the apartment. The Stanleys drove back to the Colbert Heights area, abandoned the truck a second time, and spent the next several days hiding in the woods with only a cooler containing their cellular telephones, wallets, and toothbrushes.[8]
Christie Smith, the victim’s daughter, testified that she tried to locate her father on Saturday and Sunday without success. When she drove by her father’s apartment early Sunday morning, she noticed that neither he nor his truck was there. She realized something was wrong. She returned a second time later that day and noticed the door to the apartment ajar. While Christie waited outside, Janice Ber-ryhill, a family friend who had dated Smith, went into the apartment and discovered that the place had been ransacked.
On Sunday evening, Christie filed a missing-person report with the Tuscumbia Police Department. At the police station, Christie encountered Patterson, who was also filing a police report because his house had been burglarized on or around June 16, 2005, and a shotgun, among other things, had been stolen. Patterson told Christie that he believed Shelly had sold her father, Smith, the shotgun taken from his house. Patterson also told Christie that he last saw Christie’s father on Friday night around 11:00 p.m. when he dropped him off at his apartment.
Patterson, who worked out of town as an engineer for the Tennessee Valley Authority (“TVA”), testified at trial that he believed Shelly had broken into his house sometime earlier, during the week of the murder, because she had done so once before when he was away. In addition, Patterson’s neighbor told him that he had seen the truck Patterson had loaned the Stanleys at his house during the week he *248 was away. When Patterson confronted Shelly on or around Friday, June 17, 2005, she denied that she had stolen the shotgun and other items. Later that evening, Patterson spoke to Smith on the telephone around 9:00 p.m. and Smith had agreed to help him locate the Stanleys because, during their conversation, Patterson and Smith realized that Shelly had sold Patterson’s missing shotgun to Smith for $50. Smith rode with him to look for the Stan-leys until around 11:00 p.m., when Patterson dropped Smith off at his apartment.[9]
On Monday morning, Christie met and talked with Capt. Jim Heffernan of the Tuscumbia Police Department at her father’s apartment regarding the missing-person report. Doug Hendon, also a family friend, accompanied her. Later that day, Capt. Heffernan had a roll-call meeting with the on-duty police officers and informed the officers of the missing-person report regarding Smith. Capt. Heffernan also told the police officers that he was looking for Shelly for questioning concerning a separate incident involving a shotgun and other items that had been stolen from Patterson’s house. He told the officers that Smith and the Stanleys were acquaintances. Capt. Heffernan issued a BOLO[10] for the Stanleys.
Around 5:80 p.m. on Monday, one of the officers on a routine patrol, Stuart Setliff, who had taken the missing-person report on Smith from his daughter, saw.three people gathered outside the Stanleys’ apartment. Thinking that one of the individuals might be one of the Stanleys or Smith, Officer Setliff stopped, approached the apartment, and learned that the three people there were Swanie Berryhill, the owner of the apartment, her son Ronald Berryhill, and Dot, Stanley’s mother. As noted, the Berryhills had called Dot because they wanted to get into the apartment based on their concern that Stanley and Shelly had left dogs unattended in the apartment. Officer Setliff called Capt. Heffernan, informing him that the landlord was going to cut the padlock on the door of the apartment.[11]
Ronald testified that he had learned that Stanley and Shelly were leaving town because Shelly had a warrant for her arrest. Ronald stated that he had already knocked on the door on Sunday and earlier in the day on Monday, with no answer, and he had heard dogs barking. After Ronald drove his mother and Dot to the apartment, Dot informed them that she did not have a key to the apartment. Ronald left them at the apartment with Officer Setliff, who had recently arrived, and went to get bolt cutters. When he returned to the apartment, he cut the padlock on the door, and Officer Setliff accompanied him into the apartment.[12] Officer Setliff testified *249 that he had informed Ronald before he cut the lock that a missing-person report had been filed on Smith. Ronald testified that he had already learned from Christie on Sunday that her father was missing. According to Ronald, Officer Setliff also informed him that a warrant had been issued for Stanley.
When Ronald and Officer Setliff entered the apartment, they saw a comforter rolled up near the bed, and they exited the apartment. Officer Setliff called Capt. Heffer-nan. Based on Officer Setliffs call, Capt. Heffernan drove to the Stanleys’s apartment.[13] Capt. Heffernan arrived shortly after Ronald and Officer Setliff exited the apartment. Capt. Heffernan, who also served as the Colbert County Coroner, testified to smelling the odor of decomposition when he arrived at the scene and approached the doorway of the apartment.
Officer Setliff, upon direction from Capt. Heffernan, lifted up a corner of the comforter on the floor, which revealed a dead body lying face down with a knife in its back and several gash wounds on its head. Capt. Heffernan did not know the identity of the body. He ordered everyone out of the apartment and left to obtain a search warrant. Officer Setliff taped off and secured the crime scene. Ronald drove Dot, who was crying, to her house.
At around 9:00 p.m. on Monday evening, Capt. Heffernan returned with a search warrant and additional personnel and searched the apartment. Ronald and Doug Hendon identified the body as Smith’s. Capt. Heffernan discovered that Smith had a knife embedded in his back. Capt. Heffernan also found a bent steak knife, a machete covered in blood, and drug paraphernalia in the apartment. Capt. Heffernan collected the evidence. He and Officer Ricky Joe Little photographed the crime scene. During the search of the apartment, Officer Setliff and Officer Little were called to Dot’s house twice. The second time the officers were called to her house, they were told that Stanley and his wife could be located in the Colbert Heights area of Tuscumbia.
Tuscumbia police officers began looking for the Stanleys late Monday evening, June 20, 2005. Law-enforcement officers found Smith’s truck early Tuesday morning on Valley View Road in the Colbert Heights area of Tuscumbia. Smith’s truck was dusted for fingerprints but revealed no matches. Finally, on Thursday, June 28, 2005, Stanley and Shelly came out of the woods and traveled to Dot’s house with the intention of taking Dot’s car and leaving town. When family members saw them near Dot’s house, however, they decided to . surrender to the police.
The retired Chief of Police of Tuscum-bia, Wayne Burns, picked them up at Dot’s house at their request and transported them to the police station, where they were arrested for the murder of Smith.[14]
*250 During the ride to the station, Retired Chief Burns testified that he advised them of their rights and notified the police station that he was bringing them to the station. Chief Burns stated that Stanley’s and Shelly’s clothes were crumpled and dirty like they had slept in them. They indicated to Chief Burns that they had slept in the woods for several days. According to Chief Burns, while being transported, Stanley told Shelly that law enforcement was not going to play them against each other. Once they arrived at the station, officers photographed them. The photographs introduced at trial showed that they both suffered from rashes caused by poison oak. Stanley also had a laceration on his back and what appeared to be a “carpet burn” on his knee.
The evidence at trial revealed that Smith suffered 36 stab wounds; his internal organs were damaged by stab wounds to the abdomen. Samples taken from the knives and machete matched Smith’s DNA. Dr. Emily Ward, medical examiner with the Alabama Department of Forensic Sciences, testified that the four visible lacerations on the top of Smith’s head could have been caused by several blows from either a baseball bat or a machete. She testified that his nose was broken, as were his upper and lower jaws. He had stab wounds on his back and right thigh and defensive wounds on his hands.
At the close of the State’s case-in-chief, Stanley renewed his motion to suppress the evidence taken from his apartment. He also renewed his motion to strike Shelly’s testimony on the ground that her testimony was not voluntary, but coerced. Stanley also moved for a judgment of acquittal on the capital-murder charge, arguing that the State had failed to prove a prima facie case of robbery.
Additionally, before Stanley presented his case, his defense counsel requested the trial judge to allow him to establish matters for the record outside the presence of the jury. Stanley’s defense counsel stated that he, his cocounsel, and investigators had made numerous attempts to locate Zack Jackson, an alleged material witness. Defense counsel informed the court that officers from the Colbert County Sheriffs Department had been looking for Jackson for more than a week to serve him with a subpoena for trial and to arrest him on an outstanding warrant. When the judge inquired whether counsel was asking the judge to take any action on the matter, defense counsel indicated that he simply wanted the record to reflect that all efforts had been made to locate Jackson.
The State called Chief Deputy Travis Long to testify about the efforts to locate Jackson. Deputy Long testified that he first became aware on Monday, April 2, 2007, that defense counsel was looking for Jackson. The warrant for Jackson’s arrest was issued on Friday, April 6, 2007. He testified that the sheriffs department was supplied with several addresses for Jackson and had repeatedly physically searched the residences at those addresses but had been unable to locate Jackson by the time of trial on April 9, 2007.
Defense counsel presented the testimony of several witnesses who testified that Shelly was equally, if not primarily, responsible for the plot to kill and for the killing of Smith. According to Shelly’s cellmate, Shelly told her that she used the steak knifes and Stanley used the machete to kill Smith. Dot testified that she rented the apartment her son and daughter-in-law shared from Swanie. Dot stated that, although she drove them to and dropped them off in the Colbert Heights area, she did not drop them at her daughter’s house that weekend. She stated that she was not in contact with them on Monday, the day Smith’s body was discovered in their *251 apartment. She turned the cooler they had carried while in hiding over to the police shortly after they were arrested. It contained Stanley’s key ring with a key to the padlock on the apartment. She testified, however, that she did not know anything about their cell phones, which were allegedly in that cooler.
On rebuttal, the State called Ronald and his sister, Janice Berryhill.[15] Ronald testified that he and his mother, Swanie, picked Dot up on the afternoon of Monday, June 20, because they assumed she had a key to the apartment because she had leased the apartment from Swanie. When Dot informed them that she did not have a key, Ronald asked if he could use bolt cutters to cut the padlock and get the dogs out of the apartment. Dot told him that she did not want to go into the apartment but that he could cut the lock and enter and retrieve the dogs. When Ronald left the apartment, he informed his mother and Dot that Smith’s body had been found and Dot then asked Ronald to drive her home. Janice testified that Dot informed her she had spoken to Stanley and he had stated he and Shelly had not seen Smith since Friday evening. According to Janice, Dot said that Stanley and Shelly were packing to leave town because a warrant had been issued for Shelly’s arrest.
Both sides rested, and the trial court instructed the jury on the applicable law. The jury returned a verdict finding Stanley guilty of capital murder, as charged in the indictment.
During the penalty phase of Stanley’s trial, Smith’s daughters and Smith’s close friend, Janice Berryhill, testified concerning Smith’s character and the impact of Smith’s death on his friends, his family, and the community. The State submitted evidence of Stanley’s prior felony conviction for first-degree robbery.
Stanley presented several witnesses who testified that Stanley had witnessed and endured poverty, neglect, and abuse from his father, who was an alcoholic. Those witnesses testified that Stanley’s father had engaged in extramarital affairs and that Stanley’s mother was often absent during his developing years. Stanley’s mother testified that Stanley was also introduced to alcohol at around nine years of age and that he was introduced to drugs at an early age.
After both sides rested and the trial judge had instructed the jury on the law applicable to the penalty-phase proceeding, the jury recommended, by a vote of 8 to 4, that Stanley be sentenced to life imprisonment without the possibility of parole. The trial court overrode the jury’s recommendation and sentenced Stanley to death. This appeal, which is automatic in a case involving the death penalty, followed. See § 13A-5-53, Ala.Code 1975.

Standard of Review

On appeal from his conviction and sentence, Stanley raises 19 issues, many of which he did not raise in the trial court. Because Stanley has been sentenced to death, however, this Court must review the lower-court proceedings for plain error. See Rule 45A, Ala. R.App. P.[16]
*252 “ ‘Plain error is defined as error that has “adversely affected the substantial right of the appellant.” The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is “particularly egregious” and if it “seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.” See Ex parte Price, 725 So.2d 1068 (Ala.1998), cert, denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999).’”
Ex parte Brown, 11 So.3d 933, 935-36 (Ala.2008) (quoting Hall v. State, 820 So.2d 113, 121-22 (Ala.Crim.App.1999)). See Ex parte Walker, 972 So.2d 737, 742 (Ala.2007); Ex parte Trawick, 698 So.2d 162, 167 (Ala.1997); Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998) (“To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s ‘substantial rights,’ but it must also have an unfair prejudicial impact on the jury’s deliberations.”). See also Harris v. State, 2 So.3d 880, 896 (Ala.Crim.App.2007) (quoting Hall v. State, 820 So.2d 113, 121-22 (Ala.Crim.App.1999)). Although Stanley’s failure to object at trial will not preclude this Court from reviewing an issue, it will weigh against any claim of prejudice he now makes on appeal. See Dotch v. State, 67 So.3d 936, 965 (Ala.Crim.App.2010) (citing Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991)). Further,
“ ‘ “the plain error exception to the contemporaneous objection rule is to be ‘used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.”” Whitehead v. State, [777 So.2d 781], at 794, [(Ala.Crim.App.1999) ], quoting Burton v. State, 651 So.2d 641, 645 (Ala.Crim. App.1993), affd, 651 So.2d 659 (Ala.1994), cert, denied, 514 U.S. 1115, 115 S.Ct. 1973,131 L.Ed.2d 862 (1995).”
Centobie v. State, 861 So.2d 1111, 1118 (Ala.Crim.App.2001).

Guilt-phase Issues

I.
Stanley, a Caucasian male, argues that the State used its peremptory challenges to exclude female prospective jurors in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419,128 L.Ed.2d 89 (1994). Stanley claims the record raises an inference of discrimination because the State struck 10 females out of 23 potential female jurors, while defense counsel only struck 4 females. The jury consisted of 8 females and 4 males. Specifically, in its written sentencing order, the trial court stated:
“The make-up of the jury was as follows: Three (3) white men, one (1) black man, five (5) white women and three (3) black women.”
(C. 273.) Stanley maintains this Court should remand the case for a Batson hearing. Stanley did not raise a Batson objection at trial. Accordingly, we review his argument under the plain-error standard. Rule 45A, Ala. RApp. P.
With regard to a finding of plain error pursuant to Batson or J.E.B., “the record must supply an inference that the prosecutor was ‘engaged in the practice of purposeful discrimination.’ Ex parte Watkins, 509 So.2d 1074, 1076 (Ala.1987).” Blackmon v. State, 7 So.3d 397, 425 (Ala.Crim.App.2005). Plain error is
“error that is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings. Ex parte Taylor, 666 So.2d 73 *253 (Ala.1995). The plain error standard applies only where a particularly egregious error occurred at trial and that error has or probably has substantially prejudiced the defendant. Taylor.”
Ex parte Trawick, 698 So.2d at 167.
“In Batson the United States Supreme Court held that black venire-members could not be struck from a black defendant’s jury because of their race. In Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), the court extended its decision in Batson to apply also to white defendants.... The United States Supreme Court in Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), held that the protections of Batson were also available to defense counsel in criminal trials. The Alabama Supreme Court has held that the protections of Batson apply to the striking of white prospective jurors. White Consolidated Industries, Inc. v. American Liberty Insurance, Co., 617 So.2d 657 (Ala.1993).”
Grimsley v. State, 678 So.2d 1194, 1195 (Ala.Crim.App.1995). “J.E.B. extends the principles of Batson and its progeny to gender discrimination.” Weaver v. State, 682 So.2d 488, 490 (Ala.Crim.App.1996).
“A party making a ... J.E.B. challenge bears the burden of proving a prima facie case of discrimination and, in the absence of such proof, the prosecution is not required to state its reasons for its peremptory challenges. Ex parte Branch, 526 So.2d 609 (Ala.1987); Ex parte Bird, 594 So.2d 676 (Ala.1991). In Branch, this Court discussed a number of relevant factors a defendant could submit in attempting to establish a prima facie case of racial discrimination; those factors are likewise applicable in the case of a defendant seeking to establish gender discrimination in the jury selection process. Those factors, stated in a manner applicable to gender discrimination, are as follows: (1) evidence that the jurors in question shared only the characteristic of gender and were in all other respects as heterogenous as the community as a whole; (2) a pattern of strikes against jurors of one gender on the particular venire; (3) the past conduct of the state’s attorney in using peremptory challenges to strike members of one gender; (4) the type and manner of the state’s questions and statements during voir dire; (5) the type and manner of questions directed to the challenged juror, including a lack of questions; (6) disparate treatment of members of the jury venire who had the same characteristics or who answered a question in the same manner or in a similar manner; and (7) separate examination of members of the venire. Additionally, the court may consider whether the State used all or most of its strikes against members of one gender.”
Ex parte Trawick, 698 So.2d at 167-68. See Sharifi v. State, 993 So.2d 907, 927 (Ala.Crim.App.2008). See also Dotch v. State, 67 So.3d 936, 982 (Ala.Crim.App.2010).
Guided by these principles of law, we consider Stanley’s Batson claims in turn.
A.
Stanley asserts that there was a pattern of purposeful strikes against women because the State used 10 of its 14 strikes to eliminate females from the panel. In particular, Stanley focuses his argument on the number of women the State stuck and argues that it was significant that four of the prosecution’s first five strikes were used against women.
The strike list shows that Stanley’s jury was struck from 69 potential jurors, 31 males and 38 females. A male juror and female juror who were not originally on *254 the jury list were added to the venire. Twenty-two members of the jury pool, 9 males and 13 females, were either absent or excused. The trial court excused 5 jurors, 3 of whom were female, dismissed a male juror who did not live in Colbert County, added a female juror who showed up after being contacted by the sheriffs department, and excused 3 jurors for cause, 2 of whom were females. During jury selection, the prosecution struck 14 jurors, 10 of whom were females. The defense, out of 14 possible strikes, struck 10 males. As mentioned above, Stanley’s petit jury was composed of 8 women and 4 men.
An examination of the voir dire proceedings shows Stanley failed to establish an inference that the prosecution struck jurors based solely on their gender. Stanley references only numbers, and this Court has held that numbers or percentages alone will not substantiate a ease of discrimination in this context. Banks v. State, 919 So.2d 1223, 1230 (Ala.Crim.App.2005) (“[Statistics and opinion alone do not prove a prima facie case of discrimination. See Johnson v. State 823 So.2d 1 (Ala.Crim.App.2001).”); Armstrong v. State, 710 So.2d 531, 533 (Ala.Crim.App.1997) (“ ‘[Ejven a showing that [a] party had struck a high percentage of strikes used against a minority was not enough alone. In Ex parte Trawiclc, 698 So.2d 162, 168 (Ala.1997), the Alabama Supreme Court held, “Without more, we do not find that the number of strikes this prosecutor used to remove women from the venire is sufficient to establish a prima facie case of gender discrimination.” ’ ”).
The record shows that the State struck all jurors, male and female, who indicated that they had a problem with the death penalty. “Mixed feelings or reservations regarding imposition of the death penalty are valid race-neutral reasons for peremptory strikes.... ” Acklin v. State, 790 So.2d 975, 988 (Ala.Crim.App.2000). See also Mashburn v. State, 7 So.3d 453 (Ala.Crim.App.2007), and Hooker v. State, 840 So.2d 197 (Ala.Crim.App.2002). “Although a juror’s reservations about the death penalty may not be sufficient for a challenge for cause, his [or her] view may constitute a reasonable explanation for the exercise of a peremptory strike.” Johnson v. State, 620 So.2d 679, 696 (Ala.Crim.App.1992), rev’d, on other grounds, 620 So.2d 709 (Ala.1993).
The first five jurors the prosecution struck were juror no. 53, a male, and jurors no. 100, no. 143, no. 106, and no. 95, all females. All these jurors indicated during voir dire examination that they had a problem with imposing the death penalty. Individual voir dire of these five jurors regarding their views on the death penalty occurred in the same order. Additionally, although an individual voir dire examination of jurors no. 48 and juror no. 146, who were female, was conducted concerning their views on the death penalty, they were struck for cause.[17] During jury selection, the record indicates that the prosecution uniformly struck these five jurors who indicated that they had a problem with the death penalty in the exact order in which each had spoken during voir dire. Thus, we find no error, plain or otherwise.
B.
Stanley claims he demonstrated a prima facie case of gender discrimination. In so arguing, he contends he demonstrated several of the factors set forth in Ex parte Branch and Ex parte Trawick factors.
*255 1.
Stanley submits that the State failed to meaningfully question the female venire-members. Stanley claims that the prosecution stuck female jurors no. 27, no. 121, no. 130, no. 88, no. 79, and no. 141, with little to no individual voir dire questioning. More particularly, Stanley contends that the State’s striking of juror no. 130, who provided only background information during voir dire, indicates a lack of meaningful questioning.
The strike of one juror does not prove that the prosecution did not engage in meaningful questioning. See Taylor v. State, 808 So.2d 1148, 1164 (Ala.Crim.App.2000) (holding that there was “no indication of a lack of questioning or a lack of any meaningful questioning of any venire-member by the prosecution” where four of the black veniremembers who were struck were not asked questions individuálly by the prosecution). The record shows that the prosecution conducted a thorough questioning of the jury as a whole and then later conducted individual voir dire examination for certain veniremembers based on their responses to questions. The record also shows that the State questioned both male and female jurors alike on numerous issues, including whether any jurors had knowledge of the facts of the case, whether any jurors knew any of the individuals associated with the case, whether any jurors had any previous involvement in the criminal prosecution process, and whether the jurors had individual opinions on topics such as reasonable doubt and the death penalty. Additionally, the prosecution’s striking of a male juror, no. 6, who also provided only general background information during voir dire, nullifies Stanley’s argument that juror no. 130 was struck solely based on gender. (R. 177-78, 202-03, 340.) Accordingly, we do not find a lack of meaningful voir dire directed at the female veniremembers.
2.
Stanley alleges that the State treated prospective jurors who answered voir dire questions similarly in a disparate manner. Disparate treatment occurs when “jurors give similar answers to the same questions, yet one group is struck on the basis of that answer while another is not.” See Taylor, 808 So.2d at 1164 (Ala.Crim.App.2000) (citing Ex parte Branch, 526 So.2d 609, 624 (Ala.1987)). A thorough review of the voir dire proceedings demonstrates that the selected female and male jurors Stanley compares are not similarly situated and that there was no disparate treatment in this case.
For example, Stanley cites the prosecution’s striking of juror no. 100, a female, who indicated she had a close relative who had been convicted of a crime, but did not strike jurors no. 63 and no. 58, males, who indicated they either personally had been charged with a crime or had a close relative who had been convicted of a crime. “ ‘Striking a prospective juror because a member of the juror’s family has been convicted of a crime is a valid race-neutral reason under Batson.’ Lewis v. State, 741 So.2d 452, 456 (Ala.Crim.App.1999).” Gobble v. State, 104 So.3d 920, 949 (Ala.Crim.App.2010). See Johnson v. State, 43 So.3d 7, 12 (Ala.Crim.App.2009) (upholding strikes of prospective jurors who have convictions or who have relatives who have prior arrests or convictions); Brown v. State, 982 So.2d 565 (Ala.Crim.App.2006) (same); Addin v. State, 790 So.2d 975, 988 (Ala.Crim.App.2000) (same); Thomas v. State, 611 So.2d 416 (Ala.Crim. App.1992) (same); Jackson v. State, 549 So.2d 616 (Ala.Crim.App.1989) (same). There is no disparate treatment in this case because juror no. 100 and jurors no. 63 and no. 58 are not similarly situated *256 under Miller-El v. Dretke, 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005), as claimed by Stanley. Juror no. 100 stated that her mother-in-law had been found guilty of murdering her husband. Juror no. 63 stated that he had a driving-under-the-influenee charge in 1987 and juror no. 58 indicated that he had been charged with driving under the influence and assault. (R. 256.)[18] In light of the facts of this case, a juror whose relative, even by marriage, has been found guilty of murder does not appear to be similarly situated to jurors who have been charged with less serious offenses.
Juror no. 100 also stated, as mentioned above, that she had a problem with imposing the death penalty. Additionally, she stated that she knew the primary investigator in the case and that she had read the newspaper story about the trial on the morning jury selection began. Click v. State, 695 So.2d 209, 220 (Ala.Crim.App.1996) (a juror’s view on the death penalty is a valid race-neutral reason for striking the prospective juror); Temmis v. State, 665 So.2d 953 (Ala.Crim.App.1994) (fact that prospective juror knows witness is valid race-neutral reason for removing the juror); Jelks v. Caputo, 607 So.2d 177, 178 (Ala.1992) (fact that juror read a newspaper article about the case is a race-neutral reason for striking the juror).
Stanley also claims disparate treatment of jurors where juror no. 79, a female, was struck by the State, and yet other similarly situated males were not struck. The record, however, shows juror no. 98, a male, was struck by the prosecution because he, like juror no. 79, knew someone in law enforcement. Stanley further claims disparate treatment of jurors because juror no. 88, a female, and juror no. 8, a male, both had a relationship with defense counsel, the prosecution struck only juror no. 88. The record, however, indicates that juror no. 88 and juror no. 8 were not similarly situated. Juror no. 88 stated that she was an acquaintance of the wife of one of the defense counsel and that she knew the family of the other defense counsel and attended church with defense counsel and his family. Juror no. 8 simply stated that he -had retained one of the defense attorneys 11 years before Stanley’s trial and did not know him other than in that professional capacity.
Stanley also asserts that jurors no. 100 and no. 121, females, and juror no. 84, a male who served on the jury, were treated differently, even though they all stated that they knew Capt. Heffernan, the primary investigator for the State. Jurors no. 100 and no. 121, however, indicated a close association with Capt. Heffernan through their families, but juror no. 84, who worked in the funeral business, stated that he had only a professional association with Capt. Heffernan, who served as county coroner.
Thus, the examples offered by Stanley do not support his claims that similarly situated jurors were treated disparately. Consequently, Stanley’s claim does not raise an inference of purposeful discrimination on the ground of disparate treatment. See, e.g., Blackmon, 7 So.3d at 425-26 (Ala.Crim.App.2005) (finding no inference of purposeful discrimination in violation of J.E.B.)- Nothing in the record indicates that similarly situated female jurors and male jurors were treated differently by the prosecution.
3.
Stanley argues that the 10 women struck by the State were a heterogeneous *257 group who shared only their gender as characteristic. As this Court explained on this issue:
“This indicia of discrimination has been described as
“ ‘ “[e]vidence that the ‘jurors in question share[d] only this one characteristic — then' membership in the group — and that in all other respects they [were] as heterogeneous as the community as a whole.’ [People u] Wheeler, 22 Cal.3d [258,] at 280, 588 P.2d [748,] at 764, 148 Cal.Rptr. [890,] at 905 [ (1978) ]. For instance ‘it may be significant that the persons challenged, although all black, include both men and women and are a variety of ages, occupations, and social or economic conditions,’ Wheeler, 22 Cal.3d at 280, 583 P.2d at 764, 148 Cal.Rptr. at 905, n. 27, indicating that race was the deciding factor.” ’ Brown v. State, 74 So.3d 984, 1022 (Ala.Crim.App.2010).”
McMillan v. State, 139 So.3d 184, 202 (Ala.Crim.App.2010).
Although the female potential jurors may initially appear to share only the characteristic of gender, “the information provided by them during voir dire examination is pertinent here, as well as in evaluating whether they were treated differently from potential [male] jurors.” McMillan, 139 So.3d at 202. Although the female jurors who were struck varied in age and some female jurors worked and some did not, these jurors did not share only the characteristic of gender. See Ex parte Trawick, 698 So.2d at 167-68 (courts may consider “evidence that the jurors in question shared only the characteristic of gender and were in all other respects as heterogeneous as the community as a whole.”). The responses during voir dire indicate that many of the jurors shared similar backgrounds and viewpoints concerning criminal prosecutions.
As stated above, jurors no. 95, no. 100, no. 106, and no. 143 shared the view that they would have a difficult time voting for the death penalty. Jurors no. 27, no. 88, and no. 141 had previously read information about Stanley’s case in the newspaper, as did juror no. 100. Jurors no. 79 and no. 100 indicated that they had close relatives who had been charged with criminal offenses. Jurors no. 79, no. 88, and no. 100 knew law-enforcement officers, who were either their relatives, close friends, or witnesses in Stanley’s trial. Accordingly, we do not find sufficient evidence indicating that the female veniremembers who were struck shared only the characteristic of gender.
4.
Stanley next maintains that the Colbert County District Attorney’s Office has a history of gender discrimination in its jury selection. Stanley cites three cases from the early 1990s in which the Colbert County District Attorney’s Office was found to have engaged in racial discrimination in selecting juries. These somewhat remote instances, however, are not sufficient to establish a history of gender discrimination. Although “[o]ne instance ... is not sufficient to establish a history of gender discrimination,” Clark v. State, 896 So.2d 584, 617 (Ala.Crim.App.2000), Stanley has not cited even a single case in which a court has found that the Colbert County District Attorney’s office has violated J.E.B. See Clark, 896 So.2d at 617 (holding that there was no plain error on a J.E.B. claim, where the appellant alleged racial and gender discrimination but cited only one case where the district attorney was found to have engaged in gender discrimination). Gender discrimination is not reflected in or indicated by the record in Stanley’s case. See Sharifi, 993 So.2d at 928 (no inference from the record of discriminatory use of *258 peremptory challenges by the prosecutor despite Sharifi’s argument that Madison County has a long history of violating Bat-son and that the number of strikes used by the State indicated prejudice). See also Dotch, 67 So.3d at 982. Stanley presented no evidence that the prosecutor had a history of misusing peremptory challenges so as to discriminate against females.
5.
Stanley asserts that the prosecution used gender-based stereotypes during the guilt-phase closing arguments and also during the penalty-phase arguments.[19] Specifically, Stanley cites the prosecutor’s argument during the guilt-phase rebuttal closing argument, where he stated as follows:
“[PROSECUTOR]: .... Is it more likely she did it or Tony did it?
“The one thing that is so convincing to me in this case — And I want to ask you this in the form of a question: Do you think a 115-pound woman did this to Henry Smith?
“(Counsel displays several pictures to jury.)
“[PROSECUTOR]: Look at this. Is that what you think? Is that what you really believe: That a 115-pound woman did this?
“... Think Shelly Stanley did that? Think she did that by herself, 115-pound woman?
“Look at those gashes in that head from that machete. Look at that. You think she did that? Those knife wounds, look at all those stab wounds. 38 of them, I think she testified to. Look at that. They want you to believe Shelly Stanley did that by herself. Ridiculous to believe something like that.
“Now, Dr. Ward told you it was a tremendous blow, tremendous blow that broke his face. Who is more likely to deliver that tremendous blow: This 115-pound woman or Tony Stanley? Just use your common sense. Human nature, a man and a woman there, who is going to do it? Back up so you don’t get hit. A man delivered that. No woman delivered that lick. Broke his face.”
(R. 1055-56.) Stanley also submits, during the penalty-phase closing argument, the prosecutor’s following statement: “You know, it doesn’t — use your common sense. Is that the work of a man or woman?” (R. 1191.)
It is well settled that
“ ‘[d]uring closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.’ Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Cr.App.1987), rev’d on other grounds, 523 So.2d 1118 (Ala.1988) (citation omitted). Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). ‘In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, ... each case must be judged on its own merits,’ Hooks v. State, 534 So.2d 329, 354 (Ala.Cr.App.1987), affd, 534 So.2d 371 (Ala.1988), cert, denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989) (citations omitted) (quoting Barnett v. State, 52 Ala.App. 260, 264, 291 So.2d 353, 357 (1974)), and the remarks must be evaluated in the context of the whole trial, Duren v. State, 590 So.2d 360 (Ala.Cr. App.1990), affd, 590 So.2d 369 (Ala.1991). ‘In order to constitute reversible *259 error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury.’ Mitchell v. State, 480 So.2d 1254, 1257-58 (Ala.Cr.App.1985) (citations omitted). ‘To justify reversal because of an attorney’s argument to the jury, this court must conclude that substantial prejudice has resulted.’ Twilley v. State, 472 So.2d 1130, 1139 (Ala.Cr.App.1985) (citations omitted).”
Coral v. State, 628 So.2d 954, 985 (Ala.Crim.App.1992).
Stanley’s defense strategy involved arguing to the jury that his wife, Shelly, murdered Smith alone or was more culpable in the murder than was he. Stanley’s defense counsel first presented this theory during opening arguments. During cross-examination of the medical examiner, Dr. Emily Ward, defense counsel elicited testimony regarding whether it was possible that a woman could have caused the injuries to Smith that resulted in his death. Additionally, during closing arguments, defense counsel repeatedly asserted that Shelly was the more culpable of the two.
In response to defense counsel’s theory that Shelly alone murdered Smith, during rebuttal the prosecutor argued that Shelly alone could not have physically murdered Smith based on facts in evidence. The evidence showed that this was a brutal murder in which Smith was stabbed numerous times. Dr. Ward testified that a tremendous amount of force would have been necessary to break Smith’s facial bones. The evidence revealed Shelly weighed around 120 pounds at the time of the murder and Smith weighed over 236 pounds. Additionally, Stanley and Shelly were seen together after the murder and were seen each driving a different pick-up truck. Thus, contrary to Stanley’s contention, a legitimate argument based on the facts in evidence before the jury rebutted defense counsel’s claim that Shelly acted completely alone in the murder of Smith or was the more culpable party.
This Court’s review of the closing arguments indicates that in the complained-of remarks the prosecutor was replying in kind to defense counsel’s argument that Shelly acted alone in killing Smith. See Broadnax v. State, 825 So.2d 134, 183 (Ala.Crim.App.2000) (finding no plain error where the prosecutor was replying in kind to defense counsel’s argument that the defendant did not commit the murders); Chandler v. State, 615 So.2d 100, 110 (Ala.Crim.App.1992) (stating that the prosecutor has a right to comment on statements made by defense counsel in closing argument). See also McWhorter v. State, 781 So.2d 257 (Ala.Crim.App.1999) (same); Ballard v. State, 767 So.2d 1123, 1135 (Ala.Crim.App.1999) (“A prosecutor has a right to reply in kind to the argument of defense counsel. This ‘reply-in-kind’ doctrine is based on fundamental fairness.”); Harris, 2 So.3d at 920 (same); Brown v. State, 11 So.3d 866, 903 (Ala.Crim.App.2007). None of the comments so infected the trial with unfairness that Stanley was denied a fair trial. See Don-nelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Moreover, the trial court thoroughly instructed the jury on more than one occasion that the arguments of counsel were not evidence in the case. We presume that the jury followed the trial court’s instructions. See Taylor v. State, 666 So.2d 36 (Ala.Crim.App.1994).
In summary, regarding the Batson and J.E.B. challenge, after thoroughly reviewing the record and the voir dire examination and considering the factors established by Ex parte Branch and Ex parte Trawick, we conclude that the record does not raise an inference of any intentional or purposeful discrimination. We conclude *260 only that the prosecutor used many of his strikes to remove women from the venire. “Without more, we do not find that the number of strikes this prosecutor used to remove women [or blacks] from the venire is sufficient to establish a prima facie case of gender [or racial] discrimination.” Ex parte Trawick, 698 So.2d at 168; Ex parte Branch, 526 So.2d at 622-23. See Burgess v. State, 827 So.2d 134, 150 (Ala.Crim.App.1998) (holding on plain-error review that there was no inference of discrimination where the only evidence presented was that the prosecution used 11 out of 15 strikes to remove women from the jury); Clark, 896 So.2d at 616-17 (finding no plain error were prosecutor used 9 of 14 strikes to remove women from the jury); Whitehead v. State, 777 So.2d 781, 804 (Ala.Crim.App.1999) (holding on plain-error review that there was no inference of discrimination where 17 out of 20 veniremembers struck were women, but 9 women remained on jury). See also Cooper v. State, 912 So.2d 1150, 1156-57 (Ala.Crim.App.2005) (holding that the State’s use of 12 of 15 peremptory strikes to remove women from venire was insufficient to establish prima facie case of gender discrimination); Minor v. State, 780 So.2d 707, 765 (Ala.Crim.App.1999), rev’d on other grounds, 780 So.2d 796 (Ala.2000) (finding that capital-murder defendant failed to establish that State’s use of 11 of its 17 strikes to remove women from venire established prima facie showing of gender discrimination, where prosecutor conducted thorough and meaningful voir dire examination, nothing in prosecutor’s questions or comments indicated intent to discriminate based on gender or that female veniremembers were treated differently by state than male venire-members, and no evidence was presented indicating that prosecutor had history of discriminating against women when using peremptory challenges); Pressley v. State, 770 So.2d 115, 127 (Ala.Crim.App.1999) (same). Therefore, because we find no error, plain or otherwise, a remand for a Batson hearing is not warranted in this case.
II.
Stanley asserts that the trial court improperly denied him a fair trial and an impartial jury in several respects. (Stanley’s brief, Issue XII, pp. 100-08.) “A trial court is vested with discretion in the conduct of a trial, and appellate courts will not interfere with the exercise of that discretion unless it clearly appears that there has been an abuse of discretion.” Carden v. State, 621 So.2d 342, 346 (Ala.Crim.App.1992). Furthermore, “the process of voir dire examination remains within the sound discretion of the trial court.” State v. Watts, 35 So.3d 1, 5 (Ala.Crim.App.2009). Applying these principles, we address each of Stanley’s assertions below.
A.
Stanley claims that the trial court erred by failing to remove two jurors for cause because, he says, the jurors could not be fair and impartial. More particularly, Stanley contends juror no. 25 should have been removed for cause because he knew the victim’s daughter. He also alleges juror no. 90 should have been removed for cause because she followed the case on television and in the newspapers. Stanley never moved that these prospective jurors be removed for cause based on any alleged bias on the jurors’ part. Therefore, we are limited to determining whether plain error occurred. See Rule 45A, Ala. R.App. P. Stanley did, however, exercise peremptory strikes to remove both juror no. 25 and juror no. 90 from the jury. (C. 263-65; R. 340^2.)
“The Sixth Amendment to the United States Constitution provides, in part: ‘In *261 all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed.... ’ ‘It is well settled that the Sixth and Fourteenth Amendments guarantee a defendant on trial for his life the right to an impartial jury.’ Ross v. Oklahoma, 487 U.S. 81, 85, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988). ‘[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, “indifferent” jurors.’ Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). A defendant is ‘entitled to be tried by 12, not 9 or even 10 impartial and unprejudiced jurors.’ Parker v. Gladden, 385 U.S. 363, 366, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966). Section 6 of the Alabama Constitution gives a defendant the right to a trial ‘by an impartial jury of the county or district in which the offense was committed.’ Article I, § 6, Ala. Const. 1901.”
Ex parte Killingsworth, 82 So.3d 761, 764 (Ala.2010).
The statutory challenges for cause under Alabama law are set out in § 12-16-150, Ala.Code 1975. There are also common-law grounds for challenging a veniremember for cause when those grounds are not inconsistent with the statute. Ex parte Killingsworth, 82 So.3d at 764. The fact that a prospective juror knows the victim or members of the victim’s family does not automatically disqualify the prospective juror for cause. Belisle v. State, 11 So.3d 256, 287 (Ala.Crim.App. 2007); Harris v. State, 632 So.2d 503, 519-21 (Ala.Crim.App.1992). Unless the prospective juror indicates on voir dire that his or her relationship with the victim or the victim’s family would prevent him or her from being fair and impartial, a challenge for cause should be denied. Dunning v. State, 659 So.2d 995, 997 (Ala.Crim.App.1994). Furthermore, the mere fact that a prospective juror read newspaper articles about the case does not automatically disqualify the prospective juror for cause when the juror assures the trial court that he or she could set aside what he or she had read and base his or her decision on the law as instructed. Pace v. State, 904 So.2d 331, 341 (Ala.Crim.App.2003); Peraita v. State, 897 So.2d 1161, 1218 (Ala.Crim.App.2003); Oryang v. State, 642 So.2d 979, 987 (Ala.Crim.App.1993).
Juror no. 25 stated that he knew Smith’s daughter because his sister-in-law and Smith’s daughter were close friends. He indicated that he had a close relationship with his sister-in-law and that she told him about accompanying Smith’s daughter to the Stanleys’ apartment after the body was discovered and that she had informed him that she believed Stanley had murdered Smith. He stated that his wife worked with Smith’s ex-wife. Juror no. 25, however, stated that he could base his verdict on the evidence presented and not on what he had heard from his sister-in-law. (R. 231, 233-34.)
Juror no. 90 stated that she had followed the events in news reports on the television and in the newspapers. She also stated she had read an article about the case the morning of voir dire examination. When asked if she could set aside her opinion and base her verdict on the evidence in the case, however, the following exchange occurred:
“[JUROR NO. 90]: Yes, I think that I can. I did have an opinion. But like I say, I don’t believe everything I read in the newspaper. But I did form an opinion. But I think that I can do that.
“[PROSECUTOR]: Do you think you can set that opinion aside based on what you — if you had an opinion coming in *262 based on — Can you set that aside and listen to the evidence that’s presented and only make your verdict on what’s presented here in court? Not what you’ve read or not what you’ve heard, but based on what comes out right here in this trial?
“[JUROR NO. 90]: Yes, I think I can.
“[PROSECUTOR]: Can you do that?
“[JUROR NO. 90]: I think I can.
“[PROSECUTOR]: You think you can. Or you know you can.
“[JUROR NO. 90]: Well, I’ve never been faced with this before.
“[PROSECUTOR]: But you’re telling me you feel like you can put that aside and be fair in this case.
“[JUROR NO. 90]: I will listen to the evidence. Yes, I would.
“[PROSECUTOR]: Will you give [Stanley] a fair trial?
“[JUROR NO. 90]: Yes.
“[PROSECUTOR]: Will you make us prove that he is guilty?
“[JUROR NO. 90]: Yes.”
(R. 241^42.) Although juror no. 90 indicated that she had read about the case in the newspaper and had seen news reports about it on television and had formed an opinion, she assured the court that she could set aside what she had read, listen to the evidence, and give Stanley a fair trial.
We find no plain error in the trial court’s failure to sua sponte dismiss the two jurors for cause. See Ex parte Trawick, 698 So.2d at 174. Moreover, if error occurred, the Alabama Supreme Court has held that the failure to remove a juror for cause is harmless when that juror is removed by a peremptory strike. Bethea v. Spnnghill Mem’l Hosp., 833 So.2d 1 (Ala.2002); see also Ex parte Bromifield, 44 So.3d 43, 48-50 (Ala.2010). But see Ex parte Colby, 41 So.3d 1 (Ala.2009) (erroneous denial of strikes for cause involving multiple jurors may not be harmless). Therefore, to the extent that these jurors should have been removed for cause, any such error was rendered harmless by their removal by the use of peremptory strikes.
B.
Stanley contends the pretrial death-qualification of the jury violated his right to a fair trial. The record .reflects that Stanley did not file a pretrial motion or otherwise object to death-qualifying the prospective jurors. Therefore, this Court reviews this issue under the plain-error standard. See Rule 45A, Ala. R.App. P. Although Stanley acknowledges that death-qualification is constitutionally permissible in capital-murder cases, see Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), he maintains that death-qualified jurors are more prone to convict and that this procedure violated his fundamental right to have an impartial jury determine his guilt.
The trial court did not err in death-qualifying the jury panel and doing so did not result in a death-prone jury. This argument has been addressed previously and decided adversely to Stanley:
“In Davis v. State, 718 So.2d 1148 (Ala.Crim.App.1995) (opinion on return to remand), affd, 718 So.2d 1166 (Ala.1998), cert, denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999), we stated:
“ ‘A jury composed exclusively of jurors who have been death-qualified in accordance with the test established in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), is considered to be impartial even though it may be more conviction prone than a non-death-qualified jury. Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996). See Lockhart v. *263 McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). Neither the federal nor the state constitution prohibits the state from ... death-qualifying jurors in capital cases. Id.; Williams; Haney v. State, 603 So.2d 368, 391-92 (Ala.Cr.App.1991), affd, 603 So.2d 412 (Ala.1992), cert, denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993).’
“718 Soüd at 1157. There was no error in allowing the State to death qualify the prospective jurors.”
Brown, 11 So.3d at 891. We point out that Stanley has made bare allegations regarding the death-qualification process, but he has not supported those allegations. Thus, there was no plain error in this regard.
C.
Stanley alleges the trial court improperly denied his motion for an individually sequestered voir dire. He claims that because of this denial he was unable to learn whether prospective jurors had been affected by pretrial publicity. The trial court’s denial of Stanley’s pretrial motion for an individually sequestered voir dire preserved this issue for review. (C. 138-42.) The trial court denied the motion, after conducting a hearing. (R. 54-58; C. 170.)
“A trial court is vested with great discretion in determining how voir dire examination will be conducted, and that court’s decision on how extensive a voir dire examination is required will not be overturned except for an abuse of that discretion. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973); Lane v. State, 644 So.2dd 1318 (Ala.Cr.App.1994); Harris v. State, 632 So.2d 503 (Ala.Cr.App.1992), affirmed, 632 So.2d 543 (Ala.1993), affirmed, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995).”
Ex parte Land, 678 Soüd 224, 242 (Ala.1996).
“‘[TJhere is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination. This rule applies to capital cases, and the granting of a request for individual voir dire is discretionary with the trial court.’ Coral v. State, 628 So.2d 954, 968 (Ala.Crim.App.1992), affd, 628 So.2d 1004 (Ala.1993). Finally, it is within the trial court’s discretion to grant or deny a motion to sequester the jury. See Centobie v. State, 861 So.23d 1111 (Ala.Crim.App.2001).”
Sneed v. State, 1 So.3d 104, 135 (Ala.Crim.App.2007).
“ ‘This discretion is limited, however, by the requirements of due process. United States v. Hawkins, 658 F.2d 279 (5th Cir.1981); Waldrop v. State [, 462 So.2d 1021 (Ala.Crim.App.1984), cert, denied, 472 U.S. 1019, 105 S.Ct. 3483, 87 L.Ed.2d 618 (1985) ]. Individual questioning may be necessary under some circumstances to ensure that all prejudice has been exposed. United States v. Hurley, 746 F.2d 725 (11th Cir.1984).’ ”
Walker v. State, 932 So.2d 140, 156-57 (Ala.Crim.App.2004) (quoting Haney v. State, 603 So.2d 368, 402 (Ala.Crim.App.1991)).
In this case, the trial court gave general qualification questions to the entire venire and allowed both the prosecution and the defense to conduct extensive voir dire examination. Furthermore, the trial court allowed the parties to conduct individual questioning when needed. Stanley has presented no evidence indicating that the pretrial publicity and knowledge of media coverage was so extensive that the method of voir dire was inadequate to ensure juror impartiality. See Hardy v. State, 804 So.2d 247, 288-89 (Ala. *264 Crim.App.1999) (denying a capital-murder defendant’s request to conduct individually sequestered voir dire to determine whether any veniremember’s impartiality was affected by pretrial publicity was not an abuse of discretion, where defense counsel was granted wide latitude in questioning venire as whole and in individually questioning individual veniremembers). See also Whitehead, 777 So.2d at 798 (same). There is no indication that Stanley was prejudiced by the way the trial court conducted the voir dire examination. See Ferguson v. State, 814 So.2d 925, 938 (Ala.Crim.App.2000). The trial court did not abuse its discretion in denying Stanley’s motion for an individual voir dire examination.
D.
Stanley argues the trial court abused its discretion in denying his motion requesting that the trial court use jury questionnaires. He maintains that the juror questionnaires would have allowed him to learn more about the prospective jurors’ backgrounds and attitudes, would have allowed him to make more informed choices in selecting the jury, and “would have provided information vital to the exercise of peremptory challenges and strikes for cause, and would have safeguarded the heightened reliability that was required for [his] capital trial.” (Stanley’s brief, p. 107.) According to Stanley, the failure to allow juror questionnaires violated his constitutional rights.
The record reflects that Stanley filed a pretrial motion requesting the use of juror questionnaires and attached to .that motion a proposed juror questionnaire. (C. 110-19.) After a hearing, the trial court denied the motion. (R. 47-48; C. 170.) It is well settled that “[a] trial court is vested with great discretion in determining how voir dire examination will be conducted, and that court’s decision on how extensive a voir dire examination is required will not be overturned except for an abuse of that discretion.” Ex parte Land, 678 So.2d at 242. “[T]he method of voir dire examination is within the discretion of the trial court[.]” Hodges v. State, 856 So.2d 875, 913 (Ala.Crim.App.2001). Both this Court and the Alabama Supreme Court have repeatedly recognized that “trial courts are not required to allow the use of jury questionnaires, even in capital cases.” Maples v. State, 758 So.2d 1, 51 (Ala.Crim.App.1999). See also Ex parte Land, 678 So.2d at 242; Morris v. State, 60 So.3d 326, 378 (Ala.Crim.App.2010); Brown v. State, 11 So.3d at 885; Sneed v. State, 1 So.3d at 135; Lee v. State, 898 So.2d 790, 854 (Ala.Crim.App.2001).
As previously stated, the trial court conducted voir dire examination initially as a group but then allowed the parties to conduct individual voir dire examination of certain prospective jurors when it thought it necessary. The record shows the parties were not limited in any way in their questioning of prospective jurors, either during group or individual voir dire. Furthermore, Stanley has failed to indicate what, if any, information about prospective jurors he was unable to discover without juror questionnaires. Accordingly, Stanley has not established that the trial court abused its discretion in denying his motion for the use of juror questionnaires.
E.
Stanley asserts that the trial court erred in denying his motion seeking disclosure of any and all information in the State’s possession regarding prospective jurors that may have been favorable to the defense. He contends the trial court’s denial of his motion hampered his ability to assess prospective jurors during jury selection, that it violated Brady v. Mary *265 land, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and that it denied him his constitutional rights to due process, a fair trial, and an impartial jury. Stanley filed a pretrial motion to require the State to reveal any exculpatory information about the prospective jurors, which the trial court denied after a hearing. (C. 129-31,170; R. 50-51.)
It is well settled that “‘[t]he State has no duty to disclose information concerning prospective jurors.’ ” McGowan v. State, 990 So.2d 931, 967 (Ala.Crim.App.2003) (quoting McGriff v. State, 908 So.2d 961, 981 (Ala.Crim.App.2000), rev’d on other grounds, 908 So.2d 1024 (Ala.2004)). See McCray v. State, 88 So.3d 1, 77 (Ala.Crim.App.2010); Vanpelt v. State, 74 So.3d 32, 51 (Ala.Crim.App.2009); Brown v. State, 982 So.2d at 585; Maples v. State, 758 So.2d at 50-51; Williams v. State, 654 So.2d 74, 76 (Ala.Crim.App.1994); Cooper v. State, 611 So.2d 460, 465-66 (Ala.Crim.App.1992). Moreover, as this Court recently explained in Doster v. State, 72 So.3d 50 (Ala.Crim.App.2010):
“ ‘The traditional common-law rule that, absent a statute or rule of practice providing otherwise, or (in some jurisdictions) other exceptional circumstance, defense counsel in a criminal case has no right of access to information in the possession of the prosecution is consistent with most of the decisions involving prosecution information regarding prospective jurors. Thus, in most of the jurisdictions in which the issue has arisen, the courts have held that at least in the particular circumstances presented, disclosure to defense counsel of prosecution information regarding prospective jurors was not required, whether the information in question related to a prospective juror’s experience or voting record on prior juries, to a prospective juror’s criminal record or other private information obtained from the record or investigative reports of a law enforcement agency, or to miscellaneous or unspecified information.’ ”
72 So.3d at 79-80 (quoting Jeffrey F. Ghent, Right of Defense in Criminal Prosecution to Disclosure of Prosecution Information Regarding Prospective Jurors, 86 A.L.R.3d 571 (1978)). Furthermore,
“ ‘the state has no duty to disclose information that is available to the appellant from another source. Hurst v. State, 469 So.2d 720 (Ala.Cr.App.1985). Here, the appellant could have procured this information from the veniremembers themselves during voir dire. See also Clifton[ v. State, 545 So.2d 173 (Ala.Crim.App.1988)] (nondisclosure did not prejudice appellant’s defense).’ ”
Arthur v. State, 711 So.2d 1031, 1080 (Ala.Crim.App.1996) (quoting Kelley v. State, 602 So.2d 473, 478 (Ala.Crim.App.1992)).
Nothing in the record indicates that Stanley was prevented from discovering information about prospective jurors during voir dire examination. Instead, as mentioned above, the record reveals that both parties were given wide latitude in their voir dire questioning. Thus, Stanley has failed to establish the trial court abused its discretion in denying his motion for disclosure of any and all information in the State’s possession regarding prospective jurors that may have been favorable to the defense.
III.
Stanley claims the trial court erred in denying his motion to suppress the evidence law-enforcement officers discovered in his apartment because, he says, the search of his apartment constituted an illegal warrantless search that violated the *266 Fourth Amendment. He maintains that, although Ronald was on the scene before law enforcement and secured the bolt cutters and cut the padlock to the door of the apartment, the search was not a private-citizen search so as to obviate the need for a warrant, and that there was no valid consent to search; thus, he asserts that the evidence recovered must be suppressed as the “fruit of an illegal search.” (Stanley’s brief, Issue IV, pp. 48-56.)
Stanley preserved this issue by raising it in a pretrial motion to suppress, which the trial court denied after conducting a hearing at which several witnesses testified. Stanley renewed his motion to suppress at trial, which the trial court also denied.
“In reviewing a trial court’s ruling on a motion to suppress, this Court reviews the trial court’s findings of fact under an abuse-of-discretion standard of review. ‘When evidence is presented ore tenus to the trial court, the court’s findings of fact based on that evidence are presumed to be correct,’ Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994); ‘[w]e indulge a presumption that the trial court properly ruled on the weight and probative force of the evidence,’ Bradley v. State, 494 So.2d 750, 761 (Ala.Crim.App.1985), affd, 494 So.2d 772 (Ala.1986); and we make ‘ “all the reasonable inferences and credibility choices supportive of the decision of the trial court.” ’ Kennedy v. State, 640 So.2d 22, 26 (Ala.Crim.App.1993), quoting Bradley, 494 So.2d at 761. ‘[A]ny conflicts in- the testimony or credibility of witnesses during a suppression hearing is a matter for resolution by the trial court.... Absent a gross abuse of discretion, a trial court’s resolution of [such] conflict[s] should not be reversed on appeal.’ Sheely v. State, 629 So.2d 23, 29 (Ala.Crim.App.1993) (citations omitted).
However, ‘ “[w]here the evidence before the trial court was undisputed the ore tenus rule is inapplicable, and the [appellate] Court will sit in judgment on the evidence de novo, indulging no presumption in favor of the trial court’s application of the law to those facts.” ’ State v. Hill, 690 So.2d 1201, 1203 (Ala.1996), quoting Stiles v. Brown, 380 So.2d 792, 794 (Ala.1980). ““[W]hen the trial court improperly applies the law to the facts, no presumption of correctness exists as to the court’s judgment.’ ” ’ Ex parte Jackson, 886 So.2d 155, 159 (Ala.2004), quoting Hill, 690 So.2d at 1203, quoting in turn Ex parte Agee, 669 So.2d 102, 104 (Ala.1995). A trial court’s ultimate legal conclusion on a motion to suppress based on a given set of facts is a question of law that is reviewed de novo on appeal. See State v. Smith, 785 So.2d 1169 (Ala.Crim.App.2000).”
State v. Hargett, 935 So.2d 1200, 1203-04 (Ala.Crim.App.2005).
A search or seizure conducted by a private citizen does not implicate the Fourth Amendment. Walter v. United States, 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980).
“ ‘A private citizen’s acts cannot constitute a search or seizure within the context of the Fourth Amendment unless the citizen is acting as an agent or instrument of the government. In order for a private search to be considered action by the government, the private actor must be regarded as having acted as an instrument or agent of the state. Coolidge v. New Hampshire, 403 U.S. 443, 487, 91 S.Ct. 2022, 2049, 29 L.Ed.2d 564 (1971). The determination of this agency must be made on a case-by-case basis and in light of all of the circumstances. It is the defendant’s burden to establish by a preponder *267 anee of the evidence that a private party acted as a government instrument or agent. U.S. v. Feffer, 881 F.2d 734, 739 (7th Cir.1987). See also, United States v. Reed, 15 F.3d 928, 931 (9th Cir.1994) (“The defendant has the burden of showing government action.”).’
“United States v. Smith, 210 F.Supp.2d 1096, 1102-03 (D.Neb.2001). A two-pronged test is used to determine whether a private citizen is acting as an agent for the police: (1) the police must have instigated, encouraged, or participated in the search; and (2) the individual must have engaged in the search with the intent of assisting the police in their investigation. Ex parte Hilley, 484 So.2d 485, 490 (Ala.1985).”
Hyde v. State, 13 So.3d 997, 1017 (Ala.Crim.App.2007).
Considering all the circumstances of the case, we cannot conclude that the Tuscum-bia Police Department officers instigated the search of the Stanleys’ apartment; the Berryhills were not acting as instruments or agents of the State in the initial entry into the Stanleys’ apartment, and there is no indication that the Berryhills engaged in the search with the intent of assisting the police in their investigation. Instead, the Berryhills had already planned to enter the Stanleys’ apartment to get the animals out when Officer Setliff arrived and accompanied Ronald into the apartment.
Officer Setliff testified that he stopped at the apartment in order to determine whether one of the people was Shelly, whom Capt. Heffernan had informed law-enforcement officers that day in a departmental meeting he wanted to see about an unrelated matter, or Smith, who had been reported missing. When he arrived, Officer Setliff learned that Swanie owned the apartment, and that, although Dot, the lessee, did not have the keys to the apartment at the time, she had actually leased the apartment from Swanie and paid the rent but had allowed Stanley and Shelly to live there. Officer Setliff indicated that because the Berryhills had learned that the Stanleys had left town, they wanted to get inside the Stanleys’ apartment, because they were concerned about the many dogs the Stanleys had left behind in the apartment. Officer Setliff testified that Ronald invited him to accompany him into the Stanleys’ apartment as, the testimony showed, was often the practice of Tuscum-bia police officers to assist landlords upon request for protective purposes.[20]
Around the time they entered the apartment, Capt. Heffernan arrived at the scene. When Capt. Heffernan arrived, still not knowing that Smith’s body was in the apartment, he noticed a foul odor similar to the odor of decomposition. After the officers entered the apartment, Officer Setliff, at the direction of Capt. Heffernan, lifted a portion of the comforter, revealing a dead body underneath. After discovering the body, Capt. Heffernan and Officer Setliff left the apartment, secured the scene, and obtained a search warrant.
Stanley has pointed to nothing in the record to suggest that Ronald was acting on behalf of the government. Thus, the initial entry into the Stanleys’ apartment was a private act, not a government act. “[T]he Fourth Amendment proscribes only governmental action, and does not apply to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.” Walter, 447 U.S. at 662. In this *268 case, the Berryhills were in the process of entering the Stanleys’ apartment when Officer Setliff arrived. Officer Setliff did not instigate or encourage the search. The Berryhills had not called the police to the Stanleys’ apartment. The police did not have the Stanleys’ apartment under surveillance. In fact, Capt. Heffernan had instructed Officer Setliff only earlier that day to patrol near the Stanleys’ apartment because he had informed all the officers at a department meeting that Smith was missing and that Shelly was wanted for questioning in an unrelated matter. The Berryhills were not assisting the police in their investigation because they had planned to enter the apartment to retrieve the dogs and had even coordinated the entry with Dot. They were merely protecting their property after they understood that the tenants had left town and had left dogs in the apartment. Furthermore, contrary to Stanley’s contention, mere contact between a private individual and the police does not make the individual an agent of the police. See Smith v. State, 908 So.2d 273, 286 (Ala.Crim.App.2000). “[D]e minimis or incidental contacts between the citizen and law enforcement agents prior to or during the course of a search or seizure will not subject the search to fourth amendment scrutiny.” Smith, 908 So.2d at 287 (quoting United States v. Miller, 688 F.2d 652, 657 (9th Cir.1982), quoting in turn United States v. Walther, 652 F.2d 788 (9th Cir. 1981)). Stanley failed to meet his burden of establishing that the Berryhills were acting as agents of the State. Instead, the Berryhills were acting as private citizens. Therefore, no Fourth Amendment violation occurred.[21]
IV.
Stanley contends that the trial court erred in denying his motion to disclose the grand-jury testimony of several prosecution witnesses. (Stanley’s brief, Issue XI, pp. 94-100.) After Stanley was indicted, he filed two motions requesting information and transcripts pertaining to the grand-jury proceedings. (C. 42-44, 47-49.) During the hearing on his motions, the prosecutor stated that the grand-jury proceedings were usually not recorded and transcribed and that he did not have any information from the grand-jury proceedings to provide to defense counsel. (R. 6.) The crux of Stanley’s argument is that because the grand-jury proceedings were not recorded he was unable to adequately cross-examine and impeach seven witnesses who had testified before the grand jury who also testified at trial.
This Court addressed a similar question in Sneed v. State, 1 So.3d 104 (Ala.Crim.App.2007), as follows:
“Before an accused may discover grand jury testimony he must establish a particularized need for the information. In Blackmon v. State, 7 So.3d 397, 409-10 (Ala.Crim.App.2005), we stated:
“‘Alabama has long protected the secrecy of grand-jury proceedings. See § 12-16-214, Ala.Code 1975. “The long time rule, sanctioned by our courts, is that the proceedings before a grand jury are essentially secret.” Steward v. State, 55 Ala.App. 238, 240, 314 So.2d 313, 315 (Ala.Crim.App.1975). However, a defendant may be allowed to inspect grand-jury proceedings if the defendant meets the *269 threshold test of showing a “particularized need” for breaching the secrecy of those proceedings. As this Court stated in Millican v. State, 423 So.2d 268 (Ala.Crim.App.1982):
“ ‘ “Before a defendant is allowed to inspect a transcript of a State’s witness who testified before the grand jury ... a trial judge should conduct an in camera inspection of such testimony, see Palermo [v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959),] and Pate[v. State, 415 So.2d 1140 (Ala.1981) ], the defendant should at least and at a very minimum make some offer of proof (1) that the matters contained in the witness’ grand jury testimony were relevant to the subject matter of the prosecution; (2) and that there exists an inconsistency between grand jury testimony and trial testimony. Unless defense counsel is merely going on a fishing expedition, he will have some information as to the particular inconsistency in the defendant’s testimony. In this case no such showing was made and the existence of any inconsistency between the witness’ trial and grand jury testimony was never even alleged. Cooks[v. State, 50 Ala.App. 49, 276 So.2d 634 (Ala.Crim.App.1973) ]. Also, there was no showing that the witness’ grand jury testimony, if available, was ‘of such nature that without it the defendant’s trial would be fundamentally unfair.’ Cooks, 50 Ala.App. at 54, 276 So.2d 634. See also Husch v. State, 211 Ala. 274, 276, 100 So. 321 (1924). (‘Moreover, if the solicitor had had such a statement in his possession, defendant could have required its production by a rule of the court if he thought it was favorable to him.’)
“ ‘ “In laying the proper predicate for examination of a witness’ grand jury testimony, it should also be established that the witness testified before the grand jury and that such testimony was recorded or reduced to writing, unless a grand juror will be called to disclose the testimony of the witness. Alabama Code 1975, Section 12-16-201.
“ ‘ “ ‘When the defendant, in effect, asks for the State District Attorney to produce a document, he should at least establish that this State official has such document or a copy thereof in his possession before the trial court will be put in error.’ Strange v. State, 43 Ala.App. 599, 606, 197 So.2d 437 [(1966)], cert, dismissed, 280 Ala. 718, 197 So.2d 447 (196[7]).
“ ‘ “Once the defendant has laid a proper predicate for the impeachment of a witness who testified before the grand jury, the trial judge should conduct an in camera inspection as outlined in Palermo, supra, and Pate, supra, to determine (1) whether the statement made by the witness before the grand jury ‘differed in any respects from statements made to the jury during trial,’ Pate, supra, and (2) whether the grand jury testimony requested by the defendant ‘was of such a nature that without it the defendant’s trial would be fundamentally unfair.’ Pate, supra. This procedure will best preserve and protect the legislative determination that ‘it is essential to the fair and impartial administration of justice that all grand jury proceedings be secret and that the secrecy of such proceedings, remain inviolate.’ Alabama Code 1975, Sections 12-16-214 through 226.’
*270 “ ‘423 So.2d at 270-71.
“ ‘Nonetheless, Alabama has no statute that requires that grand-jury proceedings be recorded or otherwise memorialized. In Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App.2001), the defendant argued that the circuit court erred in denying her motion to transcribe the grand-jury testimony. In upholding the circuit court’s ruling, we stated:
“ ‘ “ ‘In Alabama there is no statute requiring that testimony before a grand jury be recorded. “A Grand Jury is not required to compile records and the testimony in the absence of a statute requiring preservation of the proceedings. State ex rel. Baxley v. Strawbridge, 52 Ala.App. 685, 296 So.2d 779 [ (Ala.Crim.App.1974) ]. There is no such statute in this state.” Sommerville v. State, 361 So.2d 386, 388 (Ala.Cr.App.), cert, denied, 361 So.2d 389 (Ala.1978), cert, denied, 439 U.S. 1118, 99 S.Ct. 1027, 59 L.Ed.2d 78 (1979). See also Gaines v. State, 52 Ala.App. 29, 30, 288 So.2d 810, 812, cert, denied, 292 Ala. 720, 288 So.2d 813 (1973), cert, denied, 419 U.S. 851, 95 S.Ct. 92, 42 L.Ed.2d 82 (1974). Because there was no legal requirement that the grand jury proceedings be recorded, this contention is without merit.’ ”
“ ‘Stallworth, 868 So.2d at 1139, quoting Hardy v. State, 804 So.2d 247, 287 (Ala.Crim.App.1999), affd, 804 So.2d 298 (Ala.2000). See also Steward v. State, supra.
“ ‘At the pretrial hearing on this motion, the prosecutor stated that it was the policy of the district attorney’s office to not record the grand-jury proceedings and that he had no knowledge that the grand-jury proceedings had been recorded in this case. Neither did Black-mon show a “particularized need” to breach the secrecy of the grand-jury proceedings. Based on the cases cited above, we conclude that the circuit court committed no error in denying this motion made after Blackmon had been indicted.’ ”
1 So.3d at 133-35. Similarly, the prosecutor in this case stated that the grand-jury proceedings were not usually recorded, Stanley did not request the information until after he had been indicted, and Stanley has failed to demonstrate a “particularized need” to breach the secrecy of the grand-jury proceedings. Consequently, Stanley is due no relief on this claim.
V.
Stanley argues that the trial court erred in allowing Capt. Heffernan, the lead investigating officer, to be present in the courtroom, over the defense’s objection, while other witnesses testified. (Stanley’s brief, p. 115). After Stanley’s defense counsel invoked “the rule,” which requires a witness to be excluded from the courtroom during the testimony of other witnesses,[22] the record reflects that the trial judge ruled Capt. Heffernan could remain in the courtroom during the testimony of other witness at both the suppression hearing and the trial. (R. 92-93.)
This Court has previously addressed this issue and decided it adversely to Stanley. In Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App.2001), this Court said:
*271 “Rule 615, Ala. R. Evid., and Rule 9.3(a), Ala. R.Crim. P., govern the exclusion of witnesses. Rule 615, Ala. R. Evid., states, in part:
“‘At the request of a party the court may order witnesses excluded so that they cannot hear the testimony of other witnesses and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, (3) a person whose presence is shown by a party to be essential to the presentation of the party’s cause, or (4) a victim of a criminal offense or the representative of a victim who is unable to attend, when the representative has been selected by the victim, the victim’s guardian, or the victim’s family.’
“We addressed this issue in Living v. State, 796 So.2d 1121, 1142-43 (Ala.Crim.App.2000), cert, denied, 796 So.2d 1121 (Ala.2001). In Living we stated:
“ ‘ “Alabama appellate courts have time and again refused to hold it an abuse of discretion on the part of the trial court to allow a sheriff, police chief or similarly situated person who will later testify to remain in the courtroom during trial.” Carroll v. State, 599 So.2d 1253, 1261 (Ala.Crim.App.1992). In Stewart v. State, 601 So.2d 491 (Ala.Crim.App.1992), this Court addressed an issue very similar to the one in the instant case. In Stewart, a police investigator was excepted from the rule requiring exclusion of all witnesses from the courtroom and was allowed to sit at the prosecution’s table.
“ ‘In addition to being allowed to sit at the prosecutor’s table, the police investigator in Stewart was allowed to testify from the prosecutor’s table. Id. at 501. This Court held in Stewart that the appellant was not prejudiced by allowing the investigator to testify from the prosecutor’s table and noted that “the jury knows that police officers investigate cases and assist the prosecution.” Id.
“ ‘Because the testimony of officers from the prosecutor’s table does not prejudice a defendant, clearly an officer’s mere presence at the table cannot be deemed so prejudicial as to constitute reversible error.’ ”
868 So.2d at 1146.
The trial court did not abuse its discretion in allowing the lead investigating officer to remain in the courtroom during the testimony of other witnesses. We therefore find no error.
VI.
Stanley asserts the trial court erred in admitting specific testimony, certain photographs, and several letters because, he says, they were highly prejudicial. (Stanley’s brief, Issues V, XIV, and XVI pp. 56-63; 111-12; 114-15.) Because Stanley failed to raise some of these arguments at the trial court level, we examine those pursuant to the plain-error standard. See Rule 45A, Ala. R.App. P. Defense counsel, however, filed pretrial motions on some, and others were objected to by defense counsel at trial. We note the particular instances as we address them.
Rule 401, Ala. R. Evid., provides:
“ ‘Relevant evidence’ means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.”
Rule 402, Ala. R. Evid., provides:
*272 “All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States or that of the State of Alabama, by statute, by these rules, or by other rules applicable in the courts of this State. Evidence which is not relevant is not admissible.”
Rule 403, Ala. R. Evid., provides:
“Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.”
Also,
“[1] “[t]he admission or exclusion of evidence is a matter within the sound discretion of the trial court.” Taylor v. State, 808 So.2d 1148, 1191 (Ala.Crim.App.2000), affd, 808 So.2d 1215 (Ala.2001). “The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion.” Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000).” ’ ”
Harris, 2 So.3d at 927 (quoting Gavin v. State, 891 So.2d 907, 963 (Ala.Crim.App.2003)).
Mindful of the above-stated law, we now address Stanley’s specific claims of error.
A.
Stanley argues that the State improperly introduced victim-impact evidence to the jury during the guilt phase of the trial. Stanley first refers to the testimony of the victim’s daughter during the guilt phase to the effect that she had had a close relationship with her father and that she had talked with or seen him almost everyday. (Stanley’s brief, Issue XIV, pp. 111-12.) Stanley filed a pretrial motion to prohibit the State from introducing victim-impact testimony and for the trial court to properly instruct the jury on the role of such testimony, which the trial court denied after a hearing. (C. 188-91, 240-41; R. 78-80.)
“‘It is well settled that victim-impact statements “are admissible during the guilt phase of a criminal trial only if the statements are relevant to a material issue of the guilt phase. Testimony that has no probative value on any material question of fact or inquiry is inadmissible.” Ex parte Crymes, 630 So.2d 125, 126 (Ala.1993), citing Charles W. Gamble, McElroy’s Alabama Evidence, § 21.01 (4th ed.1991). However, “when, after considering the record as a whole, the reviewing court is convinced that the jury’s verdict was based on the overwhelming evidence of guilt and was not based on any prejudice that might have been engendered by the improper victim-impact testimony, the admission of such testimony is harmless error.” Crymes, 630 So.2d at 126.’
“Jackson v. State, 791 So.2d 979, 1011 (Ala.Crim.App.2000).”
Gissendanner v. State, 949 So.2d 956, 965 (Ala.Crim.App.2006). “[T]he introduction of victim impact evidence during the guilt phase of a capital murder trial can result in reversible error if the record indicates that it probably distracted the jury and kept it from performing its duty of determining the guilt or innocence of the defendant based on the admissible evidence and the applicable law.” Ex parte Rieber, 663 So.2d 999, 1006 (Ala.1995). However, “a judgment of conviction can be upheld if the record conclusively shows that the admission of the victim impact evidence during *273 the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant.” 663 So.2d at 1005.
A thorough review of the daughter’s testimony reveals that there was no impropriety, that she did not describe the impact of the crime on her life, and that she made no statement amounting to victim-impact evidence during the guilt phase. (R. 399-401.) Rather, the testimony provided background information to introduce her as a witness and to explain the events that led up to the discovery of her father’s body. See Hodges v. State, [Ms. CR-04-1226, March 23, 2007] — So.3d—,—(Ala.Crim.App.2007) (finding “testimony offered by the victim’s sister was not offered as victim-impact evidence, but was offered to show the victim’s activities on the day of the murder and when she was last in contact with the family, and it went toward establishing when the crime was committed”); Grayson v. State, 824 So.2d 804, 812 (Ala.Crim.App.1999) (stating that testimony by the victim’s mother identifying her and stating that she had planned to return home was not victim-impact testimony and was relevant as to the timing of the victim’s death as well as to explain where the death occurred). See also Gissendanner. Because we find the complained-of testimony, which was not objected to during the guilt phase, does not amount to victim-impact evidence, we find no error.
Stanley also objects to a photograph of the victim the State introduced during the testimony of the victim’s daughter because he claims it amounted to improper victim-impact evidence. However, we likewise find that it did not constitute improper victim-impact evidence because it was introduced at the beginning of the trial for the purpose of identifying the victim. See, e.g., Ferguson v. State, 814 So.2d at 946 (finding no plain error in the admission, during the guilt phase, of a photograph of the victims in front of their boat because it was relevant to show, among other things, that they were alive before the offense); Taylor v. State, 666 So.2d 36, 66 (Ala.Crim.App.1994) (finding no plain error in the admission, during the guilt phase, of a photograph of the victims in front of a Christmas tree). See also McMillan, 139 So.3d at 226. Here, the photograph of Smith was relevant to the issue of identity and was therefore admissible. Thus, we also find no error in this regard.
B.
Stanley contends the trial court erred in admitting photographs of the victim’s body as it appeared at the crime scene and photographs of the autopsy. (Stanley’s brief, Issue XVI, pp. 114-15.) The record shows that Stanley’s counsel filed a pretrial motion to suppress photographs of the crime scene and the autopsy. After conducting a hearing on the motion, the trial judge ordered the State to limit the number of photographs and to provide defense counsel with the photographs it planned to use during trial.[23] (C. 183-84, 240; R. 60-68.) Stanley’s counsel did not object to the photographs he now takes issue with when they were admitted into evidence.
Alabama courts have recognized that photographs depicting the crime scene and the wounds of the victims are relevant and admissible. See Stallworth v. State, 868 So.2d at 1151 (quoting Land v. State, 678 So.2d 201, 207 (Ala.Crim.App.1995)) (“‘The courts of this state have *274 repeatedly held that photographs that accurately depict the crime scene and the nature of the victim’s wounds are admissible despite the fact that they may be gruesome or cumulative.’ ”). See also Miller v. State, 63 So.3d 676, 704-705 (Ala.Crim.App.2010) (applying law on autopsy photographs to crime-scene photographs); Van-pelt, 74 So.3d at 80 (same); Hyde, 13 So.3d at 1016 (same).
“ ‘Generally photographs are admissible into evidence in a criminal prosecution “if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge.” ’ Bankhead v. State, 585 So.2d 97, 109 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), affd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev’d, 625 So.2d 1146 (Ala.1993), quoting Magwood v. State, 494 So.2d 124, 141 (Ala.Crim.App.1985), affd, 494 So.2d 154 (Ala.1986), cert, denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986). ‘Photographic exhibits are admissible even though they may be cumulative, demonstrative of undisputed facts, or gruesome.’ Williams v. State, 506 So.2d 368, 371 (Ala.Crim.App.1986) (citations omitted). In addition, ‘photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors.’ Ex parte Siebert, 555 So.2d 780, 784 (Ala.1989). ‘This court has held that autopsy photographs, although gruesome, are admissible to show the extent of a victim’s injuries.’ Ferguson v. State, 814 So.2d 925, 944 (Ala.Crim.App.2000), affd, 814 So.2d 970 (Ala.2001). ‘ “[AJutopsy photographs depicting the character and location of wounds on a victim’s body are admissible even if they are gruesome, cumulative, or relate to an undisputed matter.” ’ Jackson v. State, 791 So.2d 979, 1016 (Ala.Crim.App.2000), quoting Perkins v. State, 808 So.2d 1041 (Ala.Crim.App.1999), affd, 808 So.2d 1143 (Ala.2001), judgment vacated on other grounds, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002), on remand to, 851 So.2d 453 (Ala.2002).”
Brooks v. State, 973 So.2d 380, 393 (Ala.Crim.App.2007).
All the photographs about which Stanley complains were introduced into evidence in the guilt phase of the trial during the testimony of the investigating officer, who was also the coroner, and the testimony of Dr. Ward, the medical examiner. Each photograph was identified by the respective witness. In addition, the medical examiner detailed the injuries depicted in the photographs and explained to the jury the significance of the injuries. We have carefully examined the photographs, as well the testimony of the witnesses, and we conclude that the photographs were relevant, probative, and properly admitted into evidence.
“The photographs were admissible because they were relevant to show the crime scene and the injuries [the] victim suffered, and because they helped to illustrate the testimony given by the investigating officers concerning the crime scene, as well as to illustrate the testimony of the coroner concerning the type and extent of the wounds that caused the victim[’s] death.”
Maxwell v. State, 828 So.2d 347, 363 (Ala.Crim.App.2000). See also Ex parte Siebert, 555 So.2d 780, 783 (Ala.1989). The trial court committed no error in allowing the crime scene and autopsy photographs to be received into evidence.
C.
Stanley asserts the trial court erroneously admitted into evidence two letters he *275 allegedly wrote to his wife while they were each in jail on capital-murder charges. (Stanley’s brief, Issue V, pp. 56-63.) He lists several different grounds in support of this assertion.
In Moore v. State, 49 So.3d 228, 232 (Ala.Crim.App.2009), this Court stated the following regarding Rule 404(b), Ala. R. Evid., and addressed the admissibility of evidence of collateral bad acts:
“Rule 404(b), provides:
“‘Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident....’
“The Alabama Supreme Court has ‘held that the exclusionary rule prevents the State from using evidence of a defendant’s prior bad acts to prove the defendant’s bad character and, thereby, protects the defendant’s right to a fair trial.’ Ex parte Drinkard, 111 So.2d 295, 302 (Ala.2000) (citing Ex parte Cofer, 440 So.2d 1121, 1123 (Ala.1983)). This court has explained that ‘[o]n the trial for the alleged commission of a particular crime, evidence of the accused’s having committed another act or crime is not admissible if the only probative function of such evidence is to prove bad character and the accused’s conformity therewith.’ Lewis v. State, 889 So.2d 623, 661 (Ala.Crim.App.2003) (quoting C. Gamble, McElroy’s Alabama Evidence § 69.01(1) (5th ed.1996)).
“ ‘ “ ‘This exclusionary rule is simply an application of the character rule which forbids the State to prove the accused’s bad character by particular deeds. The basis for the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds of the jurors.’ ” ’
“Ex parte Jackson, 33 So.3d 1279, 1284-85 (Ala.2009) (quoting Ex parte Arthur, 472 So.2d 665, 668 (Ala.1985), quoting in turn McElroy’s supra, § 69.01(1)).”
Furthermore, the Alabama Supreme Court provided in Ex parte Jackson, 33 So.3d 1279 (Ala.2009):
“ ‘The well-established exceptions to the exclusionary rule include: (1) relevancy to prove identity; (2) relevancy to prove res gestae; (3) relevancy to prove scienter; (4) relevancy to prove intent; (5) relevancy to show motive; (6) relevancy to prove system; (7) relevancy to prove malice; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes. Willis v. State, 449 So.2d 1258, 1260 (Ala.Crim.App.1984); Scott v. State, 353 So.2d 36 (Ala.Crim.App.1977). However, the fact that evidence of a prior bad act may fit into one of these exceptions will not alone justify its admission. “‘Judicial inquiry does not end with a determination that the evidence of another crime is relevant and probative of a necessary element of the charged offense. It does not suffice simply to see if the evidence is capable of being fitted within an exception to the rule. Rather, a balancing test must be applied. The evidence of another similar crime must not only be relevant, it must also be reasonably necessary to the government’s case, and it must be plain, clear, and conclusive, before its probative value will be held to outweigh its potential prejudicial effects.’ ” Averette v. State, 469 So.2d 1371, 1374 (Ala.Crim.App.1985), quoting United States *276 v. Turquitt, [557 F.2d 464] at 468-69 [ (5th Cir.1977) ].’ ”
33 So.3d at 1285 (quoting Robinson v. State, 528 So.2d 343, 347 (Ala.Crim.App. 1986)).
Even if the evidence of a collateral bad act fits into an exception to the general exclusionary rule, the trial court must determine whether the evidence is relevant and probative, Rule 401, Ala. R. Evid., and whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, Rule 403, Ala. R. Evid.
1.
Stanley alleges the trial court erred in admitting the letters because, he says, the letters bolstered the State’s case and contained information as to prejudicial prior bad acts, which he alleges violated Rule 404(b), Ala. R. Evid., and did not fall under any exception to the general exclusionary rule. More particularly, he contends the letters were inadmissible because they referenced “scuffles and fights” and only served to demonstrate that Stanley was a “bad a-” who “would always take no sh~.” (Stanley’s brief, p. 57.) (C. 369-79; R. 781-86.)[24] He claims the letters are prejudicial because they showed an attempt by Stanley to discourage his wife from testifying against him and because they contain discussions of prior bad acts by Stanley.[25]
During Shelly’s testimony, she recognized and identified Stanley’s handwriting and the letters as the ones he had sent to her, and she read portions of the letters into evidence. The portions of the first letter that she read from, dated July 2, 2005, are as follows:
“A: ‘Have you spoken with your lawyer? Say nothing. I haven’t yet. We need to ask for bond reduction and a motion of discovery. Find out exactly what they claim to have on us. That’s all we need to say: Bond reduction, a motion of discovery, and nothing else. It’s scary. But stick with that. Okay? Let me know anything I might need to on anything like this subject without saying anything out and out unless it doesn’t matter that details are said.’
[[Image here]]
“A: ‘Baby, you’ve got to trust sending my letters to or through my mom. Okay? Do like that, Shelly. And say no details on anything. Let me know or my mom if and when you see — Say nothing — to your attorney because I still haven’t saw mine.
“ ‘Lower bonds and motion for discovery are all we want to speak about to anyone. My attorney is one of, if not, the crappiest attorney in Colbert County. They’re trying to screw me. I feel it. Don’t let them screw me, Shelly. Beg your attorney to take my case. They want to give me the death penalty. No sh — , Shelly. They want you to lie on me and give me the death penalty on capital murder. That’s what they’re going to shoot for with us, me. I’m going to take a break to see if I can lighten up somewhat.’ ”
(R. 782.)
After that first letter was admitted into evidence, Shelly read the following portions of a letter dated July 12, 2005:
*277 “A: ‘When I’m put in the one I was in with three other dudes, I heard around the bars on the opposite side of the cell from the door I entered a couple of voices next cell, drunk tank, saying, “Ain’t no way I could walk around in my house three or four days looking at somebody I hacked up with a machete.” My blood pressure shot up. But I was cool. I didn’t say a word. Thinking back, I should have. I really should have.
“ ‘These people in here think I’m some kind of spineless, cowardly, killing thief. I wish someone could tell them besides me about all the straight-up, no sucker-punch scuffles and fights I’ve been in and how I truly fared in them. They don’t know me, and they think they do.
“ T can’t get into a fight and not hurt my bond or our case. But I can’t take a lot more either. I need for you to remind me in your letters what a bad a-, straight-up person I was and how I would always take no sh~ and take a beef or problem straight to a person’s face, not behind their back and not use a weapon and not be intimidated if they picked up a weapon or crowbar — like when [sic] hit me with my back turned with that crowbar and kicked his ass after he busted my head and I grabbed nothing.
“ ‘How I had you clear my vision after I got my eye busted, went back, and they were gone. I’ve always been straight up and straight forward. And now, all the sudden, I’m the coward and a punk cause these people have found me guilty of some kind of cowardly deed without a trial. I need you to remind me who I am on the inside, the straightforwardness we know.”
(R. 783-85.) After Shelly read portions of the second letter, the prosecution questioned her as follows:
“Q: He wanted you to remind him that he’s bad a-.
“A: Yes, sir.
“Q: That’s what he asking you to do.
“A: Yes, sir.
“[DEFENSE COUNSEL]: Your Honor, I would object to counsel characterizing. The letter stands for itself.
“THE COURT: I’ll sustain that and grant a motion to strike.”
(R. 785.)
Initially, we question whether the letters constitute “other crimes, wrongs, or acts” generally excluded under Rule 404(b), because the letters here fail to contain references to specific incidents when Stanley was involved in altercations and do not describe any prior convictions, charges, or arrests involving Stanley. Instead, the letters were admitted to demonstrate Stanley’s continuing control over Shelly and his extent of involvement in the crime. The letters showed Stanley’s and Shelly’s relative culpability and rebutted Stanley’s defense theory that Shelly was the primary actor in the murder. See, e.g., Johnson v. State, 120 So.3d 1100, 1111 (Ala.Crim.App.2005), rev’d on other grounds, Johnson v. State, 120 So.3d 1119 (Ala.2006) (“[T]hat evidence, although not directly linked to the instant offense, was relevant and material because it helped to explain the relationship between the co-conspirators and illustrated the nature of Johnson’s conduct as a catalyst in the murder.”). The State correctly submits that this evidence was not offered as Rule 404(b) evidence, but rather, was offered “to demonstrate that Stanley was still attempting to exert influence and give instructions to Shelly through the mail, even after their arrest.” (State’s brief, p. 62.) We conclude that the letters were admissible because they were relevant and probative to show relative culpability and to *278 rebut Stanley’s defense, despite Stanley’s claim that they should have been precluded under Rule 404(b), Ala. R. Evid.
In this case, during opening statements, both attorneys for the State and for Stanley explained that the Stanleys knew Smith, the victim, because they often purchased pills from him and knew that he carried substantial amounts of cash. Stanley’s defense counsel argued, during his opening statement, that Stanley was merely an “accessory after the fact” in the murder of Smith. (R. 366.) Defense counsel argued that Stanley did not commit the murder. Rather, Shelly acted alone. He claimed it was Shelly who exerted control over Stanley and devised the plan to murder Smith in order to obtain more drugs and money.
The prosecution introduced and admitted the letters to support its theory of the case that Stanley was the “puppet master” who instigated and carried out Smith’s murder and exerted control over Shelly during the murder and after they turned themselves into the police. To support its theory, the State presented this evidence, along with other evidence indicating that, even while in jail, Stanley continued to control and to influence Shelly and tried to discourage her from testifying against him. In addition to counsel’s arguments, several witnesses also testified that both Stanley and Shelley were drug addicts. The evidence showed that, shortly before Smith’s murder, the Stanleys had exhausted their supply of drugs, and because they knew Smith often carried pills and cash, they summoned him to their apartment early on the morning of the murder. Thus, even if considered Rule 404(b) evidence, the letters evidencing Stanley’s involvement in the murder — e.g., whether he exercised control over Shelly — and Stanley’s and Shelly’s relative culpability concerned contested issues, and exceptions to the exclusionary rule would therefore apply. See Baker v. State, 87 So.3d 587, 599-600 (Ala.Crim.App.2009) (evidence of prior act of domestic violence involving defendant and capital-murder victim was admissible because intent to kidnap was contested issue); McGowan v. State, 990 So.2d 931, 961-62 (Ala.Crim.App.2003) (evidence of defendant’s use of cocaine was relevant at guilt phase of capital-murder trial where defendant claimed that if he rather than accomplice killed the victims, then his use of crack cocaine prevented him from forming the intent to kill, and his use of crack cocaine provided a motive for the murders, i.e., obtaining money from the victims so he could buy more crack cocaine). Additionally, we note that the alleged bad-acts evidence fails to rise to the level of the Rule 404(b) evidence requiring reversal in Ex parte Jackson, 33 So.3d 1279 (Ala.2009) and Ex parte Billups, 86 So.3d 1079 (Ala.2010).
Stanley also argues that the probative value of the evidence of his collateral bad acts was substantially outweighed by the danger of unfair prejudice. Although evidence offered against a defendant at trial is generally prejudicial, the probative value of evidence is substantially outweighed by its prejudice only when it is unduly and unfairly prejudicial. See, e.g., Hurley v. State, 971 So.2d 78, 81-82 (Ala.Crim.App.2006), and the cases quoted therein; and Irvin v. State, 940 So.2d 331, 346 (Ala.Crim.App.2005), and the cases quoted therein. Here, we do not find the evidence to be unduly and unfairly prejudicial, and we find no error in the trial court’s determination that the probative value of this evidence was not outweighed by its prejudicial impact. Only a brief reference to Stanley’s being a “bad a — ” was made, no undue emphasis was placed on this evidence, and the trial court struck the only testimony that did place an em *279 phasis on this evidence.[26] Under these circumstances, evidence about Stanley’s control over Shelly was relevant to the contested issue of Stanley’s intent to murder and to rob the victim, was not admitted simply to prove Stanley’s bad character, and was more probative on the issue of guilt than it was prejudicial to his defense. In finding no error, much less plain error, we conclude that the evidence in question was material, relevant, and reasonably necessary to the State’s case, it clearly fell within at least one exception to the exclusionary rule, and its probative value was not outweighed by its prejudicial effect.
Furthermore, the error, if any, in its admission was harmless. See Rule 45, Ala. R.App. P. (“No judgment may be reversed or set aside, nor new trial granted in any civil or criminal case on the ground of misdirection of the jury, the giving or refusal of special charges or the improper admission or rejection of evidence, nor for error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties.”).
“The Alabama Supreme Court has stated:
“ ‘ “[B]efore the reviewing court can affirm a judgment based upon the ‘harmless error’ rule, that court must find conclusively that the trial court’s error did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant.” Ex parte Crymes, 630 So.2d 125, 126 (Ala.1993) (emphasis omitted). “ ‘The basis for the [exclusionary rule] lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds of jurors.’ ” Ex parte Cofer, 440 So.2d 1121, 1123 (Ala.1983), quoting C. Gamble, McElroy’s Alabama Evidence, § 69.01(1) (3d ed.1977), also quoted in Hobbs v. State, 669 So.2d 1030, 1032 (Ala.Crim.App.1995).’
“Ex parte Casey, 889 So.2d 615, 621-22 (Ala.2004).”
*280 Turner v. State, 929 So.2d 1041, 1048 (Ala.Crim.App.2005).
Here, the letters contain no references to specific incidents or times when Stanley engaged in altercations and do not prove or indicate a prior offense or bad act by Stanley such that it might have affected one of Stanley’s substantial rights. Johnson v. State, 120 So.3d 1119, 1125 (Ala.2006); Brown v. State, 74 So.3d 984, 1003 (Ala.Crim.App.2010) (“[T]he evidence as to Brown’s guilt was overwhelming. After reviewing the entire record as a whole, ‘is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty’ even without the admission of Washington’s statement to Mobbs. United States v. Hasting, 461 U.S. 499, 510, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983). See also Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Under these circumstances, any error in the admission of the letters was harmless. See Rule 45, Ala. R.App. P.”).
“ ‘ “ ‘After finding error, an appellate court may still affirm a conviction on the ground that the error was harmless, if indeed it was.’ Guthrie v. State, 616 So.2d 914, 931 (Ala.Crim.App.1993), citing Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). ‘The harmless error rule applies in capital cases.’ Knotts v. State, 686 So.2d 431, 469 (Ala.Crim.App.1995), opinion after remand, 686 So.2d 484 (Ala.Crim.App.1995), affd, 686 So.2d 486 (Ala.1996), cert, denied, 520 U.S. 1199, 117 S.Ct. 1559, 137 L.Ed.2d 706 (1997), citing Ex parte Whisenhant, 482 So.2d 1241 (Ala.1983). ‘In order for a constitutional error to be deemed harmless under Chapman, the state must prove beyond a reasonable doubt that the error did not contribute to the verdict. In order for the error to be deemed harmless under Rule 45, the state must establish that the error did not injuriously affect the appellant’s substantial rights.’ Coral v. State, 628 So.2d 954, 973 (Ala.Crim.App.1992), opinion after remand, 628 So.2d 988 (Ala.Crim.App.1992), affd, 628 So.2d 1004 (Ala.1993), cert, denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994). ‘The purpose of the harmless error rule is to avoid setting aside a conviction or sentence for small errors or defects that have little, if any, likelihood of changing the result of the trial or sentencing.’ Davis v. State, 718 So.2d 1148, 1164 (Ala.Crim.App.1997), affd, 718 So.2d 1166 (Ala.1998), cert, denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999).”
‘“McNabb v. State, 887 So.2d 929, 976-77 (Ala.Crim.App.2001).’
“Sale v. State, 8 So.3d 330, 347 (Ala.Crim.App.2008). See also Ex parte Brown, 11 So.3d 933 (Ala.2008) (holding that the alleged improper admission of evidence in a capital trial was harmless); Cothren v. State, 705 So.2d 849 (Ala.Crim.App.1997) (holding that the improper admission of the defendant’s coerced confession was harmless in light of the overwhelming evidence establishing that the defendant committed the capital offense).”
Ex parte Brownfield, 44 So.3d 43, 48 (Ala.2009).
In the present case, the letters were relevant and were properly admitted. Moreover, the probative value of the letters was not outweighed by their prejudicial effect. The letters were properly admitted and any error was, at most, harmless.[27]
*281 2.
Stanley maintains that the letters were improperly admitted because, he says, the prosecution failed to prove chain of custody as to the letters. Stanley did not object to the admission of the letters on chain-of-custody grounds. We therefore review this claim for plain error. See Rule 45A, Ala. R.App. P.
This Court has previously considered this issue and decided it adversely to Stanley. In Vanpelt, 74 So.3d at 72, this Court addressed a claim by Vanpelt that the trial court erred in allowing into evidence letters Vanpelt had written because, he argued, “no witness testified concerning the chain of custody of any of the letters.” Vanpelt, 74 So.3d at 72. This Court held that the letters were properly admitted and reasoned:
“The Alabama Supreme Court in Ex parte Holton, 590 So.2d 918 (Ala.1991), addressed the requirements for a chain of custody:
“ ‘Proof of [an] unbroken chain of custody is required in order to establish sufficient identification of the item and continuity of possession, so as to assure the authenticity of the item. Id. In order to establish a proper chain, the State must show to a “reasonable probability that the object is in the same condition as, and not substantially different from, its condition at the commencement of the chain.” McCray v. State, 548 So.2d 573, 576 (Ala.Crim.App.1988).’
“590 So.2d at 919-20. In Hale v. State, 848 So.2d 224 (Ala.2002), the Supreme Court reexamined its holding in Holton after the 1995 codification of § 12-21-13, Ala.Code 1975. The Supreme Court stated:
“ ‘Section 12-21-13, Ala.Code 1975, provides:
“ ‘ “Physical evidence connected with or collected in the investigation of a crime shall not be excluded from consideration by a jury or court due to a failure to prove the chain of custody of the evidence. Whenever a witness in a criminal trial identifies a physical piece of evidence connected with or collected in the investigation of a crime, the evidence shall be submitted to the jury or court for whatever weight the jury or court may deem proper. The trial court in its charge to the jury shall explain any break in the chain of custody concerning the physical evidence.” ’
“ ‘(Emphasis added.) This statute, by its terms, applies only to “[p]hysical evidence connected with or collected in the investigation of’ the charged crime. To invoke the statute the proponent of the evidence must first establish that the proffered physical evidence is in fact the very evidence “connected with or collected in the investigation.” Moreover,
“ ‘ “[i]n Land v. State, 678 So.2d 201 (Ala.Cr.App.1995), affd, 678 So.2d 224 (Ala.1996), a case which appears to rely on § 12-21-13, this court ruled that where a witness can specifically identify the evidence, and its condition is not an issue in the case, then the State is not required to establish a complete chain of custody in order for the evidence to be admitted into evidence. We stated:
*282 ‘The eyeglasses were admissible without establishing a chain of custody because [the testifying officer] was able to specifically identify them, and their condition was not an issue in the case.’ Land, 678 So.2d at 210....”’
“848 So.2d at 228 (emphasis in original and some citations omitted).
“Here, each of the exhibits was physical evidence that was collected in connection with the investigation of Sandra’s murder. Further, each exhibit was properly identified by a witness and the condition of the exhibits was not in issue. Accordingly, pursuant § 12-21-13, Ala.Code 1975, the exhibits were properly admitted.”
Vanpelt, 74 So.Bd at 72-73. See also Phillips v. State, 65 So.3d 971, 1029-1030 (Ala.Crim.App.2010).
Stanley does not assert that the letter exhibits were actually tampered with, altered, or contaminated. Instead, he seems to suggest that because no witness testified regarding the chain of custody for the letters, the letters were inadmissible. Each letter, however, was identified by Shelly as having been written to her by Stanley while they were both incarcerated. The condition of the letters was not at issue because there is no indication from the record that the contested exhibits were improperly tampered with or altered. Accordingly, we find no error in the trial court’s allowing the letters into evidence, and Stanley is due no relief on this claim.
3.
Stanley argues that the State failed to establish that he authored the letters. Stanley did not object to the letters on this ground. Thus, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
Rule 901(b)(2), Ala. R. Evid., governs lay-witness opinion testimony as it relates to the identification of handwriting and contemplates that a lay witness can offer an opinion on the genuineness of handwriting. This rule requires that “[n]on-expert opinion [testimony] as to the genuineness of handwriting [must be] based upon familiarity not acquired for purposes of the litigation.” Rule 901(b)(2). Rule 701 requires that a layperson’s testimony about an opinion or inference be limited to statements that are “(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness’s testimony or the determination of a fact in issue.” Rule 701, Ala. R. Evid.
In satisfaction of Rule 701 and Rule 901, Shelly testified at trial that she had been married to Stanley for a number of years so she was familiar with his handwriting; she identified both letters Stanley had sent to her; and she stated that the letters were written to her by Stanley. See, e.g., United States v. Apperson, 441 F.3d 1162, 1200-01 (10th Cir.2006) (finding sufficient basis for witness to testify as to the authentication of handwriting on a letter by testifying that “based upon his long-standing association with [the appellant], he was familiar with his handwriting”); United States v. Tipton, 964 F.2d 650, 654-55 (7th Cir.1992) (stating that witness could authenticate documents purportedly written by the appellant because the witness “was familiar with [the appellant's handwriting and signature as a result of observing ... documents [the appellant] prepared”); United States v. Barker, 735 F.2d 1280, 1283 (11th Cir.1984) (providing that witnesses who were coworkers of the appellant could authenticate writing on checks as appellant’s because they “testified they were familiar with the [appellant’s handwriting and stated in their opinions it matched or was similar to the handwriting on the checks”); United States v. Camger, *283 592 F.2d 312, 315 (6th Cir.1979) (holding that the “requirement of the illustration in Rule 901(b)(2)[, Fed. R. Evid.,] ... was clearly satisfied by the testimony of the witness who was familiar with the handwriting and signatures” of the writer).[28] The Advisory Committee’s Notes to Rule 901(b)(2), Ala. R. Evid., explain that “lay opinions may be based upon familiarity gained by seeing the person write, by exchanging correspondence, or other means. See, e.g., Alabama Farm, Bureau Mut. Casualty Ins. Co. v. Wood, 277 Ala. 624, 173 So.2d 787 (1965) (witness testifies that he has seen the purported author write and would recognize that person’s handwriting); Gilliland v. Dobbs, 234 Ala. 364, 174 So. 784 (1937) (authenticating witness had corresponded with the purported author). See generally C. Gamble, McElroy’s Alabama Evidence § 111.01(1) (4th ed.1991).” This Court thus finds no error in admitting this testimony.
VII.
Stanley claims that the trial court erred in admitting the testimony of his wife, Shelly. (Stanley’s brief, Issue VI, pp. 63-68.) He contends that Shelly’s waiver of the spousal privilege was involuntary because she was threatened with the death penalty. He also contends that her accomplice testimony was not sufficiently corroborated because, he says, no evidence other than her testimony connected him to Smith’s murder.
A.
Stanley asserts that Shelly’s plea agreement with the District Attorney’s Office renders her decision to testify involuntary. He moved to strike her testimony at trial as violative of the spousal privilege and alleged error on this basis in his motion for a new trial.
We find no error in the admission of Shelly’s testimony because the testimonial exemption of a spouse in a criminal trial is personal to the spouse witness and may be waived by the spouse for whatever reason. See, e.g., Paulson v. State, 455 So.2d 85, 87 (Ala.Crim.App.1984).
The marital-privilege statute as it pertains to criminal cases is codified at § 12-21-227, Ala.Code 1975, and provides: “The husband and wife may testify either for or against each other in criminal cases, but shall not be compelled so to do.” Furthermore,
“[u]nder our statute, it is the witness-spouse’s privilege, and the defendant-spouse can in no way compel or prevent her from exercising such privilege.
“The defendant-spouse cannot as a matter of law require her to testify in his behalf nor can the State require her to testify against him.
“This statute dealing with marital privilege is drawn in such a way to prevent the coercion by others which could directly or indirectly push the husband or wife into the witness box.”
Holyfield v. State, 365 So.2d 108, 112 (Ala.Crim.App.1978). See also Morrison v. State, 382 So.2d 1187, 1189 (Ala.Crim.App.1980) (holding, in a case where the appellant claimed that his wife had been coerced or intimidated into testifying in court, that the witness-spouse was properly advised of her privilege and testified voluntarily even though she first stated that she would testify against her husband, then said that she was unsure and would rather not and, *284 after some discussion, finally decided in favor of testifying). In Arnold, v. State, 853 So.2d 524 (Ala.1977), the Alabama Supreme Court interpreted this statute and stated that “the Alabama Legislature abolished the rule of incompetency and adopted the present statutory language which allows the spouse to testify voluntarily.” 358 So.2d at 526.
Nothing in the record suggests the manner in which Shelly would testify, but only that she would waive her privilege and testify as a witness in the case. The evidence showed that Shelly surrendered to law-enforcement officers with her husband, that she was arrested, and that she was charged with capital murder in connection with Smith’s death. While in jail awaiting trial, Shelly waived her spousal privilege, pleaded guilty to murder, and was sentenced to life imprisonment without the possibility of parole.[29] Her plea agreement, dated May 23, 2006, entered into with the District Attorney’s Office, provided, in pertinent part:
“11. Shelly Stanley acknowledges that she has been advised of her spousal testimonial privilege as set out in Title 12-21-227 of the Code of Alabama, 1975.
“12. Shelly Stanley understands that she may testify against her husband, Anthony Stanley, but may not be compelled to do so.
“13. Shelly Stanley knowingly and voluntarily waives her spousal testimonial privilege, and agrees to testify against her husband, Anthony Stanley, at any time requested by the State of Alabama.”
(C. 422, 434.) Shelly signed this plea agreement in the presence of her counsel and stated at that time that no threats, force, or other promises had been used to induce her to plead guilty. The agreement indicated that the District Attorney’s Office could bring and reinstate “any and all charges that could have been brought by the State of Alabama” if Shelly failed to abide by the terms of the plea agreement. (C. 423, 435.) See Paulson, 455 So.2d at 87-88 (upholding the voluntariness of a spouse’s testimony where she hoped to get a more lenient sentence).
At trial, Shelly testified that she had pleaded guilty to murder and was sentenced to life imprisonment. Her attorneys were with her when she entered her plea, and she agreed to testify truthfully for the State in exchange for the agreement. (R. 745-46, 832-33.) She stated, when questioned by defense counsel, that she believed that, if she did not testify in Stanley’s case, she could still be charged with capital murder. She, however, also stated that this was not the only reason she was testifying. (R. 828-29.)
After Shelly’s testimony at trial and after defense counsel moved to strike her testimony on the ground that the plea agreement was given under duress, the trial court took a recess and heard testimony from one of Shelly’s attorneys, outside the presence of the jury, regarding the voluntariness of her plea. (R. 840-44.) After hearing Shelly’s testimony at trial and her attorney’s testimony, and after considering the arguments of counsel, the trial judge denied Stanley’s motion to strike Shelly’s testimony. (R. 844.) We have carefully examined the record and are of the opinion that the trial court properly determined that Shelly voluntarily wished to testify and that such a voluntary act on her part, after full explanation of her right not to testify against her husband, was in accordance with § 12-21-227, Ala.Code 1975. Moreover, nothing in the record indicates that Shelly did not freely and voluntarily testify at trial about *285 both her and her husband’s involvement in Smith’s murder. See Paulson, supra, and Morrison, supra. Thus, we find no error in the trial court’s denial of Stanley’s motion to strike his wife’s testimony.[30]
B.
Stanley contends that there was no evidence connecting him to the crime other than Shelly’s testimony. Stanley claims that her testimony was not sufficiently corroborated under § 12-21-222, Ala.Code 1975. Stanley also argues that the trial court improperly failed to charge the jury as to the necessity for corroboration of accomplice testimony. He argues that the failure to do so constitutes reversible error. Stanley announced that he had no exceptions to the trial court’s charge to the jury at the guilt phase. (R. 1086, 1088.) Thus, we review this claim for plain error. Rule 45A, Ala. R.App. P.
Under § 12-21-222, Ala.Code 1975, a felony conviction “cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient.” In addressing whether the evidence was sufficient to corroborate accomplice testimony in Ex parte McCullough, 21 So.3d 758 (Ala.2009), the Alabama Supreme Court stated:
“In Ex parte Hardley, 766 So.2d 154 (Ala.1999), this Court addressed the test for determining the sufficiency of evidence corroborating an accomplice’s testimony:
“‘Discussing § 12-21-222, at § 300.01(5), C. Gamble, McElroy’s Alabama Evidence (5th ed.1996), Professor Gamble notes:
“ ‘ “Nonaccomplice evidence of the defendant’s guilt, to be sufficient corroboration of the accomplice’s testimony to take the case to the jury, must tend to connect the defendant with the crime or point to the defendant, as distinguished from another person, as the perpetrator of the crime. Nonaccomplice evidence which merely confirms the way and manner in which the crime was committed, but which is colorless and neutral insofar as the defendant’s connection with the crime is concerned, is not sufficient corroboration to warrant submission of the case to the jury.” ’
“766 So.2d at 157.
“This Court has elaborated on this test:
‘“Under § 12-21-222, Ala.Code 1975, a felony conviction “cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient.” (Emphasis added.) In reviewing a claim of insufficient corroboration, the Alabama appellate courts have stated that
*286 “ ‘ “[t]he test for determining whether there is sufficient corroboration of the testimony of an accomplice consists of eliminating the testimony given by the accomplice and examining the remaining evidence to determine if there is sufficient evidence tending to connect the defendant with the commission of the offense.”
“ ‘Andrews v. State, 370 So.2d 320, 321 (Ala.Crim.App.), cert, denied, 370 So.2d 323 (Ala.1979), citing Miller v. State, 290 Ala. 248, 275 So.2d 675 (1973). The evidence corroborating the accomplice’s testimony and connecting the defendant to the offense can be purely circumstantial evidence. Mathis v. State, 414 So.2d 151 (Ala.Crim.App.1982). But, ‘ “[i]t must be of a substantive character, must be inconsistent with the innocence of the accused, and must do more than raise a suspicion of guilt....’ Sorrell v. State, 249 Ala. 292, [293], 31 So.2d 82, 83 [(1947)].” Ex parte Bell, 475 So.2d 609, 613 (Ala.), cert denied, 474 U.S. 1038, 106 S.Ct. 607, 88 L.Ed.2d 585 (1985).’
“Ex parte Bullock, 770 So.2d 1062, 1067 (Ala.2000).
“Furthermore, in Ex parte Stewart, 900 So.2d 475 (Ala.2004), this Court, quoting Ex parte Hunt, 744 So.2d 851, 858-59 (Ala.1999), noted:
“ ‘ “The Court of Criminal Appeals has ... added the following caveats to the rule [regarding corroboration of accomplice testimony]:
“““ “The tendency of the corroborative evidence to connect [the] accused with the crime, or with the commission thereof, must be independent, and without the aid of any testimony of the accomplice; the corroborative evidence may not depend for its weight and probative value on the testimony of the accomplice, and it is insufficient if it tends to connect [the] accused with the offense only when given direction or interpreted by, and read in conjunction with the testimony of the accomplice.” 23 C.J.S. Criminal Law, Section 812(b)(1961).’
““‘Mills v. State, 408 So.2d [187], 191-92 [ (Ala.Crim.App.1981) ].”
“““ “ ‘[EJvidence which merely raises a conjecture, surmise, speculation, or suspicion that [the] accused is the guilty person is not sufficiently corroborative of the testimony of an accomplice to warnmt a conviction.’ 23 C.J.S. Criminal Law, Section 12(5)(b).” Staton v. State, 397 So.2d 227, 232 (Ala.Crim. App.1981).’
“ ‘ “Steele v. State, 512 So.2d 142, 143-44 (Ala.Crim.App.1987).” ’
“900 So.2d at 477-78 (emphasis added). 21 So.3d at 761-62. See Williams v. State, 72 So.3d 721 (Ala.Crim.App.2010). See also Green v. State, 61 So.3d 386 (Ala.Crim.App.2010). It is well settled that the corroborating evidence need only be slight and can be circumstantial — it does not have to be strong enough by itself to warrant a conviction — but it must tend to connect the accused with the commission of the crime. See McGowan, 990 So.2d at 987 (explaining that although evidence corroborating an accomplice’s testimony need only be slight, it must tend to connect the defendant to the crime and be inconsistent with the defendant’s innocence); Stoinslci v. State, 956 So.2d 1174, 1182 (Ala.Crim.App.2006) (providing that “[c]orroboration need only be slight to suffice”); Steele v. State, 911 So.2d 21, 28 (Ala.Crim.App.2004) (explaining that accomplice testimony may be corroborated by circumstantial evidence); Gavin, 891 So.2d at 976 (stating *287 that corroborating evidence by itself need not be sufficient to sustain a conviction); Ferguson, 814 So.2d at 952 (“Corroborative evidence need not directly confirm any particular fact nor go to every material fact stated by the accomplice.”); Arthur, 711 So.2d at 1059-60 (providing that circumstantial evidence may be sufficient to corroborate the testimony of an accomplice); Dykes v. State, 30 Ala.App. 129, 133, 1 So.2d 754, 756-57 (1941) (explaining that “[i]t has been repeatedly held, and advisedly so, that the corroboration of the testimony of an accomplice need not go to every material fact to which he testifies. If corroborated in some of such facts the jury may believe that he speaks the truth as to all”).
“Whether such corroborative evidence exists is a question of law' to be resolved by the trial court, its probative force and sufficiency being questions for the jury.” Caldwell v. State, 418 So.2d 168, 170 (Ala.Crim.App.1981) (citations omitted).
Guided by these principles of law and applying the rule that requires us to subtract Shelly’s testimony and examine the remaining evidence, we conclude that the remaining evidence sufficiently connected Stanley to Smith’s murder. The evidence showed that Smith’s body was found in the Stanleys’ apartment. See Ex parte Scott, 728 So.2d 172, 178 (Ala.1998) (recognizing that the defendant’s proximity to the crime scene is a relevant consideration in determining whether an accomplice’s testimony was sufficiently corroborated). The evidence revealed that Stanley and Shelly were seen together after the murder and even stayed in a Best Western hotel on the night of the murder. They were also seen driving the victim’s truck in the Colbert Heights area. Additionally, Stanley had carpet burn on his knees when he surrendered to authorities and the evidence indicated that Smith had been stabbed repeatedly with two steak knives in the back while he lay face down on the carpet. Even after subtracting Shelly’s accomplice testimony, there was ample evidence tending to connect Stanley with Smith’s murder. Accordingly, there is no merit to Stanley’s claim. Shelly’s accomplice testimony was amply corroborated.
Regarding whether the trial court erred in failing to instruct the jury on accomplice testimony, “section [12 — 21— 222, Ala.Code 1975] merely creates a statutory rule, and not a constitutional right.” Alexander v. State, 281 Ala. 457, 458, 204 So.2d 488, 489 (1967). See also Woodberry v. State, 497 So.2d 587, 589 (Ala.Crim.App.1986). Moreover, the failure to give such an instruction can be harmless.
“[1] “The court should have instructed the jury concerning the need for corroborative evidence of McCants’s testimony. However, the failure to do so does not mean that this cause must automatically be reversed. Automatic reversal exists only when the error ‘necessarily renders a trial fundamentally unfair.’ Rose v. Clark, 478 U.S. 570, [577], 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986). Alabama has applied the harmless error analysis in a case involving the death penalty to the failure of the court to instruct the jury on the principle of accomplice corroboration. Gurley v. State, 639 So.2d 557 (Ala.Cr.App.1993); Frazier v. State, 562 So.2d 543, 558 (Ala.Cr.App.), rev’d on other grounds, 562 So.2d 560 (Ala.1989).” ’ ”
Jackson v. State, 836 So.2d 915, 946 (Ala.Crim.App.1999) (finding that because there was sufficient evidence to corroborate the accomplice’s testimony, the trial court’s failure to instruct the jury on the necessity of corroborating accomplice testimony “did not rise to the level of plain error and was, *288 at most, harmless error. See Rule 45, Ala. R.App. P.”).
“ ‘[T]he error of failing to instruct the jury on the need for corroborative evidence is harmless when the testimony of an accomplice has in fact been corroborated. Frazier v. State, 562 So.2d 543, 558 (Ala.Cr.App.), reversed on other grounds, 562 So.2d 560 (Ala.1989). Accord People v. Brunner, 797 P.2d 788, 790 (Colo.App.1990); State v. Brown [187 Conn. 602], 447 A.2d 734, 740 (Conn.1982); Ali v. United States, 581 A.2d 368, 377-78 (D.C.App.1990), cert, denied, 502 U.S. 893, 112 S.Ct. 259 [116 L.Ed.2d 213] (1991); Strong v. State [261 Md. 371], 275 A.2d 491, 495 (Md. 1971), vacated on other grounds, 408 U.S. 939 [92 S.Ct. 2872, 33 L.Ed.2d 760] (1972); State v. England, 409 N.W.2d 262, 265 (Minn.App.1987).’ ”
Burton v. State, 651 So.2d 641, 654 (Ala.Crim.App.1993) (quoting Gurley v. State, 639 So.2d 557, 561 (Ala.Crim.App.1993)). See also Ex parte Bankhead, 585 So.2d 112,119 (Ala.1991), rev’d on other grounds, 625 So.2d 1146 (Ala.1993) (holding that because there was sufficient evidence to corroborate the accomplice’s testimony, the trial court did not commit reversible error in not instructing the jury on the need for corroboration of accomplice testimony); Hutcherson v. State, 677 So.2d 1174, 1200 (Ala.Crim.App.1994), rev’d on other grounds, 677 So.2d 1205 (Ala.1996) (holding that even if the witness was an accomplice and testified for the State, “there was more than sufficient evidence to corroborate his testimony; therefore, no reversible error would have occurred. Burton v. State, 651 So.2d 641 (Ala.Cr.App.1993); Gurley v. State, 639 So.2d 557 (Ala.Cr.App.1993); Frazier v. State, 562 So.2d 543 (Ala.Cr.App.), rev’d on other grounds, 562 So.2d 560 (Ala.1989)”).
In this case, as mentioned above, there was ample evidence to corroborate Shelly’s testimony. Therefore, the trial court’s failure to instruct the jury as to the necessity of corroborating accomplice testimony did not adversely affect Stanley’s substantial rights. See Hyde v. State, 778 So.2d 199, 221 (Ala.Crim.App.1998) (holding that because there was corroborating evidence, there was no plain error as a result of the trial court’s not charging the jury regarding accomplice testimony). Based on the foregoing, no basis for reversal exists regarding this claim.
VIII.
Stanley argues that the trial court allowed the State to elicit improper hearsay testimony. More particularly, Stanley cites three different instances of testimony he alleges were hearsay. (Stanley’s brief, Issue VII, pp. 68-70.) Because Stanley failed to object to the testimony he now challenges, our review is limited to an examination for plain error. See Rule 45A, Ala. R.App. P.
Stanley challenges instances where Ronald Berryhill, Janice Berryhill, and Jenna Mitchell testified that the Stanleys were leaving town. (R. 467, 491-92, 1011, 703.) Both Ronald and Janice testified that Dot told them on Sunday, June 19, 2005, that her son and daughter-in-law were leaving town that evening because a warrant had been issued for Shelly’s arrest. Mitchell testified that when her mother, Shelly, visited her on Saturday, June 18, 2005, Shelly told her that she was going to be leaving the area for a long time and that she wanted to see her before she left town.
“Rule 801(c), Ala. R. Evid., reads:
‘““Hearsay” is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.’
*289 “Rule 802, Ala. R. Evid., provides that
“ ‘[h]earsay is not admissible except as provided by these rules, or by other rules adopted by the Supreme Court of Alabama or by statute.’ ”
Ex parte Baker, 906 So.2d 277, 288 (Ala.2004).
The record indicates that the testimony Stanley alleges was hearsay was not elicited to prove the truth of the matter asserted. Rather, regarding Ronald’s and Janice’s testimony, it was presented to provide an explanation of why Ronald and Swanie decided to go to the Stanleys’ apartment on Monday to retrieve the dogs that had been left there unattended. This testimony was being offered not “to prove the truth of whatever facts might be stated, ‘but rather to establish the reason for action or conduct by the witness.’ ” Gray-son, 824 So.2d at 813 (quoting Edwards v. State, 502 So.2d 846, 849 (Ala.Crim.App.1986), quoting in turn Tucker v. State, 474 So.2d 131, 132 (Ala.Crim.App.1984), rev’d on other grounds, 474 So.2d 134 (Ala.1985)).
Likewise, as for Mitchell’s testimony as to what her mother told her about leaving for awhile, it also was not offered to prove the truth of the matter asserted. Instead, the testimony was offered to describe Shelly’s physical and emotional condition on the day of the murder. See, e.g., Brownfield v. State, 44 So.3d 1, 20 (Ala.Crim.App.2007) (finding testimony not to be inadmissible hearsay but to explain why the authorities were telephoned); Robit-aille v. State, 971 So.2d 43, 57 (Ala.Crim.App.2005); Stallworth, 868 So.2d at 1153. Consequently, the complained-of testimony was not hearsay, and we find no error, plain or otherwise, in its admission into evidence.
IX.
Stanley contends the trial court committed several errors in its jury instructions in the guilt phase of the trial. (Stanley’s brief, Issues III and IX.) Stanley did not object to any of the alleged errors at trial. Therefore, we review his assertions pursuant to the plain-error rule. Rule 45A, Ala. RApp. P.
“ ‘When reviewing a trial court’s jury instructions, we must view them as a whole, not in bits and pieces, and as a reasonable juror would have interpreted them.’ Johnson v. State, 820 So.2d 842, 874 (Ala.Crim.App.2000).
“ ‘A trial court has broad discretion when formulating its jury instructions. See Williams v. State, 611 So.2d 1119, 1123 (Ala.Cr.App.1992). When reviewing a trial court’s instructions, “ ‘the court’s charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.’ ” Self v. State, 620 So.2d 110, 113 (Ala.Cr.App.1992) (quoting Porter v. State, 520 So.2d 235, 237 (Ala.Cr.App.1987)); see also Beard v. State, 612 So.2d 1335 (Ala.Cr.App.1992); Alexander v. State, 601 So.2d 1130 (Ala.Cr.App.1992).’
“Williams v. State, 795 So.2d 753, 780 (Ala.Crim.App.1999).”
Vanpelt, 74 So.3d at 92. See also Reynolds v. State, 114 So.3d 61, 148-149 (Ala.Crim.App.2010).
“In the context of challenged jury instructions, the plain-error doctrine has been applied as follows.
“ ‘ “ ‘In setting out the standard for plain error review of jury instructions, the court in United States v. Chandler, 996 F.2d 1073, 1085, 1097 (11th Cir.1993), cited Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), for *290 the proposition that “an error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner.” Williams v. State, 710 So.2d 1276, 1306 (Ala.Crim.App.1996), affd, 710 So.2d 1350 (Ala.1997), cert, denied, 524 U.S. 929, 118 S.Ct. 2325,141 L.Ed.2d 699 (1998).’ ”
“ ‘Broadnax v. State, 825 So.2d 134, 196 (Ala.Crim.App.2000), quoting Pilley v. State, 789 So.2d 870, 882-83 (Ala.Crim.App.1998).’ ”
Harris, 2 So.3d at 910. See also Belisle, 11 So.3d at 308; Gobble, 104 So.3d at 973 (quoting Johnson v. State, 820 So.2d 842, 874 (Ala.Crim.App.2000), quoting in turn Ex parte Boyd, 715 So.2d 852 (Ala.1998)) (“ ‘ “The absence of an objection in a case involving the death penalty does not preclude review of the issue; however, the defendant’s failure to object does weigh[ ] against his claim of prejudice.” ’ ”).
Moreover,
“An accused has the right to have the jury charged on ‘ “any material hypothesis which the evidence in his favor tends to establish.” ’ Ex parte Stork, 475 So.2d 623, 624 (Ala.1985). ‘In determining whether an instruction was supported by the evidence the question is not whether the Supreme Court or Court of Criminal Appeals believes the evidence, but simply whether such evidence was presented.’ Id. ‘[E]very accused is entitled to have charges given, which would not be misleading, which correctly state the law of his case, and which are supported by any evidence, however weak, insufficient, or doubtful in credibility.’ Ex parte Chavers, 361 So.2d 1106, 1107 (Ala.1978). ‘ “ ‘It is a basic tenet of Alabama law that “a party is entitled to have his theory of the case, made by the pleadings and issues, presented to the jury by proper instruction, ... and the [trial] court’s failure to give those instructions is reversible error.” ”” Ex parte McGriff, 908 So.2d 1024, 1035 (Ala.2004), quoting Winner Int’l Corp. v. Common Sense, Inc., 863 So.2d 1088, 1091 (Ala.2003), quoting in turn other cases. ‘In order to determine whether the evidence is sufficient to necessitate an instruction and to allow the jury to consider the defense, we must view the testimony most favorably to the defendant.’ Ex parte Pettway, 594 So.2d 1196,1200 (Ala.1991).”
Williams v. State, 938 So.2d 440, 444-45 (Ala.Crim.App.2005).
With these principles in mind, we turn to Stanley’s specific claims of error.
A.
Stanley submits the trial court committed plain error by not instructing the jury on intoxication and manslaughter as a lesser offense because there was evidence indicating that he had a long history of drug addiction and that he was under the influence of drugs when he committed the crime. (Stanley’s brief, Issue III, pp. 45-48.) The record shows that the trial court instructed the jury on intentional murder and felony murder as lesser-included offenses of capital murder. Stanley did not, however, request an instruction on voluntary intoxication and manslaughter, and he did not object when the trial court did not give such charges. We therefore review Stanley’s claim for plain error. See Rule 45A, Ala. R.App. P.
“ ‘A charge on intoxication should be given if “ ‘there is an evidentiary foundation in the record sufficient for the jury to entertain a reasonable doubt’ ” in the element of intent. Coon v. State, 494 So.2d 184, 187 (Ala.Crim.App.1986) (quoting Government of the Virgin Islands v. Carmona, 422 F.2d 95, 99 n. 6 (3d Cir.1970)). See *291 also People v. Perry, 61 N.Y.2d 849, 478 N.Y.S.2d 966, 966-67, 462 N.E.2d 143, 143-44 (App.1984) (“[a] charge on intoxication should be given if there is sufficient evidence of intoxication in the record for a reasonable person to entertain a doubt as to the element of intent on that basis”). An accused is entitled to have the jury consider the issue of his intoxication where the evidence of intoxication is conflicting, Owen v. State, 611 So.2d 1126, 1128 (Ala.Crim.App.1992); Crosslin v. State, 446 So.2d 675, 682 (Ala.Crim.App.1983), where the defendant denies the commission of the crime, Coon v. State, 494 So.2d at 187; see Moran v. State, 34 Ala.App. 238, 240, 39 So.2d 419, 421, cert, denied, 252 Ala. 60, 39 So.2d 421 (1949), and where the evidence of intoxication is offered by the State, see Owen v. State, 611 So.2d at 1127-28.’
“Pilley v. State, 930 So.2d 550, 561-62 (Ala.Crim.App.2005).”
“However, the court should charge on voluntary intoxication only when there is a sufficient evidentiary foundation in the record for a jury to entertain a reasonable doubt as to the element of intent. Ex parte McWhorter, 781 So.2d 330, 342 (Ala.2000). In Pilley this Court provided guidance as to what evidence would be required to form that evidentiary foundation.
“ ‘The Alabama Legislature has defined “intoxication” to include “a disturbance of mental or physical capacities resulting from the introduction of any substance into the body.” § 13A-3 — 2(c)(1), Ala.Code 1975. Thus, evidence that the defendant ingested alcohol or drugs, standing alone, does not warrant a charge on intoxication. “[TJhere must be evidence that the ingestion caused a disturbance of the person’s mental or physical capacities and that that mental or physical disturbance existed at the time the offense was committed.” Lee v. State, 898 So.2d 790, 838 (Ala.Crim.App.2001) (opinion on return to remand), cert, denied, 898 So.2d 874 (Ala.), cert, denied, 543 U.S. 924, 125 S.Ct. 309, 160 L.Ed.2d 222 (2004). See also Maples v. State, 758 So.2d 1, 23 (Ala.CrimApp.), affd 758 So.2d 81 (Ala.1999). Such a holding is consistent with this Court’s opinion in Windsor v. State, 683 So.2d 1027, 1037 (Ala.Crim.App.1994), affd, 683 So.2d 1042 (Ala.1996), in which we stated:
“ ‘ “In this case, however, there was no evidence that the appellant was intoxicated. Although there was evidence that the appellant had been drinking beer on the day of the robbery-murder, there was no evidence concerning the quantity of beer he consumed that day at the time of the murder. Evidence that someone was drinking an alcoholic beverage is not evidence that that person was intoxicated. There was no ‘reasonable theory’ to support an instruction on intoxication because there was no evidence of intoxication. The court did not err in not instructing the jury on intoxication and manslaughter where there was no evidence that the appellant was intoxicated at the time the robbery-murder occurred.” ’
“Pilley, 930 So.2d at 563.”
Harris, 2 So.3d at 911. Thus, “ ‘[ujnder § 13A-l-9(b), Ala.Code 1975, a trial judge is not required to instruct on a lesser-included offense “unless there is a rational basis for a verdict convicting the defendant of the included offense.” ’ ” Harris, 2 So.3d at 912 (quoting Pilley v. State, 930 So.2d 550, 563 (Ala.Crim.App.2005)).
*292 The evidence showed that Stanley and Shelly ingested crack cocaine and OxyContin the night before the stabbing and early in the morning of the stabbing. Shelly testified that they had been on a drug “binge” for about four days before the murder. However, Shelly testified they ran out of drugs around 3:00 a.m. Saturday morning, the day of the murder and that, typically, a “high” lasted only approximately 20 minutes. There was no evidence indicating that Stanley was still intoxicated at the time Smith, the victim, arrived at the Stanleys’ apartment around 7:30 a.m. There was also no evidence concerning the effects, if any, the amount of crack cocaine and other substances allegedly ingested the night before and in the early hours of the morning of the murder had on Stanley at the time of the stabbing. In fact, the evidence showed that Stanley changed clothes and cleaned up after the murder and that he and Shelly moved Smith’s truck. Rather, based on the evidence presented at trial, Stanley failed to establish any evidentiary foundation of intoxication that would warrant an instruction on intoxication. Windsor v. State, 683 So.2d 1027, 1037 (Ala.Crim.App.1994) (“Although, there was evidence that the appellant had been drinking beer on the day of the robbery-murder, there was no evidence concerning the quantity of beer he consumed that day at the time of the murder. Evidence that someone was drinking an alcoholic beverage is not evidence that that person was intoxicated.”). Compare Fletcher v. State, 621 So.2d 1010, 1018 (Ala.Crim.App.1993) (finding plain error where the trial court did not instruct the jury on the legal principles of intoxication and manslaughter because the trial judge invaded the province of the jury by stating that he “ ‘did not get the impression from the evidence that [the defendant] was so intoxicated that he didn’t know what he was doing.’ ”). The evidence was insufficient to support a jury’s finding beyond a reasonable doubt that Stanley was unable to form the requisite intent to commit capital murder, because he was experiencing “a disturbance of mental or physical capacities” resulting from drug or alcohol use at the time of the murder. See § 13A-3-2(e)(l), Ala.Code 1975. Furthermore, an intoxication instruction would have been inconsistent with the defense’s theory that Shelly acted alone in Smith’s murder. See Ex parte Mills, 62 So.3d 574, 583 (Ala.2010) (lesser-included-offense instruction based on intoxication was inconsistent with the appellant’s claim of innocence); Pilley, 930 So.2d at 563 (holding that an intoxication instruction was inconsistent with the appellant’s theory of complete innocence); Hunt, 659 So.2d at 958 (“Where, as in this case, an intoxication instruction would conflict with defense strategy, there is no plain error in the trial court’s failure to give such an instruction.”). Thus, we find no plain error in the trial court’s failure to instruct the jury on voluntary intoxication or manslaughter as a lesser-included offense. See Spencer v. State, 58 So.3d 215, 232 (Ala.Crim.App. 2008).
B.
Stanley maintains that the trial court’s instruction on reasonable doubt violated the principles of Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328,112 L.Ed.2d 339 (1990). (Stanley’s brief, Issue IX, pp. 78-82.) Stanley specifically takes issue with certain terminology used by the trial court to describe reasonable doubt. He contends that by stating that reasonable doubt is not a “possible” or “speculative” doubt, the trial court lessened the State’s burden of proof and shifted the burden of proof to him. (Stanley’s brief, pp. 79-80.) Stanley claims that by equating reasonable doubt with “an abiding conviction ... aris *293 ing from the evidence” and by instructing the jury that, “in determining what the true facts are, you are limited to the evidence that has been presented from the witness stand,” the court misled the jury into thinking that it could not consider the lack of evidence in reaching its verdict. (Stanley’s brief, pp. 80-81.)
A review of the entire reasonable-doubt instruction given by the trial court in this case reveals that it properly followed the legal guidelines and the Alabama Pattern Jury Instructions in instructing the jury. The trial court charged the jury as follows:
“The State of Alabama has the burden of proving the guilt of the Defendant beyond a reasonable doubt. And this burden remains on the State throughout the case. The Defendant is not required to prove his innocence.
“The phrase ‘reasonable doubt’ is self-explanatory. And efforts to define it do not always clarify the term. But it may help you some to say that the doubt that would justify an acquittal must be a reasonable doubt and not a mere possible doubt. A reasonable doubt is not mere guess or surmise and is not forced or capricious doubt.
“If after considering all the evidence in this case you have an abiding conviction of the truth of the charge, then you are convinced beyond a reasonable doubt. And it would be your duty to convict the Defendant. The reasonable doubt which entitles an accused to an acquittal is not a mere fanciful, vague, conjectural, or speculative doubt but a reasonable doubt arising from the evidence and remaining after a careful consideration of the testimony such as reasonable, fair-minded, and conscientious men and women would entertain under all the circumstances.
“You would observe that the State is not required to convince you of the Defendant’s guilt beyond all doubt but simply beyond all reasonable doubt. After comparing and considering all of the evidence in this case your minds are left in such condition that you could not say that you have an abiding conviction of the Defendant’s guilt, then you’re not convinced beyond a reasonable doubt. And the Defendant would be entitled to an acquittal.”
(R. 1062-63.)
In Vanpelt, 74 So.3d at 83, this Court addressed a similar issue and, in concluding that the complained-of instruction did not improperly shift the burden of proof to the defendant, stated:
“In Cage, the Supreme Court held that a Louisiana trial court’s reasonable-doubt instruction impermissibly suggested a higher degree of doubt than is required for acquittal under the reasonable-doubt standard of In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The instruction in Cage provided, in relevant part:
“ ‘If you entertain a reasonable doubt as to any fact or element necessary to constitute the defendant’s guilt, it is your duty to give him the benefit of the doubt and return a verdict of not guilty. Even where the evidence demonstrates a probability of guilt, if it does not establish such guilt beyond a reasonable doubt, you must acquit the accused. This doubt, however, must be a reasonable one; that is one that is founded upon a real tangible substantial basis and not upon mere caprice and conjecture. It must be such doubt as would give rise to a grave uncertainty, raised in your mind by reasons of the unsatisfactory character of the evidence or the lack thereof. A reasonable doubt is not a mere possible doubt. It is an actual substantial doubt. It is a doubt that a reasonable man can seriously enter *294 tain. What is required is not an absolute or mathematical certainty, but a moral certainty.’
“Cage, 498 U.S. at 40 (emphasis in original). The Cage Court determined that this reasonable-doubt instruction impermissibly suggested a higher degree of doubt than is required for acquittal under the reasonable-doubt standard established in In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Specifically, the Cage court held that ‘[i]t is plain to us that the words “substantial” and “grave,” as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable-doubt standard.’ Cage, 498 U.S. at 41.”
“In Smith v. State, this court reviewed a similar issue and held as follows:
“ ‘Although the trial court did refer to a reasonable doubt as an “actual doubt,” it did not state that the doubt must be “grave” or “substantial,” as the faulty charge in Cage instructed. See Cage, 498 U.S. at 40, 111 S.Ct. at 328 (holding that the terms “grave” and “substantial” suggest a higher degree of doubt than that actually required to acquit). Furthermore, the trial court’s instruction that the doubt could not be “fanciful,” “vague,” “speculative,” “arbitrary,” or “merely possible” follows the language of the Alabama Pattern Jury Instruction: Criminal on a reasonable doubt charge. The fact that the trial court followed an accepted pattern jury instruction weighs heavily against any finding of error. Canvll v. State, 599 So.2d 1253 (Ala.Cr.App.1992), affd, 627 So.2d 874 (Ala.1993), cert, denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994); Dill v. State, 600 So.2d 343 (Ala.Cr.App.1991), affd, 600 So.2d 372 (Ala.1992), cert, denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), affd, 577 So.2d 531 (Ala.), cert, denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). Based on the foregoing, there is no plain error in the trial court’s instruction on reasonable doubt.’
“Smith v. State, 756 So.2d 892, 922 (Ala.Crim.App.1997).”
Vanpelt, 74 So.3d at 83-84. See also Lee v. State, 898 So.2d 790, 841-42 (Ala.Crim.App.2001); Greenhill v. State, 746 So.2d 1064, 1069-71 (Ala.Crim.App.1999). Likewise, this Court has approved instructions similar to the one presented here and concluded that the burden of proof was not shifted. See Brown, 11 So.3d at 903; Harris, 2 ,So.3d at 912-14; Belisle, 11 So.3d at 309; Stallworth, 868 So.2d at 1164.
In Knotts v. State, 686 So.2d 431 (Ala.Crim.App.), opinion after remand, 686 So.2d 484 (Ala.Crim.App.1995), we held:
“The Due Process Clause of the Fourteenth Amendment ‘protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.’ In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). In Cage v. Louisiana, the United States Supreme Court found that a jury charge that defined ‘reasonable doubt’ by using the phrases ‘grave uncertainty,’ ‘actual substantial doubt,’ and ‘moral certainty’ could have led a reasonable juror to interpret the instructions to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause. Subsequently, the Court ‘made it clear that the proper inquiry is not whether the instruction “could have” been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury did so apply it.’ Victor v. Nebraska, 511 U.S. 1, 6, 114 S.Ct. 1239, *295 1243, 127 L.Ed.2d 583 (1994) (quoting Estelle v. McGuire, 502 U.S. 62, 72-73, and n. 4, 112 S.Ct. 475, 482 and n. 4, 116 L.Ed.2d 385 (1991), emphasis in original). Thus, the constitutional question presented here is whether there is a reasonable likelihood that the jury understood the instructions to allow the conviction based on proof insufficient to meet the Winship reasonable doubt standard. Victor v. Nebraska; Ex parte Kirby, 643 So.2d 587 (Ala.), cert, denied, [513] U.S. [1023], 115 S.Ct. 591, 130 L.Ed.2d 504 (1994); Cox v. State, 660 So.2d 233 (Ala.Cr.App.1994).
“In reviewing the reasonable doubt instruction, we do so in the context of the charge as a whole. Victor v. Nebraska; Baker v. United States, 412 F.2d 1069 (5th Cir.1969), cert, denied, 396 U.S. 1018, 90 S.Ct. 583, 24 L.Ed.2d 509 (1970); Williams v. State, 538 So.2d 1250 (Ala.Cr.App.1988). So long as the definition of ‘reasonable doubt’ in the charge correctly conveys the concept of reasonable doubt, the charge will not be considered so prejudicial as to mandate reversal. Victor v. Nebraska; Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954).”
686 So.2d at 459. Additionally, as this Court said in Harris:
“The instruction on reasonable doubt that the trial court provided to the jury here incorporated the language found in the Alabama Pattern Jury Instructions on reasonable doubt. The pattern jury instructions inform jurors that their doubt cannot be based on ‘a mere guess or surmise’.... It also informs jurors that reasonable doubt that ‘entitles an accused to an acquittal is not a mere fanciful, vague, conjectural or speculative doubt.’ Alabama Pattern Jury Instructions: Criminal, Instructions 1.4 and 1.5 (3d ed.1994). ‘ “ ‘A trial court’s following of an accepted pattern jury instruction weighs heavily against any finding of plain error.’ ” Wilson v. State, 111 So.2d 856 (Ala.Crim.App.1999), quoting Price v. State, 725 So.2d 1003, 1058 (Ala.Crim.App.1997), affd, 725 So.2d 1063 (Ala.1998), cert, denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999).’ Snyder v. State, 893 So.2d 488, 550 (Ala.Crim.App.2003).”
2 So.3d at 913.
We conclude that the instruction did not shift the burden of proof to Stanley. See Harris; McGowan v. State, 990 So.2d at 956. Further, the “abiding-conviction” language did not render the instruction unconstitutional. See Woods v. State, 789 So.2d 896, 933-34 (Ala.Crim.App.1999) (holding that instruction that proof beyond reasonable doubt required the jurors to have an “abiding conviction” as to the truth of the charge correctly stated the State’s burden of proof). Taken as a whole, the trial court’s instruction in this case properly conveyed the concept of reasonable doubt to the jury, and it did not lessen the State’s burden of proof. There is no reasonable likelihood that the jury applied the instruction in a manner that violated Stanley’s constitutional rights. Therefore, we find no error.
C.
Stanley claims the trial court’s instructions failed to distinguish between the intent necessary to commit capital murder and the intent necessary to commit felony murder. (Stanley’s brief, Issue IX, pp. 82-83.)
We have reviewed the trial court’s jury instructions on capital murder and felony murder; the instructions track the language in the Alabama Pattern Jury Instructions: Criminal (3d ed.1994). See Ex parte Hagood, 111 So.2d 214, 219 (Ala.1999) (“It is the preferred practice to use *296 the pattern jury instructions in a capital case.”). Alabama courts have often held that a trial court’s use of an instruction taken from Alabama’s Pattern Jury Instructions weighs heavily against a finding of plain error. See, e.g., Price v. State, 725 So.2d 1003, 1058 (Ala.Crim.App.1997). Cf. Ex parte Wood, 715 So.2d 819, 824 (Ala.1998) (“[T]here may be some instances when using those pattern charges would be misleading or erroneous.”)
In regard to the capital-murder charge, the trial court, on more than one occasion, instructed the jury that to be convicted of capital murder the accused must have a specific or particularized intent to kill.[31] In regard to the felony-murder instruction, the trial court instructed the jury that the intent necessary was the intent to commit the underlying felony — not the intent to commit murder. The trial court correctly instructed the jury that felony murder required the defendant to have caused the victim’s death during the commission of a robbery in the first degree, and the court accurately defined the elements of robbery in the first degree, including the element that the defendant have the intent to overcome the victim’s physical resistance or physical power of resistance or the intent to compel acquiescence to the taking of the property as well as the intent to deprive the owner of his or her property.
Clearly, the court instructed the jury concerning the difference between capital murder and felony murder. The instructions were not misleading; rather, they properly apprised the jury of the elements of capital murder and felony murder. See Smith v. State, 908 So.2d 273, 297 (Ala.Crim.App.2000); Freeman v. State, 555 So.2d 196, 208 (Ala.Crim.App.1988) (noting that “the trial judge extensively instructed the jury on the difference between capital murder, felony murder, and intentional murder”); Davis v. State, 440 So.2d 1191, 1194 (Ala.Crim.App.1983) (trial court instructed the jury on “the intent required for a capital felony, on the felony murder doctrine and on the distinction between the intent required for a capital felony and the intent required for the lesser included offense of non-capital murder”); Womack v. State, 435 So.2d 754, 763 (Ala.Crim.App.1983) (holding that “[t]he jury was given proper instructions on the ‘intent to kill requirement’ ” where the trial court “made it clear to the jury that the felony murder doctrine was relevant only to the lesser included offense of noncapital murder, and that there could be no conviction for the capital offense absent a finding beyond a reasonable doubt that the appellant possessed the intent to kill”). There was no plain error as to the trial court’s instructions to the jury on capital murder and felony murder.
D.
Stanley alleges that the trial court erred in failing to ensure that the proceedings were fully transcribed by the court reporter. Specifically, Stanley claims error because the jury-charge conferences during both the guilt and penalty phases were not recorded or transcribed. Stanley also asserts error because other bench conferences were not recorded or transcribed. (Stanley’s brief, Issue IX, pp. 76-78.)
Stanley’s trial counsel moved the trial court to “require a full and complete transcription of the entire proceedings in this case, including, but not limited to ... all conferences and hearings (including bench and chamber conferences) ... [and] the *297 jury instructions and charge conference,” and the trial court granted the motion. (C. 81, 95.) Regarding the charge conferences, Stanley never objected to what transpired off the record. He also did not attempt to have the record supplemented with a transcript of the complained-of conferences.
As this Court noted in Calhoun v. State, 982 So.2d 923 (Ala.Crim.App.2005):
“As we stated in Wynn v. State, 804 So.2d 1122, 1143-44 (Ala.Crim.App.), cert, denied, 804 So.2d 1152 (Ala.2001):
“‘[I]t should have been apparent to the defense during the trial that the court reporter was not recording certain sidebars.... Defense counsel could have easily reminded the trial court that it had granted his motion for full recordation of the proceedings and remedied the omissions at that time. Therefore, this error was invited by the appellant.’
“Moreover, in determining whether there is reversible error based on an omission in the transcript we use the standard discussed in Ingram v. State, 779 So.2d 1225 (Ala.Crim.App.1999), affd, 779 So.2d 1283 (Ala.2000), cert, denied, 531 U.S. 1193, 121 S.Ct. 1194, 149 L.Ed.2d 109 (2001). In Ingram, we stated:
‘“Where the transcript or record is incomplete, two rules have evolved. The first applies to the situation where the appellant is represented on appeal by the same counsel that represented him at trial. In that case, the failure to supply a complete record is not error per se and will not work a reversal absent a specific showing of prejudice. In other words, in such a case, the appellant must show that failure to record and preserve the specific portion of the trial proceedings complained of visits a hardship upon him and prejudices his appeal. The second applies to the situation where the appellant is represented by new counsel on appeal. When he is represented on appeal by counsel other than the attorney at trial, the absence of a substantial and significant portion of the record, even absent any showing of specific prejudice or error, is sufficient to warrant reversal.’
“779 So.2d at 1280-81.”
932 So.2d at 941-42. See also Brown v. State, 11 So.3d at 892-93 (quoting Green v. State, 796 So.2d 438, 439-40 (Ala.Crim.App.2001), quoting in turn Ex parte Godbolt, 546 So.2d 991, 997 (Ala.1987), quoting in turn United States v. Selva, 559 F.2d 1303,1305-06 (5th Cir.1977)).
 In this case, Stanley is represented on appeal by the same attorneys who represented him at trial. Therefore, Stanley must make a specific showing of prejudice resulting from the failure to record and preserve the proceedings he claims should have been included in the record on appeal. See Hodges v. State, 926 So.2d 1060, 1066 (Ala.Crim.App.2005). Stanley failed to specifically allege that anything erroneous, inflammatory, or prejudicial occurred during the unrecorded portions of the trial. The unrecorded proceedings took place in open court; defense counsel had a full opportunity to comment on and challenge those proceedings; defense counsel did not object to the injection of anything prejudicial; and Stanley has not alleged or offered any evidence that he was actually prejudiced by anything that was not on the record. Further, after reviewing the record at the point of each transcript omission referenced by Stanley, we conclude that the lack of a complete transcription has not adversely affected his substantial rights. See Brown, 11 So.3d at 893 (“[I]t is clear *298 that no major portions of the record are missing. In the overwhelming majority of the pages cited, the conversation after the discussion that was not transcribed continues on as if nothing occurred off the record. Indeed, in some instances it is clear that the court was involved in scheduling matters or that the off-the-record discussion was between defense counsel and the prosecution.”). Thus, we find no plain error.
X.
Stanley alleges several instances of prosecutorial misconduct. (Stanley’s brief, Issue VIII, pp. 70-76.) Because Stanley did not object to the prosecutor’s argument and questioning in this regard, we review these claims under the plain-error rule. See Rule 45A, Ala. R.App. P. Regarding prosecutorial-misconduct claims, the role of a prosecutor, and this Court’s standard of review when evaluating claims of prosecutorial misconduct, this Court has said:
“‘“It is, of course, the duty of every prosecutor to represent the interests of the state zealously, vigorously, and earnestly. His ‘responsibility [as] a public prosecutor differs from that of the usual advocate; [his] duty is not merely to convict, but also to protect the innocent.’ EC7-13, Alabama Code of Professional Responsibility. ‘The prosecuting attorney owes a duty to exercise his full powers in furtherance of society’s valid and strong interest in enforcement of criminal laws, not only in seeing that the guilty are punished but that criminal acts by others are discouraged by example of such punishment.’
“Sprinkle v. State, 368 So.2d 554, 561 (Ala.Cr.App.1978), writ quashed, 368 So.2d 565 (Ala.1979).”
[[Image here]]
“ ‘Initially, we observe that the trial court instructed the jury that comments of counsel were not evidence in the case. Also, we have repeatedly stated that, “ ‘Statements of counsel in argument to the jury must be viewed as having been made in the heat of the debate, and such statements are usually valued by the jury at their true worth.’ ” Stephens v. State, 580 So.2d 11, 22 (Ala.Cr.App.1990), affd, 580 So.2d 26 (Ala.), cert, denied, 502 U.S. 859, 112 S.Ct. 176, 116 L.Ed.2d 138 (1991), quoting Harris v. State, 539 So.2d 1117, 1123 (Ala.Cr.App.1988). Moreover, a prosecutor is free to argue his impressions of the evidence. Freeman, supra.’ ”
Stallworth, 868 So.2d at 1153-54 (quoting Davis v. State, 494 So.2d 851, 853 (Ala.Crim.App.1986)).
“ ‘The prosecutor’s duty in a criminal prosecution is to seek justice, and although the prosecutor should prosecute with vigor, he or she should not use improper methods calculated to produce a wrongful conviction.’ Smith v. State, [Ms. CR-97-1258, December 22, 2000] So.3d ——, —(Ala.Crim.App.2000), affd in pertinent part, rev’d on other grounds, [Ms. 1010267, March 14, 2003] — So.3d — (Ala.2003). ‘In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract.’ Bankhead v. State, 585 So.2d 97, 106 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), affd on return to remand, *299 625 So.2d 1141 (Ala.Crim.App.1992), rev’d on other grounds, 625 So.2d 1146 (Ala.1993). [1] “Prosecutorial misconduct is a basis for reversing an appellant’s conviction only if, in the context of the entire trial and in light of any curative instruction, the misconduct may have prejudiced the substantial rights of the accused.” ’ Carroll v. State, 599 So.2d 1253, 1268 (Ala.Crim.App.1992), affd, 627 So.2d 874 (Ala.1993), quoting United States v. Reed, 887 F.2d 1398, 1402 (11th Cir.1989). The relevant question is whether the prosecutor’s conduct ‘so infected the trial with unfairness as to make the resulting conviction a denial of due process.’ Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).”
Minor v. State, 914 So.2d 372, 415 (Ala.Crim.App.2004). In addition:
“ ‘In judging a prosecutor’s closing argument, the standard is whether the argument “so infected the trial with unfairness as to make the resulting conviction a denial of due process.” ’ Bankhead [v. State], 585 So.2d [97,] 107 [ (Ala.Crim.App.1989),] quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). ‘A prosecutor’s statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury.’ Roberts v. State, 735 So.2d 1244, 1253 (Ala.Crim.App.1997), affd, 735 So.2d 1270 (Ala.), cert, denied, 5[2]8 U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999). Moreover, ‘statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.’ Bankhead, 585 So.2d at 106. ‘Questions of the propriety of argument of counsel are largely within the trial court’s discretion, McCullough v. State, 357 So.2d 397, 399 (Ala.Crim. App.1978), and that court is given broad discretion in determining what is permissible argument.’ Bankhead, 585 So.2d at 105. We will not reverse the judgment of the trial court unless there has been an abuse of that discretion. Id.”
Ferguson, 814 So.2d at 945-46. Moreover, “ ‘[t]his court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.’ ” Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990) (quoting Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985)).
Mindful of the above-stated principles, this Court addresses each of Stanley’s arguments in turn.
A.
Stanley contends that the prosecution improperly appealed to gender stereotypes during the rebuttal closing argument at both the guilt phase and the penalty phase. Specifically, Stanley cites error when the prosecutor argued as follows, during the rebuttal closing argument of the guilt phase:
“[PROSECUTOR]: ... Do you think a 115-pound woman did this to Henry Smith?
“(Counsel displays several pictures to jury.)
“[PROSECUTOR]: ... Is that what you think? Is that what you really be *300 lieve: That a 115-pound woman did this?
“... Think she did that by herself, 115-pound woman?
[[Image here]]
“... Who is more likely to deliver that tremendous blow: This 115-pound woman or Tony Stanley? ...”
(R. 1055-56.) Subsequently, during the penalty-phase rebuttal closing argument, the prosecutor said: “[U]se your common sense. Is that the work of a man or woman?” (R. 1191.)
Stanley presented virtually this identical issue, discussed in Issue I.B.5 above, when arguing the State violated Batson and J.E.B. by allegedly injecting gender stereotypes into the trial. Contrary to Stanley’s contention, however, that portion of the prosecutor’s guilt-phase rebuttal closing argument cited was not improper gender stereotyping; rather, the prosecutor’s remarks were a proper argument that the facts of the case did not support Stanley’s claim that his wife was more culpable than he was or that she acted alone in murdering Smith. “The prosecution is entitled to ‘spotlight the defense’s strategy,’ and a prosecutor’s remarks during closing argument pointing out the flaws in the defense’s theory of the ease do not constitute improper argument.” Reeves v. State, 807 So.2d 18, 45 (Ala.Crim.App.2000).
Even if the prosecutor’s remarks could be characterized as invoking gender stereotypes, the record indicates that the prosecutor’s argument made in rebuttal during the guilt phase of trial was permissible as a “reply in kind” to defense counsel’s argument. In reviewing the State’s rebuttal in its entirety, during both the guilt phase and the penalty phase, it is clear that the comments were responses to similar remarks made in Stanley’s closing argument regarding whether Shelly was more culpable than he was or acted alone. “When the door is opened by defense counsel’s argument, it swings wide, and a number of areas barred to prosecutorial comment would suddenly be subject to reply.” Davis, 494 So.2d at 855. “It is axiomatic that a prosecutor may legitimately argue facts in evidence and, further, that a prosecutor has a right based on fundamental fairness to reply in kind to the argument of defense counsel. DeBruce v. State, 651 So.2d 599, 609 (Ala.Crim.App.1993), affd, 651 So.2d 624 (Ala.1994).” Harris, 2 So.3d at 921. A prosecutor’s arguments and statements “‘must be examined in [their] context and in light of what had transpired, that is in light of preceding argument of defense counsel, to which the prosecutor’s arguments were] an answer.’ ” Stephens v. State, 580 So.2d 11, 21 (Ala.Crim.App.1990), ajfd, 580 So.2d 26 (Ala.1991) (quoting Henderson v. State, 460 So.2d 331, 333 (Ala.Crim.App.1984)).
In light of the context in which the arguments were made and what defense counsel had argued, the prosecutor’s arguments were not of such a nature that they “so infected the trial with unfairness as to make the resulting conviction a denial of due process.” Darden v. Wainwñght, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Also, the trial court repeatedly instructed the jury that the evidence in this case came from the testimony from the witness stand and from the exhibits introduced into evidence and not from the attorneys’ statements. We presume that the jury followed the trial court’s instructions. See Taylor, 666 So.2d 36 (Ala.Crim.App.1994). After reviewing the comments in the context of the entire proceedings, we conclude that the comments did not improperly appeal to gender stereotypes and that they were not of such a nature as to inflame the passions of the jury. For *301 these reasons, we do not find any plain error in this regard.
B.
Stanley asserts error because the prosecutor urged the jury “to do [its] duty” and return a verdict of guilty of capital murder. Stanley refers to a statement made by one of the prosecutors at the close of his guilt-phase argument, arguing to the jury that it was the jury’s duty to return a verdict of guilty of capital murder. Specifically, the prosecutor stated as follows:
“I ask you as the District Attorney of Colbert County and on behalf of the people of the state of Alabama to go in there and do your duty and return a verdict of capital murder because that’s exactly what it is.”
(R. 1058.)
“ ‘Generally, the prosecutor is in error by exhorting the jury to “do what’s right,” or to “do its job,” if that exhortation “implies] that, in order to do so, it can only reach a certain verdict, regardless of its duty to weigh the evidence and follow the court’s instructions on the law.” ’ McNair v. State, 658 So.2d 820, 339-40 (Ala.Crim.App.1992), affd, 653 So.2d 353 (Ala.1994), quoting Arthur v. State, 575 So.2d 1165, 1185 (Ala.Crim.App.1990). However, it is not improper for a prosecutor to argue to the jury that a defendant is guilty or to urge the jury to find the defendant guilty of the crime charged so long as that argument is based on the evidence; in fact, that is exactly what a prosecutor is supposed to do during closing argument. See Galloway v. State, 484 So.2d 1199 (Ala.Crim.App.1986), and the authorities cited therein. See also Broadnax v. State, 825 So.2d 134, 183 (Ala.Crim.App.2000), affd, 825 So.2d 233 (Ala.2001), and Melson v. State, 775 So.2d 857, 889-90 (Ala.Crim.App.1999), affd, 775 So.2d 904 (Ala.2000). Moreover, ‘ “the prosecuting attorney may characterize the accused or his conduct in language which, although it consists of invective or opprobrious terms, accords with the evidence of the case.” ’ Henderson v. State, 584 So.2d 841, 857 (Ala.Crim.App.1988), remanded on other grounds, 584 So.2d 862 (Ala.1991), on remand to, 587 So.2d 1071 (Ala.Crim.App.1991), remanded on other grounds, 616 So.2d 348 (Ala.1992), on return to remand, 616 So.2d 352 (Ala.Crim.App.1993), quoting Nicks v. State, 521 So.2d 1018, 1023 (Ala.Crim.App.1987), affd, 521 So.2d 1035 (Ala.1988). See also Handley v. State, 214 Ala. 172, 175, 106 So. 692, 695 (1925) (argument, ‘ “She is a murderer; she is a murderer. She is not some one who has committed some of the lower offenses of homicide” — did not transcend the bounds of legitimate argument’); Maples v. State, 758 So.2d 1, 58 (Ala.CrimApp.), affd, 758 So.2d 81 (Ala.1999) (prosecutor’s comment that the defendant ‘ “is a murderer; a capital murderer” ’ was not improper); Mel-son, 775 So.2d at 889 (prosecutor’s reference to the defendant as a ‘ “coldblooded murderer” ’ with ‘ “no remorse” ’ was not improper); Thomas v. State, 766 So.2d 860, 933-34 (Ala.Crim.App.1998), affd, 766 So.2d 975 (Ala.2000) (prosecutor’s references to defendant as a ‘ “street punk,” ’ ‘ “criminal,” ’ ‘ “thug,” ’ ‘ “murderer,” ’ and ‘ “manipulator” ’ were not improper); and Kinard v. State, 495 So.2d 705, 711 (Ala.Crim.App.1986) (prosecutor’s reference to defendant as ‘ “an unmitigated liar and murderer’” was not improper). The prosecutor’s com *302 ments were supported by the evidence in this case and were not improper.”
Minor, 914 So.2d at 420 (finding no plain error in prosecutor’s comment asking the jury “ ‘to find that man guilty of the murder of his son’ ”). See Moms, 60 So.3d at 369; Brooks v. State, 973 So.2d at 395-99.
Additionally, “‘[t]here is no impropriety in a prosecutor’s appeal to the jury for justice and to properly perform its duty.’ ” Freeman v. State, 776 So.2d 160, 186 (Ala.Crim.App.1999) (quoting Price v. State, 725 So.2d 1003, 1033 (Ala.Crim.App.1997)). Because the prosecutor’s comments fell within the range of permissible argument, Stanley has failed to establish that these comments were improper or that they so infected the trial with unfairness that he was denied due process. See Darden. Therefore, no plain error occurred, and Stanley is not entitled to any relief.[32]
C.
Stanley argues the prosecutor misled the jury on the law and the facts during closing arguments in two separate instances. These instances were also not objected to; thus, our review is limited to plain error. See Rule 45A, Ala. R.App. P.
Stanley contends the prosecutor misstated the law and lowered the State’s burden of proof when he asked the jury during closing argument: “Is it more likely that she did it or Tony did it?” (R. 1005.) When considered in the context of the entire closing argument, the prosecutor did not misstate the law or improperly shift the burden of proof to Stanley. See Broadnax, 825 So.2d at 184-85 (prosecutor did not improperly shift the burden of proof to the defendant during closing arguments in the guilt phase of capital-murder prosecution, where prosecutor did not suggest that defendant had obligation to produce any evidence or to prove his innocence, but asked the jury to consider evidence presented and to determine whether evidence established reasonable doubt as to defendant’s guilt). See also Barber v. State, 952 So.2d 393, 440-42 (Ala.Crim.App.2005) (burden was not improperly shifted where the prosecutor’s statement that the defendant would not want to talk about his confession because all he would have to say is that he was intoxicated); Minor, 914 So.2d at 420-21 (prosecutor’s comments during rebuttal closing argument of guilt phase of capital trial did not impermissibly shift the burden of proof but were a legitimate comment on the lack of evidence to support the defense’s theory); Reeves, 807 So.2d at 45-46 (prosecutor’s comment during rebuttal closing argument at guilt phase did not spotlight defense’s strategy and argue that the evidence did not support defense’s theory that the robbery was a “‘mere afterthought’ ”). Further, the trial court instructed the jury as to the State’s burden of proof and the presumption of innocence afforded a defendant. Therefore, we conclude that reasonable jurors would not have construed the argument to mean that Stanley had any burden of proof. Accordingly, we do not find that there was any error, much less plain error, in this regard.
Regarding his second contention that the prosecutor misstated the facts during closing argument, we likewise find no error. Stanley complains that the prosecutor misstated Jenna Mitchell’s testimony when during closing arguments he stated *303 that Stanley told Jenna Mitchell that “I deserve it” and “Your Mom doesn’t deserve this. I deserve it.” Jenna Mitchell’s testimony was as follows:
“Q: What did he say to you?
“A: Said that my mom shouldn’t have to take the blame for it and that she didn’t have nothing to do with it.
“Q: What else did he say?
“A: That it wasn’t her fault.
“Q: What else?
“A: And that he should take the blame for it.”
(R. 707.)
The prosecutor’s statements here were reasonable inferences drawn from the evidence and were not of such a nature that they “ ‘so infected the trial with unfairness as to make the resulting conviction a denial of due process.’ ” Darden, 477 U.S. at 181. The trial court repeatedly instructed the jury that the statements of the attorneys were not evidence and that it should consider only those statements that were supported by the evidence. We presume that the jury followed the trial court’s instructions. See Taylor, 666 So.2d 36 (Ala.Crim.App.1994). Accordingly, we find no error, plain or otherwise, in the prosecutor’s stating his impressions of what inferences could be drawn from the evidence. See Lee, 898 So.2d at 851-52.
D.
In a cursory argument presented in his brief, Stanley suggests that his conviction is due to be reversed because the “prosecutor made extensive use of leading questions.” (Stanley’s brief, p. 74.) He then references 62 places in the record where this “egregious” conduct supposedly occurred. He also specifically cites instances during Shelly’s testimony and claims that the prosecutor badgered Dot, Stanley’s mother, on cross-examination.
Stanley objected to only two of the cited instances of the prosecutor’s purportedly leading questions. On both of those instances, the trial judge instructed the prosecutor not to lead the witness. (R. 483, 729-28.) Defense counsel did not move to strike the answers.
As to the remaining allegedly improper questions, as this Court said in Broadnax, “[bjecause of the way this issue is presented in his brief to this Court, we seriously question [Stanley’s] sincerity in making this argument.” 825 So.2d at 170. His string citation to numerous pages from the record does not meet the requirements of Rule 28(a)(10), Ala. R.App. P. Likewise, Stanley fails to specify which questions were allegedly improper, or how he was prejudiced by the allegedly improper questions. We will not create Stanley’s argument for him. Egbuonu v. State, 993 So.2d 35, 38-39 (Ala.Crim.App.2007). See Reynolds, 114 So.3d at 145. Further, in Calhoun v. State, 932 So.2d 923 (Ala.Crim.App.2005), this Court stated as follows regarding leading questions in a capital case:
“Rule 611(c), Ala. R. Evid., which addresses leading questions, states:
“ ‘Leading questions should not be used on the direct examination of a witness, except when justice requires that they be allowed. Leading questions are permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions.’
“Alabama has never enforced an across-the-board ban on leading questions by a prosecutor during direct examination. ‘Every question may be said in some sense to be leading....’ Donnell v. Jones, 13 Ala. 490, 507 (1848). As we stated in Williams v. State, 568 So.2d 354, 356-57 (Ala.Crim.App.1990):
*304 “ ‘ “Any question expressly or impliedly assuming a material fact not theretofore testified to, so that the answer may affirm such fact, is leading. Smith v. S.H. Kress & Co., 210 Ala. 436, 98 So. 378 [ (1923) ].” Ray v. State, 32 Ala.App. 556, 559, 28 So.2d 116, 118 (1946). “ ‘[T]he trial judge has discretion to allow some leading questions, especially since prior testimony is simply being repeated.’ Brown Mechanical Contractors, Inc. v. Centennial Ins. Co., 431 So.2d 932, 944 (Ala.1983). ‘Whether to allow or disallow a leading question is within the discretion of the trial court and except for a flagrant violation there will not be reversible error.’ Bradford v. Stanley, 355 So.2d 328, 331 (Ala.1978).” Lynn v. State, 543 So.2d 704, 707 (Ala.Cr.App.1987), affirmed, 543 So.2d 709 (Ala.1988), cert, denied, [493] U.S. [945], 110 S.Ct. 351, 107 L.Ed.2d 338 (1989). Thus, leading questions may be allowed on direct examination, depending on the circumstances of the particular case. Certain subjects are especially conducive to a leading form, “‘else the counsel and witness cannot be made to understand each other,’ ” among them “ ‘[p]roof of ... personal identity.’ ” C. Gamble, McElroy’s Alabama Evidence § 121.05(2) (3d ed.1977).’
“See also Evans v. State, 794 So.2d 415 (Ala.Crim.App.2000), and James v. State, 788 So.2d 185 (Ala.Crim.App.2000). We have refused to find error when a circuit court has allowed leading questions on preliminary matters that are not disputed, see Womble v. State, 44 Ala.App. 416, 211 So.2d 881 (1968); when a witness is hostile, see Dennis v. State, 584 So.2d 548 (Ala.Crim.App.1991); when a witness is immature, see McCurley v. State, 455 So.2d 1014 (Ala.Crim.App.1984); when a witness’s memory has failed, see Garth v. State, 536 So.2d 173 (Ala.Crim.App.1988); and to establish the predicate for admission of a confession, see Jones v. State, 292 Ala. 126, 290 So.2d 165 (1974).”
932 So.2d at 963.
Nevertheless, our plain-error review necessarily encompassed the pages referenced by Stanley, and we find no plain error in the prosecutor’s questions. See Johnson, 120 So.3d at 1117; Lee v. State, 898 So.2d at 827.
Regarding his argument that the prosecutor badgered the defense witness, Dot, on cross-examination,
“ ‘A party is given wide latitude on cross-examination to test a witness’s partiality, bias, intent, credibility, or prejudice, or to impeach, illustrate, or test the accuracy of the witness’s testimony or recollection as well as the extent of his knowledge. Wells v. State, 292 Ala. 256, 292 So.2d 471 (1973); Housing Authority of City of Decatur v. Decatur Land Co., 258 Ala. 607, 64 So.2d 594 (1953); Hooper v. State, 585 So.2d 142 (Ala.Cr.App.1991), cert, denied, 503 U.S. 920, 112 S.Ct. 1295,117 L.Ed.2d 517 (1992); C. Gamble, [McElroy’s Alabama Evidence, § 136.01 (4th ed.1991) ]. The range of cross-examination rests largely in the discretion of the trial court, and that court’s ruling will not be disturbed unless it clearly appears that the defendant was prejudiced by the ruling. Hooper v. State. However, “where the witness’ testimony is important to the determination of the issues being tried, there is little, if any, discretion in the trial court to disallow cross-examination.” Wells v. State, 292 Ala. at 258, 292 So.2d at 473.’
*305 “Williams v. State, 710 So.2d 1276, 1327-28 (Ala.Cr.App.1996), affd, 710 So.2d 1350 (Ala.1997), cert, denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).”
Ballard, 767 So.2d at 1140-41.
Stanley makes a blanket argument on appeal that the prosecutor badgered his mother on the stand. However, he fails to point to specific instances and fails to demonstrate that he was substantially prejudiced. The record shows that on one occasion Stanley’s defense counsel objected on the grounds of badgering to the prosecutor’s cross-examination of Dot. That occasion happened shortly after the prosecutor asked Dot the first question on cross-examination. Nevertheless, we have reviewed the entire cross-examination of Dot and conclude that the prosecutor did not step outside the range of propriety or badger any defense witness in the present case. Thus, we find no error.
E.
Finally, Stanley argues that the cumulative effect of the alleged prosecutorial misconduct in this case denied him a fair trial and rehable sentencing and warrants reversal of his conviction and sentence. This Court has considered each of the claims of prosecutorial misconduct individually and has found that none of the claims of error require reversal. After thoroughly reviewing the record and considering the allegations of prosecutorial misconduct cumulatively, we find no prosecutorial misconduct, but even if there was impropriety, this Court finds that the cumulative effect of any alleged errors did not probably injuriously affect Stanley’s substantial rights and does not require reversal. See, e.g., Ex parte Woods, 789 So.2d 941, 942-43 n. 1 (Ala.2001) (“The correct rule is that, while, under the facts of a particular case, no single error among multiple errors may be sufficiently prejudicial to require reversal under Rule 45, if the accumulated errors had ‘probably injuriously affected substantial rights of the parties,’ then the cumulative effect of the errors may require reversal.”). Therefore, this claim is without merit.
In accordance with Rule 45A, Ala. R.App. P., we have searched the record with respect to Stanley’s capital-murder conviction for any error that may have adversely affected Stanley’s substantial rights and have found no plain error or defect in the guilt-phase proceedings of the trial. See Rule 45A, Ala. R.App. P.

Penalty-Phase Issues

XI.
In a one-paragraph argument in his brief to this Court, Stanley maintains that “Alabama’s protocol is not ‘substantially similar’ to Kentucky’s and therefore Baze [v. Rees, 553 U.S. 35 (2008),] is not controlling” and his “death sentence constitutes cruel and unusual punishment.” (Stanley’s brief, Issue XVIII, pp. 115-16.)
This issue has previously been addressed and decided adversely to Stanley. In Gobble v. State, 104 So.3d at 977, this Court wrote:
“Gobble argues that evolving standards of decency have rendered Alabama’s method of performing lethal injection unconstitutional. She cites the article, Leonidas G. Koniaris, Inadequate Anaesthesia in Lethal Injection for Execution, 365 Lancet 1412 (2005), to support her argument. This study was based on the improper administering of the first drug-sodium thiopental— which acts as an anaesthesia. The United States Supreme Court cited this study in Baze v. Rees, 553 U.S. 35, n. 2, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008). Alabama’s method of performing lethal injection, a three-drug protocol, is substantially similar to the one considered *306 by the United States Supreme Court in Baze v. Rees.
“The Alabama Supreme Court in Ex parte Belisle, 11 So.3d 323 (Ala.2008), held that Alabama’s method of performing lethal injection does not constitute cruel and unusual punishment. The Court stated:
“ ‘The Eighth Amendment to the United States Constitution provides: “Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.” “Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel within the meaning of that word as used in the constitution. It implies there something inhuman and barbarous, — something more than the mere extinguishment of life.” In re Kemmler, 136 U.S. 436, 447, 10 S.Ct. 930, 34 L.Ed. 519 (1890). However, as the Supreme Court of the United States recently stated in Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008):
“ ‘ “Our cases recognize that subjecting individuals to a risk of future harm — not simply actually inflicting pain — can qualify as cruel and unusual punishment. To establish that such exposure violates the Eighth Amendment, however, the conditions presenting the risk must be ‘sure or very likely to cause serious illness and needless suffering,’ and give rise to ‘sufficiently imminent dangers.’ Helling v. McKinney, 509 U.S. 25, 33, 34-35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (emphasis added). We have explained that to prevail on such a claim there must be a ‘substantial risk of serious harm,’ an ‘objectively intolerable risk of harm’ that prevents prison officials from pleading that they were ‘subjectively blameless for purposes of the Eighth Amendment.’ Fanner v. Brennan, 511 U.S. 825, 842, 846, and n. 9, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).” ’
“ ‘553 U.S. at 49-50,128 S.Ct. at 1530-31.
“ ‘In Baze, two death-row inmates challenged Kentucky’s use of the three-drug protocol, arguing “that there is a significant risk that the procedures will not be properly followed — in particular, that the sodium thiopental will not be properly administered to achieve its intended effect— resulting in severe pain when the other chemicals are administered.” 553 U.S. at 49,128 S.Ct. at 1530. Belisle’s claim, like the claims made by the inmates in Baze, “hinges on the improper administration of the first drug, sodium thiopental.” Baze, 553 U.S. at 53,128 S.Ct. at 1533.
“ ‘The Supreme Court upheld the constitutionality of Kentucky’s method of execution, Baze, 553 U.S. at 62-64, 128 S.Ct. at 1538, and noted that “[a] State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard.” Baze, 553 U.S. at 61, 128 S.Ct. at 1537. Justice Ginsburg and Justice Souter dissented from the main opinion, arguing that “Kentucky’s protocol lacks basic safeguards used by other States to confirm that an inmate is unconscious before injection of the second and third drugs.” Baze, 553 U.S. at 114, 128 S.Ct. at 1567 (Ginsburg, J., dissenting). The dissenting Justices recognized, however, that Alabama’s procedures, along with procedures used in Missouri, California, and Indiana “provide a degree of assurance — missing from Kentucky’s protocol — that the first *307 drug had been properly administered.” Baze, 553 U.S. at 121, 128 S.Ct. at 1571 (Ginsburg, J., dissenting).
‘“The State argues, and we agree, that Belisle, like the inmates in Baze, cannot meet his burden of demonstrating that Alabama’s lethal-injection protocol poses a substantial risk of harm by asserting the mere possibility that something may go wrong. “Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of ‘objectively intolerable risk of harm’ that qualifies as cruel and unusual.” Baze, 553 U.S. at 50, 128 S.Ct. at 1531. Thus, we conclude that Alabama’s use of lethal injection as a method of execution does not violate the Eighth Amendment to the United States Constitution.’
“11 So.3d at 338-39. Alabama’s method of performing lethal injection is not cruel and unusual.”
Gobble, 104 So.3d at 977-979 (footnote omitted). See also Revis v. State, 101 So.3d 247, 328-329 (Ala.Crim.App.2011); McCray, 88 So.3d at 81-82; Reynolds, 114 So.3d at 157-158; Doster, 72 So.3d at 105-106; Phillips, 65 So.3d at 1039-1040; Morris, 60 So.3d at 383; Vanpelt, 74 So.3d at 89-90; Saunders v. State, 10 So.3d 53, 77 (Ala.Crim.App.2007); Lewis v. State, 24 So.3d 480, 536-37 (Ala.Crim.App.2006); Bryant v. State, 951 So.2d 732, 747-48 (Ala.Crim.App.2003) (all addressing challenges to Alabama’s method of performing lethal injection).
Consequently, Stanley is not entitled to any relief on this claim because Alabama’s method of execution is not unconstitutional.
XII.
Stanley argues that his “death sentence was imposed in violation of the Sixth and Eighth Amendments.” (Stanley’s brief, p. 83.) He contends that his death sentence should be vacated pursuant to the United States Supreme Court’s decisions in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In Apprendi, the United States Supreme Court held that any fact that increases a sentence above the statutory maximum must be presented to a jury and proven beyond a reasonable doubt. In Ring, the Court extended its holding in Apprendi to death-penalty cases. Stanley raised the application of Ring in a pretrial motion that was properly denied by the trial court.
Stanley raises several claims challenging the constitutionally of Alabama’s capital-sentencing scheme. Although “[b]oth this Court and the Alabama Supreme Court have repeatedly rejected identical challenges[,]” McCray v. State, 88 So.3d at 82, see also Revis v. State, 101 So.3d at 326-327, and Reynolds v. State, 114 So.3d at 156-157, and the cases cited therein, this Court will address each of the claims individually below.
A.
Stanley claims that the trial court erred in not dismissing his indictment, which he says failed to provide him with adequate notice because, he says, it did not set forth the aggravating circumstances upon which the State intended to rely. (Stanley’s brief, Issue XV, pp. 112-13.) He filed a motion to dismiss the indictment based on this ground. (R. 73-74.) After conducting a hearing, the trial judge denied Stanley’s motion to dismiss. (R. 109.)
We addressed and rejected a similar argument in Sneed v. State, 1 So.3d at 143, as follows:
*308 “ ‘Stallworth also argues, in relation to the Ring issue, that his indictment was void because it failed to include in the indictment the aggravating circumstances the State intended to prove. In Poole v. State, 846 So.2d 370 (Ala.Crim.App.2001), we held that, although Apprendi required that the facts that increased a sentence above the statutory maximum must be submitted to a jury, those facts did not have to be alleged in the indictment. Recently, the Alabama Supreme Court adopted our holding in Poole. See Hale v. State, 848 So.2d 224 (Ala.2002).
“ ‘Also, the holdings in Poole and Hale are consistent with prior case-law, which holds that aggravating circumstances do not have to be alleged in the indictment. See Ex parte Lewis, 811 So.2d 485 (Ala.2001), and Dobard v. State, 485 So.2d 1338 (Ala.Crim.App.1982). Stallworth’s argument is not supported by Alabama law.’
“(Footnote omitted.)”
1 So.3d at 142-43 (quoting Stallworth, 868 So.2d at 1186). See Bryant, 951 So.2d at 749 (rejecting an identical argument because the “indictment returned against Bryant advised him of the crime with which he was charged — the capital offense of murder during kidnapping, in violation of § 13A-5-40(a)(l), Ala.Code 1975 — and [thus] [i]ncluded in the indictment was the aggravating circumstance of kidnapping in the first degree ... ”). See also Sharifi, 993 So.2d at 940; Barber, 952 So.2d 393; Benjamin v. State, 940 So.2d 371 (Ala. Crim.App.2005); Walker, 932 So.2d 140. Thus, Stanley’s argument is without merit.
B.
Stanley contends the jury never determined that the statutory aggravating circumstance existed beyond a reasonable doubt or that it outweighed the mitigating circumstances. He claims that, because the jury recommended that he be sentenced to life imprisonment without the possibility of parole, it clearly found that the mitigating circumstances outweighed the aggravating circumstances. Thus, he submits, his death sentence should be vacated because it violates Ring. (Stanley’s brief, pp. 83-86.) He also argues that the Alabama Supreme Court’s decision in Ex parte Waldrop, 859 So.2d 1181 (Ala.2002), is contrary to the law and “undermines the reliability of the capital sentencing process and unfairly skews sentencing toward the imposition of the death penalty. Adams v. Texas, 448 U.S. 38, 46-47 [100 S.Ct. 2521, 65 L.Ed.2d 581] (1980).” (Stanley’s brief, p. 86.)
Applying Ring in Ex parte Waldrop, the Alabama Supreme Court held:
“Because the jury convicted Waldrop of two counts of murder during a robbery in the first degree, a violation of Ala.Code 1975, § 13A-5-40(a)(2), the statutory aggravating circumstance of committing a capital offense while engaged in the commission of a robbery, Ala.Code 1975, § 13A-5-49(4), was ‘proven beyond a reasonable doubt.’ Ala.Code 1975, § 13A-5-45(e); Ala.Code 1975, § 13A-5-50. Only one aggravating circumstance must exist in order to impose a sentence of death. Ala.Code 1975, § 13A-5-45(f). Thus, in Waldrop’s case, the jury, and not the trial judge, determined the existence of the ‘aggravating circumstance necessary for imposition of the death penalty.’ Ring [v. Arizona ], 536 U.S. [584,] 609, 122 S.Ct. [2428,] 2443, 153 L.Ed.2d 556 [(2002)]. Therefore, the findings reflected in the jury’s verdict alone exposed Waldrop to a range of punishment that had as its maximum the death penalty. This is all Ring and Apprendi [v. *309 New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) ] require.”
859 So.2d at 1188.
The decision in Ex parte Waldrop has been consistently followed and upheld. See, e.g., Mitchell v. State, 84 So.3d 968, 988 (Ala.Crim.App.2010); Spencer, 58 So.3d at 247-248; Yeomans v. State, 898 So.2d 878, 903 (Ala.Crim.App.2004); Ex parte MeNabb, 887 So.2d 998, 1005-06 (Ala.2004). Further, this court is bound by the decisions of the Alabama Supreme Court. As we stated in Reynolds:
“Reynolds also challenges the constitutionality of the Alabama Supreme Court’s decision in Ex parte Waldrop, 859 So.2d 1181 (Ala.2002). He claims that the decision ‘impermissibly eased the State’s burden of proving that the death penalty is appropriate by ensuring that the jury was unaware that its guilt-innocence phase finding authorized the trial judge to impose the death penalty without additional process,’ and that the Waldrop decision ‘undermines the reliability of the capital sentencing process and unfairly skews sentencing toward the imposition of the death penalty.’ (Reynolds’s brief, at 111-12.) ‘However, this Court is bound by the decisions of the Alabama Supreme Court and has no authority to reverse or modify those decisions. See § 12-3-16, Ala.Code 1975.’ Doster [v. State], 72 So.3d [50,] 101 n. 13 [(Ala.Crim.App.2010) ].”
114 So.3d at 157 n. 31. See also Revis, 101 So.3d at 326-327.
Moreover, contrary to Stanley’s contentions, it is well settled that “[t]he jury’s unanimous finding of one aggravating circumstance is sufficient to satisfy Ring.” Ex parte MeNabb, 887 So.2d at 1006. During the guilt phase, the jury unanimously found beyond a reasonable doubt that Stanley committed a robbery during the course of committing a murder. Because the jury convicted Stanley of murder during the course of a first-degree robbery, a violation of § 13A-5-40(a)(2), Ala.Code 1975, the statutory aggravating circumstance of committing a capital offense while engaged in the commission of a robbery, § 13A-5-49(4), Ala.Code 1975, was “prov[en] beyond a reasonable doubt.” § 13A-5-45(e), Ala.Code 1975; § 13A-5-50, Ala.Code 1975. Only one aggravating circumstance must exist in order to impose a sentence of death. § 13A-5-45(f), Ala. Code 1975. Thus, the jury, and not the trial judge, determined the existence of the “aggravating circumstance necessary for imposition of the death penalty” for Stanley. See Ring, 536 U.S. at 609, 122 S.Ct. 2428. Therefore, the findings reflected in the jury’s guilty verdict alone exposed Stanley to a range of punishment that had the death penalty as its maximum. Thus, there is no Ring violation in this regard.
Likewise, “Ring did not invalidate Alabama’s law that vests the ultimate sentence determination in the hands of the trial judge and not a jury.” Turner v. State, 924 So.2d 737, 785 (Ala.Crim.App.2002). See, e.g., Ex parte Hodges, 856 So.2d 936 (Ala.2003); Ex parte Waldrop; Brownfield; Blackmon, 7 So.3d at 417; Harris; Eatmon v. State, 992 So.2d 64 (Ala.Crim.App.2007); Barber. “ ‘The determination whether the aggravating circumstances outweigh the mitigating circumstances is not a finding of fact or an element of the offense. Consequently, Ring and Apprendi do not require that a jury weigh the aggravating circumstances and the mitigating circumstances.’ ” Ex parte Hodges, 856 So.2d at 943 (quoting Ex parte Waldrop, 859 So.2d at 1190). See also Brownfield; Lewis, 24 So.3d at 533 (wherein Lewis argued among other specific grounds that Alabama’s death-penalty statute violates Ring because “it does not *310 require a unanimous finding by the jury as to whether the aggravating circumstances exist beyond a reasonable doubt and whether the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt”); Blackmon v. State, 7 So.3d at 417. Therefore, Stanley is entitled to no relief.
C.
Stanley asserts the trial court unconstitutionally relied on an aggravating circumstance not found by the jury beyond a reasonable doubt, specifically, the aggravating circumstance that the offense was “especially heinous, atrocious, or cruel” when compared to other capital offenses. He further claims error because he submits the trial court was required pursuant to Ring to accept any mitigating circumstances found by the jury to exist. He appears to argue that both of these alleged infirmities could have been resolved by the use of a special verdict form. (Stanley’s brief, pp. 86-88.)
As stated above, only a jury’s unanimous finding of one aggravating circumstance is required to satisfy Ring. See § 13A-5-45(f), Ala.Code 1975; Ex parte McNabb. In this case, because the jury convicted Stanley of murder during the course of a first-degree robbery, an offense defined in § 13A-5-40(a)(2), Ala.Code 1975, the statutory aggravating circumstance of committing a capital offense while engaged in the commission of a robbery, § 13A-5-49(4), Ala. Code 1975, was “prov[en] beyond a reasonable doubt.” § 13A-5-45(e), Ala. Code 1975; § 13A-5-50, Ala.Code 1975. Because only one aggravating circumstance must exist in a capital case in order to impose a sentence of death and because the jury in this case, and not the trial judge, unanimously determined the existence of the “aggravating circumstance necessary for imposition of the death penalty,” it is of no consequence pursuant to Ring or Apprendi that the jury here recommended that Stanley be sentenced to life imprisonment without the possibility of parole. See Ring, 536 U.S. at 609, 122 S.Ct. 2428. Moreover,
“[t]he Supreme Court has held, in numerous cases, that the jury’s verdict finding a defendant guilty of capital murder during the guilt phase of his trial indicated that the jury had unanimously found a proffered aggravating circumstance included within the § 13A-5^40(a), Ala.Code 1975, definition of the particular capital-murder offense charged in the indictment. See, e.g., Ex parte Hodges, 856 So.2d 936 (Ala.2003); Ex parte Waldrop, 859 So.2d 1181 (Ala.2002); Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App.2001) (opinion on return to second remand), cert, denied, 868 So.2d 1189 (Ala.2003). But see Ex paHe McGriff, 908 So.2d 1024,1039 (Ala.2004) (authorizing prospective use of a penalty-phase special interrogatory).”
Bryant, 951 So.2d at 750-51. Likewise, as mentioned above, because the jury is not required to weigh the aggravating circumstances and the mitigating circumstances pursuant to Ring and Apprendi and Stanley was not exposed “to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone,” Ring, 536 U.S. at 602, 122 S.Ct. 2428, and because the jury found him guilty of capital murder-robbery, we find no Ring error as to Stanley’s claim that the trial court was required to accept the mitigating circumstances Stanley claims are inherent in the jury’s advisory verdict of life imprisonment without the possibility of parole.
D.
Stanley, citing Tedder v. State, 322 So.2d 908 (Fla.1975), maintains that Alabama’s advisory-jury override violates “evolving *311 standards of decency” and the Eighth Amendment restrictions against cruel and unusual punishment. (Stanley’s brief, pp. 88-92.) Stanley claims that, in light of Ring, Alabama’s “standardless” override results in the arbitrary application of the death penalty in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Stanley’s brief, pp. 92-94.) However, these arguments have previously been determined adversely to Stanley. In Doster, this Court stated:
“Doster also argues that Alabama’s sentencing scheme is ‘standardless’ and violates the Eighth Amendment and the Equal Protection Clause of the Constitution.
“Alabama’s death-penalty sentencing scheme has repeatedly withstood constitutional attacks.
“ ‘The appellant maintains that the jury override provision of Ala.Code 1975, § 13A-5^17(e), is unconstitutional. He claims that the statute contains no guidelines for the sentencing judge to follow and that the statute violates the Eighth Amendment, particularly in a case where, as here, the jury unanimously recommends a sentence of life imprisonment without parole.
“ ‘Sentencing by a jury is not constitutionally required. Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). Proffitt v. Florida, 428 U.S. 242, 251-52, 96 S.Ct. 2960, 2966-67, 49 L.Ed.2d 913 (1976), and § 13A-5-47(e) set “out a standard of review for jury override that meets constitutional requirements.” McMillian v. State, 594 So.2d 1253, 1272-73 (Ala.Cr.App.1991), remanded on other grounds, 594 So.2d 1288 (Ala.1992). The argument that the jury override provision of § 13A-5-47(e) is constitutionally infirm because it allows for the “arbitrary and standardless” imposition of the sentence of death has been repeatedly rejected by the appellate courts of this state. See, e.g., Ex parte Jones, 456 So.2d 380, 381-83 (Ala.1984), cert, denied, 470 U.S. 1062, 105 S.Ct. 1779, 84 L.Ed.2d 838 (1985); McMillian v. State, 594 So.2d at 1272; Parker v. State, 587 So.2d 1072, 1098 (Ala.Cr.App.1991). See also Ex parte Giles, 632 So.2d 577 (Ala.1993) (holding that Ala. Const. § 11 “does not preclude judicial override of the jury’s sentencing recommendation in a capital case”).
“ ‘The trial court’s sentencing order reflects the fact that the court gave “consideration to the recommendation of the jury in its advisory verdict that the defendant be sentenced to life without parole.” R. 65. The court, however, after independently weighing the aggravating and mitigating circumstances, determined that the aggravating circumstance outweighed the mitigating circumstances and chose not to accept the jury’s recommendation. Constitutional and statutory provisions require no more.’
“Carr v. State, 640 So.2d 1064, 1073-74 (Ala.Crim.App.1994). Moreover, as we stated in Sneed v. State, 1 So.3d 104 (Ala.Crim.App.2007):
“ ‘The appellant further contends that, in light of Ring [v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) ], Alabama’s standardless override results in the arbitrary application of the death penalty in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments and the Equal Protection Clause. “The United States Supreme Court in Ring did not invalidate its earlier holding in Harris v. Alabama, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995), which *312 upheld § 13A-5-47(e), Ala.Code 1975 — commonly referred to as the judicial-override statute — against constitutional attack.” Tomlin v. State, 909 So.2d 213, 282 (Ala.Crim.App.2002), rev’d on other grounds, 909 So.2d 283 (Ala.2003). Therefore, the appellant’s argument is without merit.’
“1 So.3d at 143-44.”
Doster, 72 So.3d at 104-105. Therefore, there is no merit to this claim.
XIII.
Stanley asserts the “aggravating circumstances found by the judge fail to adequately narrow the class of death eligible offenders.” (Stanley’s brief, p. 109.) More particularly, he claims error because: (1) he alleges that the trial court’s “double counting” of the robbery as both an aggravating circumstance for purposes of determining his sentence and as an element to elevate the murder to a capital offense is improper; and, (2) he contends that the trial court’s application of the aggravating circumstance that the murder was especially heinous, atrocious, or cruel as compared to other capital offenses is unconstitutionally vague and overbroad on its face and as applied to the facts of this case. (Stanley’s brief, Issue XIII, pp. 109-111.) Stanley raises these claims for the first time on appeal; therefore, this issue is due to evaluated under the plain-error rule. Rule 45A, Ala. R.App. P.
Both of these claims have previously been decided adversely to Stanley. The Alabama Supreme Court and this Court have rejected numerous challenges to “double counting.” See Ex parte Windsor, 683 So.2d 1042, 1060 (Ala.1996); Ex parte Woodard, 631 So.2d 1065, 1069-70 (Ala.1993); Ex parte Trawick, 698 So.2d at 178; McCray, 88 So.3d at 74; McMillan, 139 So.3d at 216; Reynolds, 114 So.3d at 157; Morris, 60 So.3d at 380; Vanpelt, 74 So.3d at 89; Newton v. State, 78 So.3d 458 (Ala.Crim.App.2009); Brown, 11 So.3d at 929; Mashbum v. State, 7 So.3d 453 (Ala.Crim.App.2007); Harris, 2 So.3d at 926-27; Jones v. State, 946 So.2d 903, 928 (Ala.Crim.App.2006); Barber, 952 So.2d at 458-59; McGowan, 990 So.2d at 996, and the cases cited therein; Coral, 628 So.2d at 965. Thus, because double counting is constitutionally permitted and statutorily required, Stanley is not entitled to any relief on this issue. See § 13A-5-45(e), Ala.Code 1975.
Likewise, challenges to the aggravating circumstance that the murder was especially heinous, atrocious, or cruel as compared to other capital offenses under § 13A-5-49(8), Ala.Code 1975, have been rejected by the Alabama Supreme Court and this Court. Ex parte Deardorff, 6 So.3d 1235, 1238-40 (Ala.2008); Ex parte Waldrop, 859 So.2d at 1190; Mitchell, 84 So.3d at 989; Baker, 87 So.3d at 604-605; Brownfield, 44 So.3d at 41-42, and the cases cited therein; Sharifi, 993 So.2d at 944.
The especially heinous, atrocious, or cruel aggravating circumstance “applies] to only those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.” Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981), citing State v. Dixon, 283 So.2d 1 (Fla.1973).
“ ‘There are three factors generally recognized as indicating that a capital offense is especially heinous, atrocious, or cruel: (1) the infliction on the victim of physical violence beyond that necessary or sufficient to cause death; (2) appreciable suffering by the victim after the assault that ultimately resulted in death; and (3) the infliction of psychological torture on the victim.’ ”
Saunders, 10 So.3d at 108 (quoting Brooks, 973 So.2d at 417-18, citing in turn Norris v. State, 793 So.2d 847 (Ala.Crim.App.1999)).
*313 The circuit court stated as follows in its sentencing order finding that the murder was especially heinous, atrocious, or cruel:
“The Court finds from the evidence introduced before the Jury that the Murder committed by the Defendant, Anthony Lee Stanley, was especially heinous, atrocious or cruel compared to other Capital Offenses. That the Defendant, Anthony Lee Stanley, repeatedly hit the Victim, Henry Smith, in the face and body with a baseball bat. That the Defendant then repeatedly stabbed the victim, Henry Smith, with a knife to such an extent that the Defendant bent one knife and had to get off of the victim and retrieve a second knife, which the Defendant used to repeatedly stab the Victim and that the Defendant left the second knife in the Victim’s back after killing him. The testimony of Dr. Ward, State Medical Examiner, elaborated on the substantial number of wounds inflicted upon the victim.
“By any standard acceptable to civilized society, this crime was extremely gruesome and barbaric. It was perpetrated with a heartless infliction of brutality and with utter indifference to the suffering of the victim and with a total disregard of human life. The Court recognizes that all capital offenses are heinous, atrocious and cruel to some extent, but the degree of heinousness, atrociousness and cruelty which characterizes this offense exceeds that which is common to all capital offenses.
“The Court finds that this is an aggravating circumstance pursuant to Section 13A-5-49-(8), Code of Alabama, as amended, and the Court has considered said aggravating circumstance.”
(R. 278.)
The trial court’s findings are supported by the record, and the record supports its finding that the especially heinous, atrocious, or cruel aggravating circumstance applied to this crime. Moreover, evidence was presented at trial that the victim, Smith, begged for his life and asked Stanley to stop stabbing him. See Ex parte Rieber, 663 So.2d at 1003 (“As the Court of Criminal Appeals pointed out, evidence as to the fear experienced by the victim before death is a significant factor in determining the existence of the aggravating circumstance that the murder was especially heinous, atrocious, or cruel.”). Because there was substantial evidence that the murder of Smith was especially heinous, atrocious, or cruel, the circuit court correctly found such in its application as an aggravating circumstance.
With regard to the constitutional challenge, specifically, in Minor, 914 So.2d 372, this Court rejected an identical constitutional challenge to the especially heinous, atrocious, or cruel aggravating circumstance, noting:
‘With respect to Minor’s constitutional challenge to the heinous, atrocious, or cruel aggravating ' circumstance in § 13A-5-49(8), Ala.Code 1975, this Court has repeatedly upheld that circumstance against similar challenges. See Duke v. State, 889 So.2d 1 (Ala.Crim.App.2002); Ingram v. State, 779 So.2d 1225 (Ala.Crim.App.1999), affd, 779 So.2d 1283 (Ala.2000); Freeman v. State, 776 So.2d 160 (Ala.Crim.App.1999), affd, 776 So.2d 203 (Ala.2000); Bui v. State, 551 So.2d 1094 (Ala.Crim. App.1988), affd, 551 So.2d 1125 (Ala.1989), judgment vacated on other grounds, 499 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712 (1991); and Hallford v. State, 548 So.2d 526 (Ala.Crim.App.1988), affd, 548 So.2d 547 (Ala.1989).”
914 So.2d at 437. See also Blackmon, 7 So.3d 397; Lindsey v. Thigpen, 875 F.2d *314 1509, 1513-14 (11th Cir.1989) (holding that Alabama’s construction of the especially heinous, atrocious or cruel aggravating circumstance to those conscienceless or pitiless homicides that are unnecessarily torturous to the victim satisfies the narrowing requirement of the Eighth Amendment). Therefore, “[b]ecause [Stanley’s] arguments are contrary to established precedent, and he has offered this Court no principled reason to question the validity of that precedent, these issues do not entitle him to any relief.” McCray, 88 So.3d at 75.
XIV.
Stanley argues “the trial court’s override of the jury’s recommendation of life imprisonment without the possibility of parole was improper and must be reversed.” (Stanley’s brief, Issue II, pp. 24-45.) In so arguing, he presents numerous claims as follows: (1) that “the trial court failed to give reasons for overriding the jury’s recommendation” (Stanley’s brief, pp. 26-27); (2) that “the trial court failed to consider the jury’s recommendation as a mitigation circumstance” (Stanley’s brief, at pp. 27-29); (3) that “the trial court failed to make findings as to the substantial non-statutory mitigating evidence presented” (Stanley’s brief, pp. 29-35); (4) that “the trial court was required to find unrebutted non-statutory mitigating circumstances” (Stanley’s brief, pp. 35-40); (5) that “the trial court erred in failing to treat Shelly Stanley’s plea agreement and sentence as a mitigating circumstance” (Stanley’s brief, pp. 40-41); and (6) that “there is no proper basis for override in this case.” (Stanley’s brief, pp. 41-45.)
In its sentencing order, the trial court made thorough and specific findings of fact regarding the existence or nonexistence of each statutory aggravating circumstances. See §§ 13A-5-47(d) and 13A-5-49, Ala. Code 1975. It found the existence of three aggravating circumstances. The trial court properly considered as an aggravating circumstance that the capital offense was committed while Stanley was engaged in the commission of a robbery, § 13A-5-49(4); that, based on his prior conviction for first-degree robbery, § 13A-5-49(2), Stanley had been previously convicted of another felony involving the use or threat of violence to the person; and that the capital offense committed by Stanley was “especially heinous, atrocious, or cruel compared to other capital offenses.” § 13A-5^9(8), Ala.Code 1975.[33]
The trial court also properly considered and made findings with regard to the statutory mitigating circumstances. See §§ 13A-5-47(d) and 13A-5-51, Ala.Code (1975). It considered all statutory mitigating circumstances and found none to exist. (C. 279-81.) Additionally, the trial court indicated that it considered the plea and sentence Shelly received, and found it not be to a mitigating circumstance. (C. 281.)
Although the trial court clearly indicated that it was considering the jury’s advisory verdict, it did not clearly provide what it was considering the verdict as, and the weight it was to be accorded. Instead, it stated in its sentencing order that it had considered all the matters presented to the court, including:
“the testimony heard at trial and at the sentencing hearing before this Court, both in aggravation and mitigation, considering the non-statutory evidence of mitigation of [Stanley’s] family background, and the recommendation of the Jury in its recommendation of life with *315 out parole, and after taking into consideration all of the other matters that were proffered before this Court as here and above stated in this Order.... ”
(C. 281-82.) In addressing a similar situation in Spencer v. State, 58 So.Bd 215, 249 (Ala.Crim.App.2008), this Court said:
“However, with regard to the sentencing order, although the trial court made thorough and specific findings of fact regarding the statutory aggravating circumstances and statutory mitigating circumstances, it did not make specific findings of fact regarding the existence or nonexistence of nonstatutory mitigating circumstances offered pursuant to § 13A-5-52. Rather, the trial court stated in its amended sentencing order that it had considered all of the matters presented to the court, including
“ ‘the testimony heard at trial and at the sentencing hearing before this Court, both in mitigation and aggravation, considering the non-statutory evidence of mitigation of the defendant’s background and the recommendation of the jury in its recommendation of life without parole, and after taking into consideration all of the other matters that were proffered before this Court as here and above stated in this order....’
“(C. 98.) (Emphasis added.) Thus, although it is apparent that the trial court considered the evidence Spencer offered as nonstatutory mitigating circumstances, it is not clear from the record whether the trial court found any of the evidence to actually constitute nonstatu-tory mitigation.”
Spencer v. State, 58 So.3d at 248-49.
“Although the trial court need not list and make findings as to each item of alleged nonstatutory mitigating evidence offered by a defendant, Reeves v. State, 807 So.2d 18, 48 (Ala.Crim.App.2000), it must make a clear finding regarding the existence or nonexistence of nonstatutory mitigating circumstance offered by a defendant. § 13A-5-47(d), Ala.Code 1975.” Scott v. State, 937 So.2d 1065, 1087 (Ala.Crim.App.2005). See also Woods v. State, 13 So.3d 1, 39-40 (Ala.Crim.App.2007); Morrow v. State, 928 So.2d 315, 325-27 (Ala.Crim.App.2004). Alabama’s judicial-override statute, codified at § 13A-5-47(e), Ala.Code 1975, provides:
“In deciding upon the sentence, the trial court shall determine whether the aggravating circumstances it finds to exist outweigh the mitigating circumstances it finds to exist, and in doing so the trial court shall consider the recommendation of the jury contained in its advisory verdict, unless such a verdict has been waived pursuant to Section 13A-5^46(a) or Section 13A-5^6(g). While the jury’s recommendation concerning sentence shall be given consideration, it is not binding upon the court.”
Thus, although it appears that the trial court considered the evidence Stanley offered as nonstatutory mitigating circumstances, it is not clear from the record whether the trial court found any of the evidence to actually constitute a nonstatu-tory mitigating circumstance, nor are the trial court’s reasons for overriding the jury’s advisory verdict clearly stated. See Spencer, 58 So.3d at 252 (remanding for the trial court to amend its sentencing order to clarify its findings regarding the existence or nonexistence of nonstatutory mitigating circumstances and judicial override of jury’s recommendation of life imprisonment without parole).
Ex parte Taylor, 808 So.2d 1215, 1219 (Ala.2001), Ex parte Carroll, 852 So.2d 833, 836 (Ala.2002), and their progeny instruct “the trial judge [to] state specific reasons for giving the jury’s recommendation the consideration he gave it” and instruct the *316 trial judge to consider a jury recommendation as a nonstatutory mitigating circumstance. Further, in Ex parte Tomlin, 909 So.2d 283 (Ala.2003), the Alabama Supreme Court explained
“In [Ex parte] Carroll, this Court stated:
“ ‘We take this opportunity to further explain the effect of a jury’s recommendation of life imprisonment without the possibility of parole. Such a recommendation is to be treated as a mitigating circumstance. The weight to be given that mitigating circumstance should depend upon the number of jurors recommending the sentence of life imprisonment without parole, and also upon the strength of the factual basis for such a recommendation in the form of information known to jury, such as conflicting evidence concerning the identity of the “trig-german” or recommendation of leniency by the victim’s family; the jury’s recommendation may be overridden based upon information known only to the trial court and not to the jury, when such information can properly be used to undermine a mitigating circumstance.’
“852 So.2d at 836 (footnote omitted). The State urges us to overrule Carroll, ‘at least insofar as it declared that a recommendation of life by the jury “is to be treated as a mitigating circumstance.”’ State’s brief at 36. We decline to do so.”
909 So.2d at 285. The Alabama Supreme Court concluded that although the trial court stated in its order that it had given “‘serious consideration to the unanimous recommendation of the jury for life [imprisonment] without parole,’ ” Ex parte Tomlin, 909 So.2d at 286, it did not properly consider the jury’s recommendation as a mitigating circumstance.
In this case, although the trial court referenced the jury’s recommendation that Stanley be sentenced to life imprisonment without parole, the circuit court’s order did not clearly state that it found the jury’s recommendation to be a mitigating circumstance and did not contain written findings concerning what weight the jury recommendation was given or the reasons it overrode the jury’s recommendation. See Ex parte Taylor, Ex parte Carroll, Ex parte Tomlin, and Spencer. Thus, we remand this case to the trial court for it to amend its sentencing order to clarify its findings regarding the judicial override of the jury’s recommendation of life imprisonment without parole. See Sneed, 1 So.3d at 116 (trial court noted jury’s recommendation as nonstatu-tory mitigating circumstance, accorded it moderate weight, considered the number of jurors who voted for each sentence, and considered the circumstances of the offense in overriding the jury’s advisory verdict). On remand, the trial court shall reweigh the aggravating circumstances and the mitigating circumstances and re-sentence Stanley and state how it considered the jury’s advisory verdict and the weight it was accorded and, if it again overrides the jury’s recommendation, clearly state the reasons for so doing. The trial court’s amended sentencing order shall be submitted to this Court within 60 days of the date of this opinion.
AFFIRMED AS TO CONVICTION; REMANDED WITH DIRECTIONS AS TO SENTENCING.
WELCH, P.J., and WINDOM, KELLUM, and BURKE, JJ., concur.

. This case was originally assigned to another member of this Court. It was reassigned to Judge Joiner on March 1, 2011.

. Shelly also testified that she often exchanged sexual acts for drugs.

. Some testimony suggested that Stanley used two baseball bats to strike Smith. The testimony indicated that one was a full-sized aluminum baseball bat and the other was a smaller-sized memorabilia-type bat.

. The testimony indicated that Stanley responded that killing Smith at that point was a "mercy killing.”

. Patricia Stanfield, who lived nearby, testified that she recalled seeing a red-colored older-model Chevrolet pick-up truck in the area on Saturday. Several days later, after local television news stations showed a photograph of the truck, Stanfield's son spoke with the police and informed them that a similar truck had been near their house on or around Saturday.

. Stanley is Mitchell’s stepfather.

. Mitchell testified that she knew that her mother was a drug addict and that she often bought OxyContin pills from Smith. Mitchell had witnessed her mother and grandmother use drugs on occasion.

. Dot turned the cooler over to the police shortly after Stanley and Shelly turned themselves in to the authorities. The cooler was introduced into evidence. However, the testimony revealed that the Stanleys’ cell phones were never located.

. Patterson testified that Shelly told him, more than once, in Stanley’s presence, that she planned to rob Smith because she knew he carried a lot of cash and pills. Patterson never told Smith about Shelly’s statements because he did not believe they were credible. At trial, Shelly denied ever discussing with Patterson any plans to rob Smith. Shelly also testified that Stanley gave her Patterson’s shotgun to sell to Smith.

. A BOLO is a "be-on-the-lookout” message issued by law enforcement.

. The evidence indicated that Dot was present because she had actually rented the apartment from Swanie, and paid the rental amount of $150 a month, although Stanley and Shelly lived there. Dot had agreed to accompany the Berryhills that day and to take the dogs with her.

.The testimony was conflicting as to whether Ronald requested that Officer Setliff accompany him into the apartment. Ronald testified that Officer Setliff asked him if it would be okay if he entered the apartment with him. Ronald indicated that he agreed and stated that Officer Sediff did not open the door nor tell him to open the door. (R. 471.) On cross-examination, Ronald explained that *249 he told Officer Setliff that he “didn’t care one way or the other" whether Officer Setliff entered the Stanleys' apartment with him. (R. 491.) Officer Setliff testified that he did ask Ronald if he could enter the apartment with him and that he did not inform him that he needed to enter the apartment. (R. 500.) During his testimony at the suppression hearing and later at trial, Officer Setliff indicated that Ronald requested that he enter the Stan-leys’ apartment with him. (R. 102, 108-09, 113, 501.) At the suppression hearing, Capt. Heffernan testified that if a landlord requests assistance with a rented premise, if an officer is available, the officer provides that assistance.

. The evidence was inconsistent regarding whether Capt. Heffernan drove to the apartment after Officer Setliffs first or second telephone call to him.

. Shelly testified that she had wanted to turn herself in, but Stanley had refused to turn himself in.

. Janice Berryhill identified herself as Janice Harbin at trial. (R. 1010.) For purposes of this opinion, we refer to her as Janice Berry-hill.

. "In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”

. These two jurors were struck for cause because they indicated that "under no circumstance could [they] impose the death penalty.” (R. 318-19, 324-25, 332-35.)

. Juror no. 58 also indicated the he had read the article about Stanley's trial on the mom-ing jury-selection began. He, however, served as an alternate.

. Stanley also presents this identical claim when arguing that the prosecutor engaged in impropriety. (Stanley’s brief, Issue VII, A., pp. 70-72.)

. See supra note 12.

. Because we have determined that the initial entry was a private search and have found no error in the trial court's denial of the motion to suppress, we need not address whether Dot had the authority to consent to the search of her son and daughter-in-law's apartment.

. Rule 9.3(a), Ala. R.Crim. P., requires that all witnesses who testify on the State’s behalf be removed from the courtroom. See also Rule 615, Ala. R. Evid.

. We note originally there were over 300 photographs. The prosecution introduced approximately 71 photographs, all of which were admitted into evidence.

. Stanley did not object to the admission into evidence of the letters. His counsel did, however, object to the prosecution’s characterization of a statement in the second letter, dated July 12, 2005, about which Stanley now complains on appeal. (State’s Exhibits 55 and 56, C. 369-79; R. 783, 786.)

. We note that the State gave the defense notice of the 404(b) acts it intended to use. The letters, however, were not included in its notice. The prosecution did provide the defense with copies of the letters prior to trial.

. Although the better course would have been for the trial court to give a limiting instruction immediately after the complained-of characterization by the prosecutor, Stanley did not ask for such an instruction, and, as this Court has said, the failure to give such an instruction generally is plain error only in those cases where the defendant testified and the evidence of prior misconduct is being admitted for impeachment purposes and not as substantive evidence of guilt:
" 'In Ex parte Minor, 780 So.2d 796 (Ala. 2000), the Alabama Supreme Court held that it was plain error where the trial court failed to sua sponte instruct the jury that evidence of the defendant's prior convictions introduced for impeachment purposes could not be considered as substantive evidence of the defendant's guilt of the crime for which he was now on trial. See also Snyder v. State, 893 So.2d
482 (Ala.2001). However, the holdings in Minor and Snyder have been repeatedly held to apply only to those cases in which the defendant testified and the evidence of prior convictions was admitted for impeachment purposes, and then on a case-by-case basis. See, e.g., Johnson v. State, 120 So.[3]d 1119 (Ala.2006); Ex parte Martin, 931 So.2d 759 (Ala.2004); Key v. State, 891 So.2d 353 (Ala.Crim. App.2002).' ”
“Floyd v. State, [Ms. CR-05-0935, September 28, 2007] So.3d , (Ala. Crim.App.2007).”
Gobble v. State, 104 So.3d at 954.
We note that the trial court gave an instruction during its oral charge to the jury directing jurors that "what the lawyers have said, both for the State and for the Defendant, is not any evidence in the case.what they say is not evidence.” (R. 1067-68.)

. We note that although Stanley cites Ex parte Minor, 780 So.2d 796 (Ala.2000), and *281 other cases in support of his claim, the Alabama Supreme Court in Johnson v. State, 120 So.3d at 1126-27, distinguished these cases from the present situation, because in those cases, the prior-conviction evidence was being introduced to impeach the defendant’s credibility.

. Rule 901(b)(2), Ala. R. Evid., is identical to its federal counterpart, Rule 901(b), Fed. R.Evid. ''[C]ases interpreting the Federal Rules of Evidence will constitute authority for construction of the Alabama Rules of Evidence.” Advisory Committee’s Notes, Rule 102, Ala. R. Evid. See also Ex parte Billups, 86 So.3d 1079, 1085 n. 4 (Ala.2010).

. Defendant’s exhibits no. 7 and no. 8. (C. 420-40.)

. We note that Stanley’s counsel points to quotations from a letter that Shelly wrote her husband while they were both in prison. Specifically, he references where she emphasized her fear of the death penalty: "I’m scared. I don't want to die. I’ll be the second woman ever put to death here.” (C. 418.) “I’m just scared. I had a bad breakdown today. I threw up 3 times, couldn’t eat, and now can’t sleep.” (C. 419.) These quotes fail to demonstrate that Shelly’s plea was not freely and voluntarily given. See, e.g., Paulson and Morrison.

. During deliberations, the jury requested to be instructed again on the elements of capital murder. The trial court gave it the capital-murder instruction and the felony-murder instruction a second time. (R. 1089-98.)

. Stanley cited Guthrie, v. State, 616 So.2d 914, 932 (Ala.Crim.App.1993), in support of this claim. However, the complained-of argument occurred in the guilt-phase closing argument. Guthrie addressed prosecutorial misconduct during the sentencing phase of a trial.

. See Part XIII, supra, with regard to the specific findings that the murder was "especially heinous, atrocious, or cruel compared to other capital offenses.” § 13A-5-49(8), Ala.Code 1975.

. Section 13A-5-47(d) and (e) provide:
"(d) Based upon the evidence presented at trial, the evidence presented during the sentence hearing, and the pre-sentence investigation report and any evidence submitted in connection with it, the trial court shall enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, each mitigating circumstance enumerated in Section 13A-5-51, and any additional mitigating circumstances offered pursuant to Section 13A-5-
52. The trial court shall also enter written findings of facts summarizing the crime and the defendant’s participation in it.
"(e) In deciding upon the sentence, the trial court shall determine whether the aggravating circumstances it finds to exist outweigh the mitigating circumstances it finds to exist, and in doing so the trial court shall consider the recommendation of the *325 jury contained in its advisory verdict, unless such a verdict has been waived pursuant to Section 13A-5-46(a) or 13A-5~46(g). While the jury’s recommendation concerning sentence shall be given consideration, it is not binding upon the court.”